1  STEPHAN C. VOLKER (CSB #63093)                                      10.582.02
   ALEXIS E. KRIEG (CSB # 254548)
2  DANIEL GARRETT-STEINMAN (CSB #269146)
   LAW OFFICES OF STEPHAN C. VOLKER
3  436 14th Street, Suite 1300
   Oakland, California 94612
4  Tel:    510/496-0600
   Fax:    510/496-1366
5
   Attorneys for Plaintiffs
6  NORTH COAST RIVERS ALLIANCE, CALIFORNIA
   SPORTFISHING PROTECTION ALLIANCE, PACIFIC
7  COAST FEDERATION OF FISHERMEN'S
   ASSOCIATIONS, SAN FRANCISCO CRAB BOAT
8  OWNERS ASSOCIATION, INC., and INSTITUTE
   FOR FISHERIES RESOURCES
9

10                  IN THE UNITED STATES DISTRICT COURT

11               FOR THE EASTERN DISTRICT OF CALIFORNIA

12                           FRESNO DIVISION

13  NORTH COAST RIVERS ALLIANCE,          )  Civ. No.
    CALIFORNIA SPORTFISHING               )
14  PROTECTION ALLIANCE, PACIFIC          )  **COMPLAINT FOR DECLARATORY**
    COAST FEDERATION OF FISHERMEN'S       )  **AND INJUNCTIVE RELIEF**
15  ASSOCIATIONS, SAN FRANCISCO CRAB      )
    BOAT OWNERS ASSOCIATION, INC., and    )
16  INSTITUTE FOR FISHERIES RESOURCES,    )
                                          )
17              Plaintiffs,               )
                                          )
18        v.                              )
                                          )
19  UNITED STATES DEPARTMENT OF THE       )
    INTERIOR, and UNITED STATES BUREAU    )
20  OF RECLAMATION,                       )
                                          )
21              Defendants.               )
                                          )
22  ─────────────────────────────────────)

23                          **INTRODUCTION**

24        1.      Plaintiffs NORTH COAST RIVERS ALLIANCE, CALIFORNIA

25  SPORTFISHING PROTECTION ALLIANCE, PACIFIC COAST FEDERATION OF

26  FISHERMEN'S ASSOCIATIONS, SAN FRANCISCO CRAB BOAT OWNERS

27  ASSOCIATION, INC., and INSTITUTE FOR FISHERIES RESOURCES (collectively,

28  "plaintiffs") hereby sue defendants UNITED STATES DEPARTMENT OF THE INTERIOR

1 and UNITED STATES BUREAU OF RECLAMATION (collectively, "Reclamation") for

2 violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. section 4321 et seq.

3     2.    Plaintiffs seek from this Court an order and judgment overturning Reclamation's

4 Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") adopted

5 for six water service contracts.  Reclamation calls this project the *Central Valley Project*

6 *Interim Renewal Contract for Westlands Water District, Santa Clara Valley Water District, and*

7 *Pajaro Valley Water Management Agency 2016-2018* ("interim contracts" or "Project").  The

8 interim contracts authorize two years of water delivery from Reclamation's Central Valley

9 Project ("CVP") to Pajaro Valley Water Management Agency, Santa Clara Valley Water

10 District, and Westlands Water District (collectively, the "interim contractors").

11     3.    The EA and FONSI violate NEPA because (1) they assume water deliveries will

12 continue even if the Project is disapproved; (2) they incorrectly state that Reclamation has no

13 authority to reduce or suspend water deliveries, and as a result analyze an unreasonably narrow

14 range of alternatives; (3) they ignore the environmental impacts that approval of the interim

15 contracts will have on lands outside the contractors' service area, including the Bay-Delta; (4)

16 they ignore the impacts that approval of the interim contracts will have on the California least

17 tern and giant garter snake; and (5) they ignore the cumulative impacts of the series of interim

18 contract approvals Reclamation continues to issue.  As a consequence of these erroneous

19 assumptions, omissions and mischaracterizations, the EA and FONSI erroneously conclude that

20 water deliveries under the interim contracts will have *no effect on the environment*.

21     4.    Due to the foregoing errors and omissions, Reclamation's EA process was

22 reduced to a meaningless charade, devoid of any effective environmental review of the interim

23 contracts' adverse effects, and of alternatives and mitigations that would avoid or reduce those

24 effects.  Plaintiffs seek speedy adjudication of this matter to address and reverse the

25 accelerating decline of fish and wildlife caused by the water diversions authorized by the

26 interim contracts and to curtail the worsening contamination of ground and surface water

27 resources in the Central Valley resulting from the harmful irrigation practices that these

28 contracts perpetuate.  Reclamation must start anew by re-assessing the demand underlying the

1  interim contracts, conducting meaningful studies of the impacts of the water deliveries they

2  authorized, and analyzing the results of those studies in a thorough environmental review that

3  considers alternatives and mitigation measures that would avoid or reduce such impacts.

4          5.      Adding insult to injury, Reclamation is using these interim contracts to avoid

5  preparation of the long-overdue Environmental Impact Statement ("EIS") that would otherwise

6  be required by NEPA for approving long-term contracts under the Central Valley Project

7  Improvement Act ("CVPIA"), Public Law No. 102-575, 108 Stat. 4600, Title XXXIV (1992).

8  Congress required Reclamation to conduct a thorough environmental review of the impacts of

9  entering into long-term contracts and then to enter into those contracts with appropriate

10  mitigations based on that comprehensive review.  Twenty years later, Reclamation still has not

11  yet completed this task, relying instead on repeated renewals of the interim contracts without

12  adequate environmental review.  NEPA does not authorize Reclamation to evade meaningful

13  environmental review by entering into an assembly-line cycle of interim contracts based on

14  meaningless EAs that ignore those contracts' significant individual and cumulative

15  environmental impacts.

16          6.      In sum,  Reclamation's continued destructive water exports from the Delta under

17  a seemingly endless cycle of interim contracts lacking any meaningful environmental review

18  violates NEPA.  This Court should reject  Reclamation's erroneous claims of impotence to

19  conduct an adequate environmental review of the interim contracts and rectify Reclamation's

20  error by setting aside its deficient EA and unlawful FONSI and ordering Reclamation to comply

21  with NEPA.

22                          **JURISDICTION AND VENUE**

23          7.      The Court has jurisdiction over this action under 28 U.S.C. sections 1331 (federal

24  question), 1337 (regulation of commerce), 1346 (United States as defendant), 1361 (mandamus

25  against an officer of the United States), 2201 (declaratory judgment), and 2202 (injunctive

26  relief), and under the Administrative Procedure Act ("APA"), 5 U.S.C. sections 701-706,

27  because (1) the action arises under the APA and NEPA; (2) Reclamation is an agency of the

28  United States government and the individual defendants are sued in their official capacities as

1  officers of the United States; (3) the action seeks a declaratory judgment that Reclamation's EA

2  and FONSI were inadequate; and (4) the action also seeks injunctive relief requiring

3  Reclamation to comply with the requirements of NEPA.

4      8.    Venue is proper in this judicial district pursuant to 28 U.S.C. sections 1391(b)(2)

5  and 1391(e)(2) because a substantial part of the events giving rise to plaintiffs' claims occurred,

6  and a substantial part of the property that is the subject of the action is situated, in this judicial

7  district.

8      9.    The parties have an actual, justiciable controversy.  Plaintiffs are entitled to a

9  declaration of their rights and of Reclamation's obligations, and further are entitled to

10  injunctive relief because of the facts and circumstances set forth herein.

11      10.   This Complaint is timely filed within the applicable six-year statute of limitations

12  set forth in 28 U.S.C. section 2401(a).  Reclamation's approval of the interim contracts

13  occurred on February 29, 2016.

14      11.   Plaintiffs have standing to assert their claims because they suffer tangible harm

15  from Reclamation's violations of law as alleged herein.  Plaintiffs' interests in restoring water

16  quality and quantity and dependent fish and wildlife species in the Bay-Delta and its watershed

17  have been and will continue be harmed by the activities permitted by the contracts.  The

18  diversion and consumptive use of vast quantities of freshwater from the Bay-Delta pursuant to

19  the interim contracts not only directly harms fish through entrainment at the pumping plants and

20  reduced freshwater flows in the Delta, but also alters the hydrologic flow patterns in the Delta,

21  adversely affects the Delta's salinity barrier, causes contamination of the San Joaquin River and

22  other Central Valley water bodies, and pollutes water in groundwater basins underlying much of

23  the Central Valley, among other environmental impacts.  A ruling from this Court requiring

24  Reclamation to conduct a thorough environmental review of these impacts would redress

25  plaintiffs' harms, at least in part, because Reclamation would be required to both discuss less

26  harmful alternatives to the interim contracts and consider mitigation measures to address the

27  harms they cause.

28      12.   Plaintiffs have suffered and are suffering procedural injuries due to Reclamation's

1    failure to fulfill its NEPA duties.  As explained in *Hall v. Norton*, "plaintiff[s] seeking to

2    enforce a procedural requirement the disregard of which could impair a separate concrete

3    interest of theirs, can establish standing without meeting all the normal standards for

4    redressability and immediacy.  Instead, they need only establish the reasonable probability of

5    the challenged action's threat to [their] concrete interest."  266 F.3d 969, 975 (9th Cir. 2001)

6    (quotation marks and citations omitted); *see also Center for Food Safety v. Vilsack*, 636 F.3d

7    1166, 1172 (9th Cir. 2011) ("Once a plaintiff has established an injury in fact under NEPA, the

8    causation and redressability requirements are relaxed").  Plaintiffs' interests in the preservation

9    and restoration of water quality and quantity and dependent fish and wildlife species in the Bay-

10   Delta and its watershed are just such "concrete interests."  *Hall v. Norton*, 266 F.3d at 975.

11          13.     Plaintiffs have associational standing because (1) their members would have

12   standing to sue in their own right to seek redress for the injuries outlined above; (2) the interests

13   at stake are germane to plaintiffs' purposes, as detailed below; and (3) neither the claims

14   asserted nor the relief requested requires the participation of plaintiffs' members in this lawsuit.

15   *Western Watersheds Proj. v. Kraayenbrink*, 632 F.2d 472, 482-485 (9th Cir. 2010).

16          14.     Plaintiffs have adequately exhausted available administrative remedies.

17   Moreover, the exhaustion requirement is inapplicable, because Reclamation had independent

18   knowledge of the legal defects described below, and because those defects are procedural in

19   nature. ʻ*Ilioʻulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1092-1093 (9th Cir. 2006).

20                                            **PARTIES**

21          15.     Plaintiff PACIFIC COAST FEDERATION OF FISHERMEN'S

22   ASSOCIATIONS ("PCFFA") is a non-profit, tax-exempt corporation which represents a

23   coalition of 14 fishermen's organizations in California, Oregon, and Washington with a

24   combined membership of more than 750 fishing men and women.  Each of its members

25   depends on the ocean's fishes for his or her livelihood.  PCFFA has a vital and direct interest in

26   Reclamation's environmental review and management of the CVP because its operation directly

27   affects water quality and quantity in the Central Valley and Bay-Delta and the health and

28   population of anadromous fishes including salmon and steelhead on which PCFFA's members

1    rely for their sustainable harvest of the ocean's fishes.  The interests of PCFFA and its members

2    have been, are being, and unless the relief requested herein is granted, will be adversely

3    affected by Reclamation's approval of the interim contracts without proper NEPA review, and

4    by the interim contracts' consequent unexamined and inadequately mitigated impacts on the

5    environment.

6         16.    Plaintiff SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION, INC.

7    ("Crab Boat Owners Association") is a California corporation whose members rely on a

8    sustainable harvest of crustaceans and fishes from San Francisco Bay and the Pacific Ocean for

9    their livelihoods.  The Crab Boat Owners Association has been protecting the rich seafood

10   fisheries of San Francisco Bay and the Pacific Ocean since 1913.  The Crab Boat Owners

11   Association's members operate small, family owned fishing boats that catch Dungeness crab,

12   wild California king salmon, herring, and many other fish species that live in the cold waters of

13   San Francisco Bay and the Pacific Ocean.  Its members are also actively involved in community

14   education, and fishing resource advocacy to ensure that the rich heritage of commercial fishing

15   for Bay Area residents will survive for future generations.  The interests of the Crab Boat

16   Owners Association and its members have been, are being, and unless the relief requested

17   herein is granted, will continue to be adversely affected and injured by Reclamation's approval

18   of the interim contracts without proper NEPA review, and by the interim contracts' consequent

19   unexamined and inadequately mitigated impacts on the environment.

20        17.    Plaintiff NORTH COAST RIVERS ALLIANCE ("NCRA") is a non-profit

21   unincorporated association with members throughout Northern California.  NCRA was formed

22   for the purpose of protecting California's rivers and their watersheds from the adverse effects of

23   excessive water diversions, ill-planned urban development, harmful resource extraction,

24   pollution, and other forms of degradation.  Its members use and enjoy California's rivers and

25   watersheds for recreational, aesthetic, scientific study, and related non-consumptive uses.  The

26   interests of NCRA and its members have been, are being, and unless the relief requested herein

27   is granted, will be adversely affected and injured by Reclamation's approval of the interim

28   contracts without proper NEPA review, and by the Project's consequent unexamined and

1    inadequately mitigated impacts on the environment.

2        18.    Plaintiff INSTITUTE FOR FISHERIES RESOURCES ("IFR") is a non-profit

3    public benefit corporation headquartered in San Francisco, California.  Since 1993, IFR has

4    engaged in fishery research and conservation activities for working fishing men and women.

5    IFR works on conservation projects and policy issues at the regional, national and international

6    levels, with a particular focus on salmon protection and water diversions.  The interests of IFR

7    and its members have been, are being, and unless the relief requested herein is granted, will be

8    adversely affected and injured by Reclamation's approval of the interim contracts without

9    proper NEPA review, and by the Project's consequent unexamined and inadequately mitigated

10   impacts on the environment.

11       19.    Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA")

12   is a non-profit corporation organized under the laws of the State of California.  CSPA has

13   thousands of members who reside and recreate throughout California.  CSPA's members are

14   citizens who, in addition to being duly licensed sport fishing anglers, are interested in the

15   preservation and enhancement of California's public trust fishery resources and vigorous

16   enforcement of California's environmental laws.  CSPA members have been involved for

17   decades in public education and advocacy efforts to protect and restore the public trust

18   resources of California's rivers.  CSPA members use California's rivers  and the Bay-Delta for

19   recreation, scientific study and aesthetic enjoyment.  The interests of CSPA and its members

20   have been, are being, and unless the relief requested herein is granted, will be adversely

21   affected and injured by Reclamation's approval of the interim contracts without proper NEPA

22   review, and by the Project's consequent unexamined and inadequately mitigated impacts on the

23   environment.

24       20.    Plaintiffs' injuries are fairly tracable to Reclamation's actions.  These injuries are

25   actual, concrete, and imminent and cannot be adequately remedied by money damages.

26   Plaintiffs have no plain, speedy, or adequate remedy at law.  Accordingly, plaintiffs seek

27   injunctive, mandamus and declaratory relief from this Court to rectify Reclamation's unlawful

28   acts and thereby to address plaintiffs' injuries.

1    21.    Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the

2  agency of the United States charged with managing the Central Valley Project ("CVP").  The

3  United States Department of the Interior approved the interim contracts challenged in this

4  litigation without an adequate environmental review.

5    22.    Defendant UNITED STATES BUREAU OF RECLAMATION (individually, and

6  also collectively with the United States Department of the Interior, "Reclamation") is the

7  federal agency within the United States Department of the Interior charged with managing the

8  CVP.  Reclamation approved the interim contracts challenged in this litigation without adequate

9  environmental review.

10                              **BACKGROUND**

11                        **I.    Environmental Setting**

12    23.    Since passage of the Central Valley Project Improvement Act ("CVPIA"), Public

13  Law No. 102-575, 108 Stat. 4600, Title XXXIV in 1992, the Sacramento River winter and

14  spring run Chinook salmon, Central Valley steelhead, North American green sturgeon and Delta

15  smelt have been driven perilously close to extinction.  Winter run Chinook salmon were

16  initially listed as a federally threatened species in 1990 (55 Fed. Reg 46515), and then due to

17  continuing population declines, declared endangered in 2005 (70 Fed. Reg. 37160).  Their

18  critical habitat in the Sacramento River and its tributaries was designated in 1993.  58 Fed Reg.

19  33212.  Spring run Chinook salmon were listed as threatened, and their critical habitat

20  designated, in 2005.  70 Fed. Reg. 37160, 52488.  Central Valley steelhead were listed as

21  threatened in 2000 (65 Fed. Reg. 52084) and their critical habitat was designated in 2005 (70

22  Fed. Reg. 52488).  The Southern Distinct Population Segment ("DPS") of North American

23  green sturgeon was listed at threatened in 2006 (71 Fed. Reg. 17757) and their critical habitat

24  was designated in 2008 (73 Fed. Reg. 52084).  Delta smelt were listed as endangered in 1993

25  (58 Fed. Reg. 12854) and their critical habitat was designated in 1994 (59 Fed. Reg. 65256).

26  Many species of fish indigenous to the Delta have already gone extinct; just 12 indigenous

27  species remain.  Habitat for the Sacramento River winter and spring run Chinook salmon,

28  Central Valley steelhead, Southern DPS of the green sturgeon, and the Delta smelt has been

1   increasingly degraded over the last several decades by excessive Delta water exports by the

2   CVP and the State Water Project ("SWP").  Those exports decrease freshwater flows, and

3   increase salinity and the concentration of herbicides, pesticides and toxic agricultural runoff, in

4   Central Valley water bodies including the Bay-Delta.

5        24.     On June 4, 2009, pursuant to its consultation duties under section 7 of the

6   Endangered Species Act ("ESA"), 16 U.S.C. section 1536, the National Marine Fisheries

7   Service ("NMFS") informed Reclamation that:

8        Based on the best available scientific and commercial information, NMFS' final

9        [Biological] Opinion concludes that the CVP/SWP [State Water Project]

10       operations are *likely to jeopardize* the continued existence of Federally listed:

11       •     Endangered Sacramento River winter-run Chinook salmon (*Oncorhynchus*

12             *tshawytscha*),

13       •     Threatened Central Valley spring-run Chinook salmon (*O. tshawytscha*),

14       •     Threatened Central Valley steelhead (*O. mykiss*),

15       •     Threatened Southern Distinct Population Segment (DPS) of North American

16             green sturgeon (*Acipenser medirostris*), and

17       •     Southern Resident killer whales (*Orcinus orca*) [who feed on the salmon].

18             NMFS also concludes that the proposed action is *likely to destroy or adversely*

19             *modify* the  designated critical habitats of

20       •     Central Valley spring-run Chinook salmon,

21       •     Central Valley spring-run Chinook salmon, and

22       •     Central Valley steelhead, and

23       •     proposed critical habitat for the Southern DPS of North American green

24             sturgeon.

25   NMFS' letter to defendant Donald R. Glaser transmitting final Biological Opinion on

26   CVP/SWP operations dated June 4, 2009, at pages 1-2 (emphasis added).

27        25.     On December 15, 2008, pursuant to its consultation duties under section 7 of the

28   ESA, the United States Fish and Wildlife Service ("FWS") informed Reclamation that "the

coordinated operations of the CVP and SWP, as proposed, are *likely to jeopardize the continued existence of the delta smelt*." FWS Biological Opinion on Proposed Coordinated Operations of the CVP and SWP, dated December 15, 2008, at page 276 (emphasis added). FWS further concluded that coordinated operation of the CVP and SWP is "likely to adversely modify delta smelt critical habitat." *Id.* at 278.

26.     The Sacramento River winter and spring run Chinook salmon, Central Valley steelhead, Southern DPS of the green sturgeon and Delta smelt are all indicator species for the health of the Bay-Delta ecosystem and for the other special status fish species that inhabit this fragile estuary. These species are put at further risk by Reclamation's continuing failure to conduct a meaningful analysis of the environmental impacts of the CVP's interim water contracts. Other special status Delta species impacted by Reclamation's lack of environmental analysis include the Sacramento splittail, longfin smelt, and white sturgeon.

27.     When the water delivered by Reclamation is used for irrigation, it leaches pollutants from the soil and contaminates ground and surface water resources in the San Joaquin Valley. The contaminated subsurface and surface drainage water discharges pollutants including selenium, arsenic, boron, mercury, uranium, chromium, molybdenum and sodium sulfates into Central Valley rivers and ultimately the Bay-Delta. This pollution degrades the Bay-Delta's water quality and exacerbates the existing threats to its  endangered and threatened fish species, including the Delta smelt, salmon, steelhead, and sturgeon. The contractors' polluted discharge is also drawn into drinking water supplies through the CVP and SWP, thereby degrading drinking water for 20 million Californians.

28.     Reclamation's approval of the interim contracts also harms the California least tern and the giant garter snake. FWS concluded in its Biological Opinion for the interim contracts that "the proposed project may affect, and is likely to adversely affect the California least tern and giant garter snake." Appendix E to Final EA at 1. FWS concluded that both the California least tern and the giant garter snake are likely to be harmed by exposure to polluted drainwater from agricultural users. *Id.* at 19, 21. While FWS stated that the least tern population in the area "is expected to be low," FWS also stated that it "anticipate[s] biological

1   effects similar to those observed at Kesterson Reservoir in the 1980s could occur to least terns

2   if exposed to drainage water originating from [Westlands Water District]." *Id.* at 19.  Kesterson

3   received drainage water containing high levels of selenium, and as a result "[a]bout 40 percent

4   of nests of ducks and other waterbirds contained one or more dead or deformed embryos and

5   four species of waterbirds . . . *experienced complete reproductive failure*." *Id.* (emphasis

6   added).

7                                   **II.    CVPIA**

8          29.    The CVPIA was enacted by Congress on October 30, 1992, for the express

9   purpose of ameliorating the adverse environmental impacts that result from CVP operations.

10   CVPIA, *supra*, §§ 3402(a)-(b), 3406(b).  In order "[t]o address impacts of the Central Valley

11   Project on fish, wildlife and associated habitat," the CVPIA requires environmental review –

12   including the preparation of an Environmental Impact Statement ("EIS") under NEPA – before

13   any long-term water service contract can be renewed by Reclamation.  CVPIA §§ 3402(a),

14   3404(c)(1).  Despite the fact that Congress enacted the CVPIA almost 25 years ago,

15   Reclamation has not yet completed its required NEPA review of the long-term contracts for the

16   West San Joaquin and San Luis Unit contractors.  Instead, it has repeatedly issued short-term,

17   interim contract renewals devoid of adequate environmental review in a series of nearly

18   identical, meaningless EAs that ignore these interim contracts' significant environmental

19   impacts, prompting plaintiffs' filing of this action.

20                            **III.    Short-Term Contract EA**

21          30.    The short-term, interim contracts were authorized by the CVPIA to bridge the

22   gaps between expiration of previous long-term contracts and the completion of environmental

23   review for, and finalization of, the new long-term contracts.  The informed approval – or

24   disapproval – of these short-term, interim contracts is within the discretion of Reclamation.

25   CVPIA § 3404(c)(1).  Specifically, the CVPIA states:

26          (c) Renewal of Existing Long-Term Contracts. – Notwithstanding the provisions of the

27          Act of July 2, 1956 (70 Stat. 483), the Secretary *shall,* upon request, renew any existing

28          long-term repayment or water service contract for the delivery of water from the Central

Valley Project for a period of 25 years and may renew such contracts for successive

periods of up to 25 years each.

> (1) No such renewals shall be authorized until appropriate environmental review,
> including the preparation of the environmental impact statement required in
> section 3409 of this title, has been completed.  Contracts which expire prior to the
> completion of the environmental impact statement required by section 3409 *may*
> *be renewed for an interim period* not to exceed three years in length, and for
> successive interim periods of not more than two years in length, until the
> environmental impact statement required by section 3409 has been finally
> completed, at which time such interim renewal contracts shall be eligible for
> long-term renewal as provided above. . . .

CVPIA § 3404(c)(1) (emphasis added).  Thus, under the CVPIA's plain language, Reclamation
lacks discretion to disapprove the initial long-term contract renewals, but retains full discretion
to disapprove or alter the interim contracts, which "*may* be renewed for an interim period." *Id*.
(emphasis added).

31.     On or about February 29, 2016, Reclamation issued a FONSI and EA covering
the Project.  Based on that FONSI and EA, Reclamation approved six interim renewal contracts,
including contracts with the Pajaro Valley Water Management Agency, Santa Clara Valley
Water District, and Westlands Water District.

32.     In its EA for the interim contracts, Reclamation ignored the CVPIA language
granting it discretion to disapprove the interim contracts and claimed that it lacked any
discretion to reject the contracts or even to reduce deliveries.  Based on this faulty premise, the
EA analyzes only two alternatives, the Proposed Action and the No Action Alternative, both of
which continue water diversions and deliveries *in the same amounts*.  Because the EA considers
continued water delivery to be the environmental baseline, it concludes that the signing of the
interim contracts will have no effect on the environment and fails to propose any mitigation
measures for the extensive environmental impacts that continued water service will cause.  The
EA also lacks any substantive analysis of the interim contracts' impacts on the giant garter

1  snake and the California least tern, despite the fact that FWS concluded that approval of the

2  interim contracts is likely to adversely affect these species.  *Compare* EA 36 (no mention of

3  either species under either "Migratory Birds" or "Federally-listed Species" headings) *with* EA

4  Appendix E at 1 ("the proposed project may affect, and is likely to adversely affect the

5  California least tern and giant garter snake").

6       33.    The EA improperly limits its Study Area for the interim contracts to their delivery

7  or service areas.  By doing so, Reclamation ignored the interim contracts' principal

8  environmental impacts, including their water diversions' impacts on the CVP's source

9  watersheds – the Bay-Delta and its tributaries including the American, Trinity, Sacramento and

10  San Joaquin  rivers – and their imperiled fish and wildlife.

11                   **IV.**    **Long-Term Contract Environmental Review**

12       34.    The CVPIA required Reclamation to expeditiously conduct environmental review

13  of the long-term contract renewals.  First, the CVPIA states:

14  > Not later than three years after the date of enactment of this title, the Secretary
15  > shall prepare and complete a programmatic environmental impact statement
   > pursuant to the National Environmental Policy Act analyzing the direct and
16  > indirect impacts and benefits of implementing this title, including all fish, wildlife,
   > and habitat restoration actions and the potential renewal of all existing Central
17  > Valley Project water contracts. Such statement shall consider impacts and benefits
   > within the Sacramento, San Joaquin, and Trinity River basins, and the San
   > Francisco Bay/Sacramento-San Joaquin River Delta Estuary.
18

19  CVPIA § 3409.  The CVPIA also requires Reclamation to undertake "appropriate

20  environmental review" before entering into any long-term contract renewals.  CVPIA §

21  3404(c)(1).

22       35.    Reclamation completed a Programmatic Environmental Impact Statement

23  ("PEIS") in October 1999, four years after the required statutory deadline.  In it, Reclamation

24  generally reviewed the impacts of implementing various aspects of the CVPIA on a regional

25  level, but did not address the environmental impacts of the long-term contracts.  Thereafter,

26  Reclamation began the process of preparing project-level EISs for long-term contract renewal.

27  Accordingly, in September 2005, Reclamation prepared and released a Draft EIS for long-term

28  contract renewals for the West San Joaquin Division and San Luis Unit contractors.

36.     Since 2005, Reclamation has done nothing to complete its environmental review of the long-term contracts despite Congress' clear intent to require Reclamation to conduct "appropriate environmental review" for the long-term contracts in an expeditious manner. CVPIA § 3404(c)(1).  Instead Reclamation has evaded this mandated review by relying on multiple interim contracts such as those challenged here.

## FIRST CLAIM FOR RELIEF

(**Violation of the National Environmental Policy Act – Inadequate EA**)

(Against All Defendants)

37.     The paragraphs set forth above are realleged and incorporated herein by reference.

38.     NEPA requires the preparation of an EIS if a proposed major federal action has the potential to significantly affect the quality of the human environment.  42 U.S.C. § 4332. Even if a project's risks of environmental harm are uncertain, if they are potentially significant, an EIS is required.  *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975).

39.     However, a proper finding by an agency that a proposed action will produce no significant impact on the environment relieves the agency of its duty to prepare an EIS.  40 C.F.R. §1501.4(e).  But an agency cannot simply issue a conclusory statement claiming without factual analysis the absence of significant impacts.  Instead, the agency must support each finding of "no significant impact" with a "concise public document," known as an environmental assessment, or EA.  40 C.F.R. § 1501.4(a)-(b), 1508.9.  The EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1) (emphasis added).  Although an EA need not be as thorough as an EIS, the agency must still conduct a "comprehensive assessment of the expected effects of a proposed action" to determine if that action poses potentially significant environmental impacts.  *Foundation on Economic Trends v. Weinberger*, 610 F.Supp. 829, 837 (D.C.D.C. 1985) (quoting *Lower Alloways Creek Tp. v. Public Service Elec.*, 687 F.2d 732, 740 (3rd Cir. 1982)).  Reclamation failed to do so here.

40.     Reclamation based its EA and FONSI for the interim contracts on the false

1   premise that in renewing the interim contracts it had no discretion to reduce or eliminate water

2   deliveries.  The plain language of the CVPIA – with which Reclamation attempts to support this

3   false premise – demonstrates to the contrary that Reclamation's approval of the interim

4   contracts is discretionary and therefore a full review of the environmental impacts of the interim

5   contract renewals is required by NEPA.

6        41.    Further, Reclamation's claimed lack of discretion is based on an outdated water

7   needs assessment, which was prepared in 2006.  Since 2006, the contractors' water needs have

8   changed significantly, based in part on retirement of farmland plagued by drainage and

9   groundwater contamination problems.  Without an accurate and current picture of the

10  contractors' current water demands, Reclamation's analysis of the Project's purpose and need

11  violates NEPA.  Reclamation's purported justification for its claimed lack of discretion to

12  consider alternatives including reducing the contract amounts or conditioning their delivery on

13  improved farming practices is factually and legally unsupportable.

14       42.    Reclamation's claim that it lacked discretion to disapprove the interim contracts

15  or reduce their deliveries caused it to ignore and trivialize the interim contracts' environmental

16  impacts, and to overlook the alternatives that would avoid or reduce these impacts, rendering its

17  EA an empty exercise.  The EA's defects include the following errors and omissions, among

18  others:

19       a.    The EA falsely states that Reclamation has no discretion to reject the interim

20            contracts, even though the CVPIA expressly grants Reclamation discretion to

21            reject the interim contracts.  It incorrectly assumes that the continued delivery of

22            water in the *same* quantities is the appropriate reference point against which to

23            measure the interim contracts' impacts.  This assumption reduced the EA to a

24            meaningless charade:  the EA compares the project *to itself* and concludes no

25            impacts would result, rather than comparing the environmental impacts of

26            Reclamation's proposal to divert and deliver massive quantities of water with the

27            reduced impacts of halting or reducing those diversions and deliveries.  This

28            deficiency prevented the EA from "foster[ing] both informed decision-making

1    and informed public participation," as required.  *Native Ecosystems Council v.*

2    *U.S. Forest Service*, 418 F.3d 953, 960 (9th Cir. 2005).

3    b.   The EA's narrow statement of purpose and need – to extend expiring past interim

4         contracts – is inadequate, because it is based on Reclamation's erroneous premise

5         that it had no discretion to consider a broader purpose and range of options.  An

6         EA's purpose and need statement is fatally flawed if, as here, it is based on the

7         agency's erroneous premise that "it had no discretion to consider" a broader

8         purpose and range of options.  *Center for Biological Diversity v. National*

9         *Highway Traffic Safety Admin.*, 538 F.3d 1172, 1219 (9th Cir. 2008).

10   c.   The EA fails to consider a reasonable range of alternatives.  It considers only two

11        alternatives, the Proposed Action and the No Action Alternative.  The No Action

12        Alternative, however, is the *same project* as the Proposed Action with only one

13        small pricing difference.  Under both so-called "alternatives," Reclamation would

14        continue to deliver water in the same amounts to the interim contractors.  The No

15        Action Alternative failed to consider *non-renewal* of the contracts, contrary to the

16        expressly discretionary terms of the CVPIA.  Alternatives proposing a reduced

17        quantity of water deliveries were likewise improperly eliminated from

18        consideration.  The EA violates NEPA because "[e]ach alternative considered

19        would authorize the same underlying action" and there is no "meaningful

20        difference" between them.  *Western Watersheds,* 719 F.3d at 1051.

21   d.   The EA ignores the environmental impacts of the interim contracts' water

22        deliveries on the source watersheds – the Delta and its tributaries including the

23        American, Trinity, Sacramento and San Joaquin rivers – and their imperiled fish

24        and wildlife.  It unlawfully excludes these directly impacted natural resources

25        from the EA's unduly narrow study area, which is improperly restricted solely to

26        the service (i.e., delivery) areas of the interim contractors – the areas that would

27        mostly benefit from rather than be harmed by the deliveries.  Consequently, the

28        EA ignores NMFS' finding that Reclamation's continued operation of the CVP as

1    enabled by the interim contracts jeopardizes the continued existence of numerous

2    aquatic species including salmon, steelhead and green sturgeon.  Yet NEPA

3    prohibits agencies from arbitrarily circumscribing the geographic scope of their

4    environmental analysis.  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113,

5    1121-23 (9th Cir. 2004).

6        e.   The EA's analysis of impacts to listed species within the interim contracts'

7            service areas is inadequate.  There is no substantive analysis of the interim

8            contracts' effects on any species; instead, the EA merely states that "direct effects

9            on federally listed species are related to ongoing farm practices such as pesticide

10           use and choice of crops grown, which are not within the control or authority of

11           Reclamation."  The EA's empty assertion that approval of the interim contracts

12           will not have *any* impacts on listed species cannot be squared with FWS'

13           conclusion that approval of the interim contracts *is likely to adversely affect* the

14           giant garter snake and the California least tern.

15       f.   The EA ignores the cumulative impacts of all of the interim contract renewals,

16           even though each subsequent interim contract renewal has an incremental

17           environmental effect.  Such an incremental effect exists both because selenium

18           and other pollutants bioaccumulate, meaning that concentrations of these

19           pollutants increase over time when a constant quantity of these pollutants is

20           discharged, and because the populations of affected species are declining, among

21           other reasons.  Because the EA's cumulative impact analysis lacks "quantified or

22           detailed information," it violates NEPA.  *Neighbors of Cuddy Mountain v. U.S.*

23           *Forest Service*, 137 F.3d 1372, 1379-1380 (9th Cir. 1998).

24       43.   Reclamation's failure to prepare a legally adequate EA and FONSI for the interim

25   contracts is arbitrary and capricious, a failure to proceed in the manner required by law, and not

26   supported by substantial evidence, and thus in violation of NEPA and subject to judicial review

27   under the APA.

28   ///

**SECOND CLAIM FOR RELIEF**

(**Violation of National Environmental Policy Act –
Failure to Prepare an EIS for Interim Contracts**)

(Against All Defendants)

44.     Plaintiffs incorporate by reference all preceding paragraphs.

45.     Approval of each of the interim contracts is a major federal action that may significantly affect the quality of the human environment.  Whether an action's effects are significant depends on considerations of "context" and "intensity."  40 C.F.R. § 1508.27.  "Intensity" is determined with reference to ten sub-factors, the presence of any one of which is sufficient to require an EIS.  40 C.F.R. § 1508.27(b); *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2004).

46.     Here, the environmental effects of the interim contracts are potentially significant because those impacts are highly uncertain, because it is reasonable to anticipate a cumulatively significant impact, and because the Project may adversely affect an endangered or threatened species or its habitat, among other reasons.  40 C.F.R. § 1508.27(b)(5), (7), (9).

47.     Accordingly, Reclamation should have prepared an EIS addressing the contracts' potentially significant impacts.  Because it failed to do so, Reclamation's approval of the interim contracts is arbitrary and capricious, a failure to proceed in the manner required by law, and not supported by substantial evidence, and thus in violation of NEPA and subject to judicial review under the APA.

**PRAYER FOR RELIEF**

48.     As relief for the above violations of law, plaintiffs respectfully request the following:

1.     A declaration that defendants acted contrary to law by issuing a FONSI for the interim contract renewals based on an EA that is legally and factually inadequate.

2.     An injunction ordering defendants to withdraw their FONSI for the interim contract renewals and to prepare an adequate EA as required by NEPA.

3     An injunction ordering Reclamation to prepare an EIS for the interim contracts as

required by NEPA.

4.     An award of costs and reasonable attorney's fees and expenses that plaintiffs

incurred in the litigation of this action under the Equal Access to Justice Act, 28

U.S.C. section 2412, and any other applicable fee recovery law or doctrine.

5.     Any other relief that this Court deems just and proper.


Dated:   March 4, 2016                          Respectfully submitted,

                                                  /s/ Stephan C. Volker
                                                STEPHAN C. VOLKER
                                                Attorney for Plaintiffs
                                                NORTH COAST RIVERS ALLIANCE, CALIFORNIA
                                                SPORTFISHING PROTECTION ALLIANCE,
                                                PACIFIC COAST FEDERATION OF FISHERMEN'S
                                                ASSOCIATIONS, SAN FRANCISCO CRAB BOAT
                                                OWNERS ASSOCIATION, INC., AND INSTITUTE
                                                FOR FISHERIES RESOURCES