UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTH COAST RIVERS ALLIANCE, *et al*., | 1:16-cv-00307-LJO-MJS |
| Plaintiffs, | ORDER GRANTING REQUEST FOR VOLUNTARY REMAND WITHOUT VACATUR (Doc. 28) |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al*., | |
| Defendants, | |
| WESTLANDS WATER DISTRICT, *et al*., | |
| Intervenor-Defendants. | |

## I. INTRODUCTION

This case concerns approval by the United States Department of the Interior and its member agency, the United States Bureau of Reclamation (collectively, "Federal Defendants," "Reclamation," or the "Bureau"), of six interim renewal contracts that authorize delivery of water from March 1, 2016, through February 28, 2018, from federal reclamation facilities to certain water districts served by the federal Central Valley Project ("CVP") and provide for repayment of capital construction costs, as well as operational and maintenance expenses associated with CVP facilities ("2016-18 Interim Contracts"). Doc. 1 (Complaint); Doc 18-2 at ECF p. 12 & 22. The 2016-18 Interim Contracts at issue in this case provide water service to Westlands Water District, Santa Clara Valley Water District, and Pajaro Valley Water Management Agency (collectively, "Interim Contractors"). *See* Doc. 1 at ¶ 2. A coalition of environmental organizations led by the North Coast Rivers Alliance (collectively, "Plaintiffs"), allege,

1

1    among other things, that Federal Defendants issued a deficient Environmental Assessment ("EA") and

2    associated Finding of No Significant Impact ("FONSI")[1] prior to approval of the Interim Contracts, in

3    violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and

4    Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Doc. 1.

5        Before the Court for decision is Federal Defendants' request for voluntary remand without

6    vacatur of the EA/FONSI. Doc. 28. Plaintiffs oppose voluntary remand and, in the alternative, request

7    vacatur of both the EA and the Interim Contracts. Doc. 44. On September 23, 2016, the Court issued an

8    Order for Supplemental Briefing, requesting further input on specific issues related to the parties'

9    requests. Doc. 41 ("Briefing Order"). Federal Defendants and Defendant Intervenors[2], filed a joint

10   statement in response to the request for supplemental briefing, Doc. 42, and Plaintiffs followed with a

11   response. Doc. 44. On December 9, 2016, the Court requested that additional information be appended

12   to the record. Doc. 50. Federal Defendants provided a responsive filing on December 12, 2016. Doc. 51.

13   Having reviewed the parties' filings in light of the entire record, the Court GRANTS Federal

14   Defendants' motion for voluntary remand without vacatur of the EA/FONSI, and DECLINES to vacate,

15   set-aside or otherwise rescind the 2016-18 Interim Contracts.

16                              **II. BACKGROUND**

17       This case is related to an earlier case, *Pacific Coast Federation of Fishermen's Ass'ns v. U.S.*

18   *Dep't of Interior* ("*PCFFA*"), 1:12-cv-01303-LJO-MJS, which concerned a similar challenge to the

19   NEPA review performed in connection with eight interim contracts that covered the period of time from

20   March 1, 2012 through the end of February 2014 ("2012-2014 Interim Contracts"). *See PCFFA*, Doc.

21   

22   [1] NEPA requires agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA's implementing regulations provide that an agency shall prepare an EA to determine whether a proposed federal action will have a significant impact and to determine whether preparation of an EIS will be necessary. 40 C.F.R. § 1508.9. An EA is a "concise public document" that "include[s] brief discussions of the need

23   for the proposal, of alternatives as required by [42 U.S.C. § 4332(E)], [and] of the environmental impacts of the proposed action and alternatives." 40 C.F.R. §§ 1508.9(a), (b). If the agency concludes in the EA that there is no significant effect from

24   the proposed project, the federal agency may issue a FONSI in lieu of preparing an EIS. 40 C.F.R. § 1508.9(a)(1).

25   [2] On June 14, 2016, the Court granted the unopposed motion to intervene filed by Westlands Water District, San Luis Water District, and Panoche Water District. Doc. 21.

1    47. The parties in *PCFFA* filed cross-motions for summary judgment that became ripe at the end of

2    January 2014. In February 2014, the Court denied the *PCFFA* plaintiffs' motion for summary judgment

3    and granted the *PCFFA* federal defendants' and defendant-intervenors' cross-motions for summary

4    judgment on all remaining NEPA claims. *PCFFA*, Doc. 88.

5         The Ninth Circuit reversed in part, first finding that, despite the fact that the Central Valley

6    Project Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4700 (1992), mandates renewal of

7    long-term water service contracts, the CVPIA does not require Reclamation to enter into interim

8    contracts and therefore the "no action" alternative articulated in the EA for the 2012-2014 Interim

9    Contracts unlawfully assumed interim contract renewal. *Pac. Coast Fed'n of Fishermen's Associations*

10   *v. United States Dep't of the Interior*, 655 Fed. Appx. 595, at *1-2 (9th Cir. July 25, 2016) ("*PCFFA*

11   *Appellate Ruling*"). The Ninth Circuit also held that "Reclamation's decision not to give full and

12   meaningful consideration to the alternative of a reduction in maximum interim contract water quantities

13   was an abuse of discretion, and the agency did not adequately explain why it eliminated this alternative

14   from detailed study." *Id*. at *2. While acknowledging that the Reclamation Project Act mandates

15   renewal of existing contract quantities when water is beneficially used, *id*. (citing 43 U.S.C. § 485h-1(1)

16   & (4)), the Ninth Circuit found that Reclamation "acted unreasonably by relying on stale water needs

17   data." *Id*. The Ninth Circuit affirmed this Court's ruling regarding the geographic scope of the EA:

18        Plaintiffs contend that the EA's geographic scope was improperly limited
          to the delivery areas and should also have considered the effects, including
19        cumulative effects, of interim contract renewal on the California River
          Delta, the source of the water, and on the Delta's fish and other wildlife.
20        This contention lacks merit because the EA was tiered off of the
          [Programmatic Environmental Impact Statement], which addressed
21        Central Valley Project-wide effects of long-term contract renewal. *See* 40
          C.F.R. § 1508.28 (describing tiering). In light of Reclamation's obligation
22        to conduct a more comprehensive analysis in the PEIS, it would be
          impractical to require the agency to trace the incremental effects of each
23        two-year water service contract on the Delta and all Central Valley Project
          waters.

24   *Id*. at *3. The matter was remanded to this Court with instructions to vacate the grant of summary

25

1  judgment in favor of defendants on plaintiffs' claim that the EA for the 2012-14 Interim Contracts was

2  inadequate because it did not give full and meaningful consideration to the alternative of a reduction in

3  maximum water quantities. *Id*. Reclamation was directed to "consider such an alternative in any future

4  EA for an interim contract renewal." *Id*. In particular, the Ninth Circuit indicated that "[i]n satisfying

5  this duty, Reclamation may rely upon any water needs assessment for which the data remain accurate."

6  *Id*.

7                               **III. <u>DISCUSSION</u>**

8  **A.    <u>Request for Voluntary Remand</u>**

9          Federal Defendants move for voluntary remand without vacatur of the EA/FONSI for the 2016-

10  18 Interim Contracts. As a threshold matter, the Court first must determine whether voluntary remand is

11  appropriate under the circumstances. "A federal agency may request remand in order to reconsider its

12  initial action." *California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012).

13  The Ninth Circuit has recognized that "[g]enerally, courts only refuse voluntarily requested remand

14  when the agency's request is frivolous or made in bad faith." *Id*. (citing *SKF USA Inc. v. United States*,

15  254 F.3d 1022, 1029 (Fed. Cir. 2001)).

16          Courts in this Circuit generally look to the Federal Circuit's decision in *SKF USA* for guidance

17  when reviewing requests for voluntary remand. *See, e.g.*, *Cal. Communities*, 688 F.3d at 992; *United*

18  *States v. Gonzales & Gonzales Bonds & Ins. Agency, Inc.*, No. C-09-4029 EMC, 2011 WL 3607790, at

19  *3 (N.D. Cal. Aug. 16, 2011). *SKF USA* describes five positions an agency may take in response to

20  judicial review of an agency action:

21              First, it may choose to defend the agency's decision on the grounds
                previously articulated by the agency. Second, it may seek to defend the
22              agency's decision on grounds not previously articulated by the agency.
                Third, the agency may seek a remand to reconsider its decision because of
23              intervening events outside of the agency's control. Fourth, even in the
                absence of intervening events, the agency may request a remand, without
24              confessing error, to reconsider its previous position. Finally, as in the
                present situation, the agency may request a remand because it believes that
25              its original decision was incorrect on the merits and it wishes to change

                               4

1    the result.

2    254 F.3d at 1027-28.

3         According to *SKF USA*, under the third scenario, "the agency may seek a remand because of

4    intervening events outside of the agency's control, for example, a new legal decision or the passage of

5    new legislation." *Id*. at 1028. Under such circumstances, "[a] remand is generally required if the

6    intervening event may affect the validity of the agency action." *Id*.

7         In contrast, under the fourth scenario, "the agency may request a remand (without confessing

8    error) in order to reconsider its previous position. It might argue, for example, that it wished to consider

9    further the governing statute, or the procedures that were followed. It might simply state that it had

10   doubts about the correctness of its decision or that decision's relationship to the agency's other policies."

11   *Id*. at 1029. In such a case, "the reviewing court has <u>discretion</u> over whether to remand." *Id*. "A remand

12   may be refused if the agency's request is frivolous or in bad faith." *Id*. One way an agency may

13   demonstrate good faith is by admitting that the reasoning adopted in its original action was flawed. *See*

14   *Cal. Communities*, 688 F.3d at 992 (approving voluntary remand where the agency "recognized" that its

15   original reasoning was flawed and sought to explain its decision in an alternative manner). In contrast,

16   bad faith may be demonstrated when an agency's position does not demonstrate a commitment to a

17   changed approach. *See Lutheran Church–Missouri Synod v. FCC*, 141 F.3d 344, 348-49 (D.C. Cir.

18   1998) (finding bad faith where the agency sought remand based on a new "policy statement" that was

19   nonbinding, where the agency could not promise any particular decision on remand, and where the court

20   determined that the agency was merely employing "novel" tactics to avoid judicial review); *Corus Staal*

21   *BV v. United States*, 387 F. Supp. 2d 1291, 1296 (Ct. Int'l Trade 2005) (denying a remand request

22   because the requesting party expressed no doubts about the correctness of its decision).

23        Citing the PCFFA Appellate Ruling as an "intervening event," Federal Defendants maintain that

24   their request for voluntary remand is governed by the third scenario, in which voluntary remand is

25   effectively mandatory rather than the fourth scenario, in which the Court's discretion is guided by a

good faith inquiry. Doc. 42 at 3. Federal Defendants cite *National Fuel Gas Supply Corp. v. FERC*, 899

F.2d 1244 (D.C. Cir. 1990), in support of their position that the present situation falls within the third

*SKF USA* category. In *National Fuel*, the D.C. Circuit granted the Federal Energy Regulatory

Commission's ("FERC") request for voluntary remand of ratemaking order after an intervening judicial

decision "dramatically—and, no doubt, unexpectedly—altered" the legal backdrop against which FERC

issued its original order. *Id*. at 1249-50. Specifically, shortly before oral argument on the appeal, a

different panel of the D.C. Circuit issued a ruling that appeared to deprive a prior FERC order of the

"legal effect that [was] sought by [FERC] in *National Fuel*." *Id*. at 1249. This, the D.C. Circuit held,

was an "intervening change in the law." *Id*.; *see also id*. at 1249-50 ("Remand under these circumstances

also comports with the general principle that an agency should be afforded the first word on how an

intervening change in law affects an agency decision pending review.").

Plaintiffs counter that the present case is distinguishable from *National Fuel*, pointing to

*American Forest Resource Council v. Ashe*, 946 F. Supp. 2d 1 (D.D.C. 2013), in which the defendant

agency argued that "an intervening change in the case law" mandated remand to the agency. *Id*. at 42 n.

5. The agency decision at issue in *American Forest* was supported by reasoning generated largely in

1996. *See id*. at 20. In requesting voluntary remand, the agency asserted that its 1996 explanation was

"consistent with [then-]existing case law," but acknowledged that, since 1996, judicial decisions

imposed a higher burden on the agency to justify the type of decision in question. *Id*. at 41. The agency

admitted that it did not meet this heightened burden in 1996 and asked for an opportunity to do so as part

of the voluntary remand. *Id*. at 41-2. The district court concluded that the "so-called 'change' in the law

identified by [the agency] is not one that automatically requires remand," reasoning that, prior to the

judicial decisions cited by the agency, the agency's own policies drew similar conclusion, i.e. the

"cases' gloss" on those issues was not novel. *Id*. at 42 n. 5. Therefore, because the agency "could have

taken the position it now takes before the so-called change in the law, the Court treat[ed] the remand

request as one based on the agency's recognition of its own error, influenced as it were by several

1  judicial decisions." *Id.*

2       Plaintiffs suggest that the present case is like *American Forest* because the Ninth Circuit's ruling

3  in *PCFFA* "relied upon existing NEPA jurisprudence and cannons of statutory interpretation to set aside

4  defendants' unlawful actions." Doc. 44 at 2. Plaintiffs argue that because *PCFFA* "obviously did not

5  amend NEPA" it was "in no sense an 'intervening change in the law.'" *Id.*

6       This takes the logic of *American Forest* too far. Federal Defendants issued the EA in dispute in

7  this case on February 29, 2016, approximately two years after this Court upheld a similar EA against

8  challenge in *PCFFA* by an order issued February 6, 2014. *PCFFA*, Doc. 88. Therefore, at the time the

9  EA issued, at least one Court (this one) found the government's actions to be <u>consistent</u> with NEPA. As

10  previously discussed, that February 6, 2014 order was vacated in part by the Ninth Circuit, but not until

11  March 28, 2016, <u>after</u> the EA in this case issued. *PCFFA*, Doc. 97. This procedural history makes this

12  case distinguishable from *American Forests*. Therefore, the Court believes it would be appropriate to

13  apply *SKF USA*'s "intervening change in the law" scenario to justify voluntary remand without a good

14  faith inquiry.

15       But, even if *SKF USA*'s fourth scenario applies, requiring a showing of good faith, Federal

16  Defendants have made such a showing in their supplemental briefing. In their original motions papers,

17  Federal Defendants indicated:

18              In the present case, without any admission that an updated water needs
                assessment or new EA is required, Defendants have determined that
19              performing an updated water needs assessment, and then making that
                assessment part of a new EA, will be a more efficient way to resolve this
20              lawsuit without wasting judicial or agency resources on litigation. The
                remand would include an updated water needs assessment and a new EA
21              based on the updated assessment and evaluation of a no-action alternative
                consistent with the Ninth Circuit's amended decision [in *PCFFA*].
22              Reclamation anticipates that this process may take approximately 12
                months, but potentially longer in light of the complexity of the issues and
23              the other time-sensitive environmental reviews currently scheduled in the
                next 6-12 months.

24  Doc. 28 at 4.

25

                                                    7

1    The Court did not find this showing compelling, explaining that "Federal Defendants refuse to

2   admit that a new EA is required, but nonetheless propose to prepare one that includes a no-action

3   alternative consistent with the Ninth Circuit's amended decision" to "resolve this litigation" and avoid

4   the waste of judicial resources. Briefing Order at 5. The Court found this insufficient to demonstrate

5   good faith. *Id*. In particular, the Court was "concerned with Federal Defendants' refusal to acknowledge

6   that there are parallels between the EA in this case and the EA in *PCFFA*," *id*., and the absence of

7   authority suggesting that judicial or party efficiency alone is sufficient to demonstrate good faith, *see id*.

8   at 4.

9    Federal Defendants returned with a clarified position:

10       Defendants' motion for voluntary remand is based on the intervening
         *PCFFA* decision, which calls into question the validity of the EA in this
11       case. . . .

                                      ***
12
         Defendants expressly "acknowledge that there are parallels between the
13       EA in this case and the EA in *PCFFA*" that the Ninth Circuit later found
         to be inadequate, [Doc. 41 at 5]. Specifically, Defendants acknowledge
14       that the EA in this case considered a no action alternative that "assumed
         [continued] interim contract renewal," as the EA did in *PCFFA*, [655 Fed.
15       Appx. 595], at * 1. *See* [Doc. 41 at] 2. That analysis cannot stand under
         the intervening *PCFFA* decision. The EA in this case also "eliminated
16       th[e] [reduced-quantity] alternative from detailed study" on the same
         grounds cited in the EA in *PCFFA*, and in doing so, the EA relied on the
17       same 2006 water needs assessment that was "prepared with data from
         1999 that predated a land retirement project," *see id*. at *2. This reasoning
18       is also insufficient according to *PCFFA*. Further, Defendants recognize
         that the treatment of the no-action and reduced-quantity alternatives in the
19       *PCFFA* EA were the two bases for the Ninth Circuit's partial reversal of
         the judgment for Defendants. *Id*. at *3.
20
         Although Defendants do not believe that they acted arbitrarily and
21       capriciously in their preparation of the EA, given the state of the law at the
         time, Defendants acknowledge that these two aspects of the alternatives
22       analysis in the EA would not pass muster under the reasoning of *PCFFA*,
         if that reasoning were applied in this case on the merits.
23
    Doc. 42 at 4-5 (footnotes omitted). In addition, as set forth in the Declaration of Michael P. Jackson
24
    ("Jackson Decl."), the Area Manager for Reclamation's South-Central California Area Office,
25

                                      8

1   Reclamation has a defined plan of action for the remand, namely to (1) conduct a new water needs

2   assessment; (2) prepare and evaluate a no-action alternative premised on non-renewal of the Interim

3   Renewal Contracts for 2016-18; and (3) consider a reduced quantity alternative. Jackson Decl., Doc. 41-

4   2, ¶ 8.

5           Plaintiffs continue to take issue with Reclamation's refusal to admit that it acted arbitrarily and

6   capriciously. But, as discussed in the Briefing Order, there is no requirement that Reclamation admit

7   wrongdoing. Briefing Order at 3-4 (citing *SKF USA* for the proposition that an "agency may request a

8   remand (underline confessing error) in order to reconsider its previous position," 254 F.3d at 1029

9   (emphasis added)). Rather, like in *California Communities*, 688 F.3d at 992, where the agency was

10  found to have demonstrated a good faith basis for voluntary remand where it recognized the need for

11  additional analysis, Federal Defendants now have acknowledged that certain aspects of the EA cannot

12  "pass muster" under *PCFFA*. This is sufficient to warrant voluntary remand.[3]

13  **B.      Vacatur.**

14          Having concluded that voluntary remand is appropriate, the Court next turns to Federal

15  Defendants' request for remand without vacatur, and Plaintiffs' parallel request to vacate both the EA

16  and the Interim Contracts.

17          In deciding whether to vacate an agency action, courts faced with a motion for voluntary remand

18  _____

19  [3] As mentioned, in the *PCFFA Appellate Ruling*, the Ninth Circuit addressed the *PCFFA* plaintiffs' argument that the
    geographic scope of the *PCFFA* EA was "improperly limited to the delivery areas and should also have considered the
20  effects, including cumulative effects of interim contract renewal on the California River Delta, the source of the water, and on
    the Delta's fish and other wildlife." 655 Fed. Appx. 595 at *3. The Ninth Circuit held "this contention lack[ed] merit because
21  the EA was tiered off of [a programmatic EIS ("PEIS")], which addressed [CVP]-wide effects of long-term contract renewal"
    and because "of Reclamation's obligation to conduct a more comprehensive analysis in the PEIS, it would be impractical to
    require the agency to trace the incremental effects of each two-year water service contract on the Delta and all [CVP]
22  waters." *Id.* Here, Defendant Intervenors suggest that Plaintiffs have alleged only harms that are "beyond the scope of the
    NEPA review required by the [Interim Contracts]," and argue that "the Ninth Circuit expressly rejected the claim that the EA
23  should have considered the [Interim Contracts'] effects on these alleged harms." Doc. 42 at 12. Pointing to allegations in the
    Complaint that at least arguably allege harms occurring within the Interim Contractors' service areas, Plaintiffs argue that
    Reclamation has "studiously avoid[ed] taking any position on that question, raising the possibility that Reclamation's future
24  EA will be functionally identical to the EA that the Ninth Circuit held inadequate." Doc. 44 at 5. The Court does not believe
    Federal Defendants' silence on this issue demonstrates "recalcitrance" or otherwise undermines their good faith basis for
25  voluntary remand. Federal Defendants have taken no position in this litigation that even remotely suggests they would be
    unwilling or unable to take into consideration evidence of environmental harm within the relevant service area(s).

have employed "the same equitable analysis" used to decide whether to vacate agency action after a "rul[ing] on the merits." *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1136, 1143 (C.D. Cal. 2002); *ASSE Int'l, Inc. v. Kerry*, ___ F. Supp. 3d ___, 2016 WL 1692806 (C.D. Cal. 2016); *Ctr. For Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1241-42 (D. Colo. 2011) (indicating that because "[v]acatur is an equitable remedy ... and the decision whether to grant vacatur is entrusted to the district court's discretion. . . .vacation of an agency action without an express determination on the merits is well within the bounds of traditional equity jurisdiction."). Courts routinely evaluate two factors originally articulated in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F. 2d 146, 150-51 (D.C. Cir. 1993), often referenced as the "*Allied-Signal*" factors: (1) "the seriousness of an agency's errors" and (2) "the disruptive consequences that would result from vacatur." *Klamath-Siskiyou Wildlands Ctr. v. NOAA Nat'l Marine Fisheries Serv*., 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (citing *California Communities*, 688 F.3d at 992 (quoting *Allied–Signal*, 988 F.2d at 150-51)). "Put differently, courts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error." *Id*. (internal quotation marks removed).[4] [5]

### 1.   Scope of the Complaint and Vacatur Request

Before evaluating the prospects of vacatur, it is helpful to outline the scope of the Complaint in this case and the forms of vacatur requested. The Complaint alleges two causes of action. The First

---

[4] Some cases suggest other factors may be considered. *See, e.g., Nat. Res. Def. Council v. Norton*, No. 1:05CV01207 OWW LJO, 2007 WL 14283, at *13 (E.D. Cal. Jan. 3, 2007). But, more recently, the Ninth Circuit appears to have recognized the two *Allied-Signal* factors as controlling. *See Cal. Communities*, 688 F.3d at 992; *see also Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1106 (E.D. Cal. 2013) (interpreting *Cal. Communities* as holding the *Allied-Signal* factors are "controlling, for purposes of assessing vacatur").

[5] As the Court noted in its Briefing Order, there is some authority to support application of a more onerous standard to a request for vacatur that would have the same operative effect as an injunction. *See* First Briefing Order at 6 n. 1 (citing *Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin*., No. CV 12-9861-GW(SSX), 2016 WL 4445770, at *5-6 (C.D. Cal. Aug. 12, 2016)). The Court declines to rule out the applicability of such a standard. However, because the Court finds that Plaintiffs' request to vacate the Interim Contracts should be denied under the less onerous *Allied-Signal* test, there is no need to evaluate that same request under the arguably more onerous traditional injunctive relief standard.

Claim for Relief alleges that the EA and associated FONSI for the 2016-18 Interim Contracts are inadequate for a number of reasons, two of which are particularly relevant to the present analysis. First, Plaintiffs allege the EA and FONSI relied on the false premise that Reclamation had no discretion to reject the 2016-18 Interim Contracts and therefore defined the no action alternative as essentially the same as the Proposed Action (approval of the Interim Contracts), rendering any comparative analysis meaningless. Doc. 1 at ¶ 42 (a) & (c). In addition, Plaintiffs allege the EA failed to consider seriously any alternatives proposing reduced quantities of water deliveries, based in part on Reclamation's assertion that it lacked discretion to reduce contract quantities when water is beneficially used. *See id.* at ¶ 42(c). Plaintiffs relatedly allege that the water needs assessments Reclamation used to determine whether water was beneficially used were outdated. *Id.* at ¶ 41.

Plaintiffs' Second Claim for Relief alleges that approval of each of the 2016-18 Interim Contracts is a "major federal action that may significantly affect the quality of the human environment," and therefore Reclamation acted unlawfully by preparing an EA instead of a more involved Environmental Impact Statement ("EIS"). *Id.* at ¶¶ 45-47.

Plaintiffs' prayer for relief requests the following:

1. A declaration that Defendants acted contrary to law by issuing a FONSI for the 2016-18 Interim contract renewals based on an EA that is legally and factually inadequate;

2. An injunction ordering Defendants to withdraw the FONSI and to prepare an adequate EA as required by NEPA;

3. An injunction ordering Reclamation to prepare an EIS;

4. An award of costs and reasonable attorneys fees and expenses; and

5. "Any other relief that this Court deems just and proper."

Doc. 1 at 17-18.

It is plain from the face of the Complaint that Plaintiffs have requested vacatur of the EA and FONSI. It is therefore appropriate to consider Defendants' request for remand without vacatur of the

1    EA/FONSI together with Plaintiffs' arguments in favor of vacating the EA/FONSI under the *Allied-*

2    *Signal* test outlined above.

3         Plaintiffs also make plain in their briefs that they seek to set aside the 2016-18 Interim Contracts

4    as well. As a general matter, where an agency acts arbitrarily and/or capriciously or not in accordance

5    with the law, the APA requires a reviewing court to set aside the agency action. 5 U.S.C. § 706(2)(A)-

6    (D). In the present case, the challenged agency action is the issuance of the EA/FONSI. Nevertheless, if

7    an agency has acted unlawfully in executing a contract, the court retains the discretion to apply the

8    <u>remedy</u> of contract rescission to associated contracts, *Natural Resources Defense Council v. Houston*,

9    146 F.3d 1118, 1129 (9th Cir. 1998), or preserve the associated contract, if the legal flaw can be

10   rectified in some another way. *Id.* (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982));

11   *Conner v. Burford*, 848 F.2d 1441, 1460-61 & n. 50 (9th Cir. 1988) (modifying district court order to

12   clarify that oil leases executed without full NEPA and Endangered Species Act ("ESA") compliance

13   need not be set aside, while enjoining any "surface-disturbing" activities on the leased properties until

14   full compliance is achieved, thereby "avoid[ing] the unnecessarily harsh result of completely divesting

15   the lessees of their property rights"); *see also Tinoqui–Chalola Council of Kitanemuk & Yowlumne*

16   *Tejon Indians v. U.S. Dep't of Energy*, 232 F.3d 1300, 1305 (9th Cir. 2000) (court has authority under

17   the APA to order rescission of a contract for sale if the federal agency "acted in excess of statutory

18   authority or without observance of the procedures required by law"); *Port of Astoria v. Hodel*, 595 F.2d

19   467, 479 (9th Cir. 1979) (court may declare contract unenforceable pending preparation of required

20   environmental review).

21        As a threshold matter, Federal Defendants argue that Plaintiffs did not pray for the remedy of

22   contract rescission[6] and should not be permitted to use Defendants' motion for voluntary remand as a

23   _____

24   [6] The parties variously refer to this request as a request for "contract set-aside" and "contract vacatur." *See, e.g.*, Doc. 42 at 8;
     Doc. 44 at 8. Regardless of label, for purposes of this case, it is a request for injunctive relief against contract

25   implementation/performance.

1   basis for expanding the scope of this lawsuit. Doc. 42 at 8.[7] In their first supplemental brief, Plaintiffs

2   argue the Complaint's generic request for "[a]ny other relief this Court deems just and proper" is

3   sufficient to permit contract set-aside as a remedy. Doc. 44 at 8. In support of this assertion, Plaintiffs

4   cite *Rental Development Corporation of America v. Lavery*, 304 F.2d 839 (9th Cir. 1962), in which

5   lessees sued lessors for breach of a lease, but did not request cancellation of the lease in their complaint.

6   The Ninth Circuit nevertheless determined that ordering lease cancellation was appropriate because the

7   complaint included "the usual prayer for 'such other relief as to the Court may seem just and proper.'"

8   *Id.* at 840-41. Other supporting authority exists, including *United States v. Martin*, 651 F.2d 24, 30-31

9   (1st Cir. 1981), in which the First Circuit permitted an award of damages after trial despite the fact that

10  the complaint did not contain an explicit prayer for damages, reasoning that the relief was justified under

11  Fed. R. Civ. P. 54(c), which provides that "every final judgment shall grant the relief to which the party

12  in whose favor it is entered is entitled, even if the party has not demanded such relief in his pleadings."

13  Defendant Intervenors cite a more recent Fifth Circuit case, *Dillard v. Merrill Lynch, Pierce, Fenner &*

14  *Smith, Inc.,* 961 F.2d 1148, 1155 (5th Cir. 1992), which affirmed a district court's refusal to consider a

15  request for declaratory and injunctive relief because the plaintiff did not request such relief in his

16  pleadings. Likewise, *Conkey v. Reno*, 885 F. Supp. 1389, 1392 (D. Nev. 1995), dismissed a claim for

17  declaratory relief because the complaint failed to indicate "what in particular [the plaintiff] wish[ed] to

18  have the Court declare," reasoning that "[t]he failure to indicate what in particular plaintiffs seek by way

19  of a declaratory judgment is in itself a failure to state a claim." Both *Dillard* and *Conkey* cited Fed. R.

20  Civ. P. 8(a)(3), which requires any pleading to contain "a demand for the relief sought, which may

21  include relief in the alternative or different types of relief." It is not necessary to and the Court does not

22  resolve these conflicting authorities here because, as explained below, even if the Complaint's generic

23  prayer sufficiently pleads a prayer for contract rescission for notice purposes, the Court finds it is

24  _____

25  [7] The Court agrees with Plaintiffs that the representations made by the *PCFFA* plaintiffs in that case that they were "not ask[ing] the Court to enjoin or otherwise disturb . . . the Bureau's entry into the interim contracts," *see PCFFA* Doc. 26 at 2, does not bind the Plaintiffs in the present action.

1    inappropriate to rescind, vacate, or otherwise block performance of the 2016-18 Interim Contracts, at

2    least not on the present record.[8]

3           Although the Court will assume, for purposes of the remaining discussion, that the Complaint

4    sufficiently pleads a prayer for contract rescission, such a prayer does not fit neatly into an analytical

5    framework in the context of the present motion. The Complaint challenges only the preparation and

6    adoption of the EA/FONSI, not the execution of the Interim Contracts. At best, contract rescission may

7    be an appropriate remedy upon a finding that the EA/FONSI were prepared in an unlawful manner.

8    Therefore, in evaluating Federal Defendants' request for remand without vacatur of the EA/FONSI, the

9    Court applies the *Allied-Signal* factors only to the question of whether the EA/FONSI should be vacated.

10   Nevertheless, as a practical matter, for the reasons discussed below, the impact of Interim Contract

11   vacatur is incorporated by reference into the discussion of the second *Allied-Signal* factor.

12          **2.      Seriousness of the Agency's Errors**

13          The first *Allied-Signal* factor is the seriousness of the agency's errors. *California Communities*,

14   688 F.3d at 992 (citing *Allied-Signal*, 988 F.2d at 150-51). One way to measure the seriousness of an

15   agency's errors is to attempt to evaluate the likelihood that the agency will be able to justify future

16   decisions that would follow the status quo. *See Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027,

17   1048-49 (D.C. Cir. 2002) (cited with approval in *Klamath-Siskiyou*, 109 F. Supp. 3d at 1243). In this

18   case, a "status quo" decision by Federal Defendants would involve approval of an revised EA/FONSI

19   (as opposed to preparation of an EIS) evaluating the 2016-18 Interim Contracts.

20          Defendant Intervenors argue that any errors in the current EA are redeemable on remand because

21   "Defendants have a plan for remand that will fully address the issues raised by the Ninth Circuit's ruling

22   in *PCFFA*." Doc. 42 at 11. Federal Defendants indicate that they plan to conduct a new water needs

23   assessment. Jackson Decl. at ¶ 8. If the water needs assessment shows that less than the full contract

24

25   [8] Moreover, even if the current Complaint does not properly request vacatur of the 2016-18 Interim Contracts, no party has addressed whether Plaintiffs would be entitled at this early stage of the case to amend their pleading to include such a prayer.

1  amount is beneficially used, Reclamation will define a reduced-quantity alternative based upon the water

2  needs assessment and analyze that alternative in detail. *Id.* at ¶ 9. If the water needs assessment shows

3  that the full contract amount is beneficially used, Reclamation will eliminate the reduced quantity

4  alternative from detailed study based upon the water needs assessment. *Id.* It is difficult to imagine what

5  else Federal Defendants could do to address the Ninth Circuit's concern in *PCFFA* that any reduced

6  quantity alternative evaluated in an EA covering the Interim Contracts should take into consideration up-

7  to-date and accurate water needs information. As to this issue, the Court "cannot say it is unlikely [the

8  agency] will be able to justify a future decision" to issue an EA/FONSI regarding and approve continued

9  implementation of the 2016-18 Interim Contracts or a modified set of similar Interim Contracts based

10  upon updated water needs assessments.

11     Potentially more problematic is Federal Defendants' admission that any new EA will need to

12  consider a no-action alternative based upon non-renewal of the Interim Contracts. Jackson Decl. at ¶ 8.

13  In the *PCFFA Appellate Ruling*, the Ninth Circuit explained that the *PCFFA* EA's "no action"

14  alternative was unlawful because it assumed continued interim contract renewal. 655 Fed. Appx. 595 at

15  *1-2. The Ninth Circuit acknowledged that "[w]hen agency action is mandatory, the 'no action'

16  alternative is properly defined as the carrying out of that action," but refused to find renewal of the

17  interim contracts was mandatory or that the contracts themselves mandated renewal. *Id.* at *2. As a

18  general rule, a "no action" alternative is "meaningless" if it assumes the existence of the very plan being

19  proposed. *Id.* (citing *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008)).

20  The no-action alternative is used to create a baseline against which the impacts of a project are

21  measured. *See Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d 633, 642 (9th Cir. 2010);

22  40 C.F.R. § 1502.14 (describing alternatives analysis applicable to EISs); *Native Ecosystems Council v.

23  U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005) (explaining that the alternatives provision of

24  NEPA applies whether an agency is preparing an EIS or an EA). Because the purpose of an EA is at

25  least in part to help the action agency determine whether an EIS is required, 40 C.F.R. § 1508.9, a

1  "meaningless" alternatives analysis in an EA calls into question the validity of the agency's

2  determination that issuance of an EA/FONSI, rather than an EIS, is appropriate.

3  　　　As to this issue, it is difficult for the Court to determine whether the agency "will be able to

4  justify a future decision" to issue an EA versus prepare an EIS. Because the scope of the impacts to be

5  considered is limited to impacts within the delivery area, *PCFFA Appellate Ruling*, 655 Fed. Appx. 595

6  at *3, it is <u>possible</u> the impacts revealed by a comparison of the proposed Interim Contracts to a proper

7  "baseline" no-action alternative would still warrant the re-issuance of an EA/FONSI. But, the present

8  record reveals <u>no information</u> upon which Court can evaluate the <u>likelihood</u> that impacts will be found

9  to be insignificant on remand. Given that this is Federal Defendants' motion to remand without vacatur,

10  this factor weighs slightly in favor of vacatur of the EA/FONSI.

11  　　　**3.**　　**Consequences of Vacatur**

12  　　　The Court next turns to the second *Allied-Signal* factor: the disruptive consequences that would

13  result from vacatur. *California Communities*, 688 F.3d at 992 (citing *Allied-Signal*, 988 F.2d at 150-51).

14  Federal Defendants do not assert that vacating the EA/FONSI would have any independent disruptive

15  consequences. Rather, they asserted in the first round of supplemental briefing that "[i]t would be

16  difficult to vacate the EA without causing at least some of the harms that would follow from vacating

17  the contracts." Doc. 42 at 7. In other words, Federal Defendants incorporate by reference arguments and

18  evidence about the disruptive consequences of setting aside the Interim Contracts into their argument

19  against vacatur of the EA/FONSI. For purposes of organizational clarity and efficiency, the Court first

20  addresses these arguments regarding the disruptive consequences of Interim Contract rescission. The

21  Court then addresses whether Federal Defendants adequately have connected EA/FONSI vacatur to

22  Interim Contract rescission.

23  　　　**a.**　　**Disruptive Consequences of Interim Contract Vacatur**

24  　　　Defendants point to several potential consequences of vacating the 2016-18 Interim Contracts.

25  Michael Shires, an economist and public policy analyst retained by Defendant Intervenors, researched

1   how the operations of Westlands Water District ("Westlands") impact the economy of its immediate

2   region, the state, and the nation. Declaration of Michael A. Shires ("Shires Decl."), Doc. 42-3 at ¶ 2-3.

3   Shires states that reductions in Westland's CVP water supply have resulted in: (1) more expensive

4   groundwater being used to attempt to cover some of the shortfall in available water; (2) farmers within

5   Westlands taking land out of production and/or curtailing harvesting of some planted crops; and

6    (3) farmers within Westlands changing the mix of crops grown. *Id.* at ¶ 5. With regard to reduced

7   acreage in production, Shires concludes that reduced water availability has caused an 18 percent decline

8   in available jobs and overall output, for an estimated loss of 5,200 jobs and nearly $650 million dollars

9   of overall economic output. *Id.* at ¶ 6. Shires concludes that if CVP water deliveries cease altogether,

10  these negative consequences would be "all the more damaging and even potentially devastating given

11  that the already prolonged unavailability of sufficient water deliveries would be extended even further.

12  Such further extension of the unavailability of sufficient water [deliveries] would be expected to result

13  in an accumulation and multiplication of negative consequences, for example, processing plan and

14  supply chain closures and other business failures." *Id.* at ¶ 8.

15       According to Jose Gutierrrez, Westlands' Deputy General Manager of Resources, failure to

16  receive water allocations has had a "significant negative impact on the local and regional economies."

17  Declaration of Jose Gutierrez ("Gutierrez Decl."), Doc. 42-2, at ¶ 28. Overall, the "weather-related and

18  regulatory-drought" has resulted in the fallowing of hundreds of thousands of acres of land in the

19  Central Valley, the loss of more than 15,000 jobs, and more than $2 billion in lost revenue to the state's

20  farming industry. *Id.* at ¶ 30. Gutierrez also explains that the area within Westlands' service area has

21  suffered from land subsidence, a consequence of long-term groundwater overdraft. *Id.* at ¶¶ 33-34.

22  Groundwater pumping generally decreases in years when CVP Contract water deliveries decrease. *Id.* at

23  ¶ 37. Water supply constraints are also expected to lead to significant land fallowing, which can

24  negatively impact air quality. *Id.* at ¶ 38.

25       Plaintiffs point out, correctly, that all of the harms listed above are harms that have occurred or

are occurring as the result of the drought <u>with the Interim Contracts in place</u>. Plaintiffs argue that "the very fact that these harms occur now, with the contracts in place, shows that vacatur is not the cause of the harm." Doc. 44 at 12-13. It is true that Defendants have not provided any quantitative (or even rough qualitative) estimate of the relative impact of Interim Contract vacatur vis-à-vis the background conditions. However, Defendants have presented evidence that tends to suggest existing economic and environmental harms would be exacerbated if the Interim Contracts are vacated. For example, Shires extrapolates from existing harms caused by the ongoing drought and regulatory restrictions to conclude that vacatur of the Interim Contracts would cause additional harm. Shires Decl., Doc. 42-3, at ¶ 8 The fact that the harms would be present to some degree without vacatur simply goes to the weight this harm is to be given in the equitable balance.

This case is unlike *Public Employees for Environmental Responsibility v. United States Fish & Wildlife Serv.*, No. CV 14-1807 (JDB), 2016 WL 3030228, at *1-2 (D.D.C. May 25, 2016) ("*PEER*"), in which the district court disregarded the agency's showing that vacatur of agency orders for noncompliance with NEPA would cause economic disruption. The *PEER* court found the agency had not made a compelling case because the forecasted harms were "imprecise or speculative." *Id.* at *2. Specifically, the agency claimed that "[f]isheries impacts can be in the millions of dollars" and that "the impacts to the aquaculture could be in the millions of dollars." *Id.* The Court found these to be "entirely conjectural" and, critically, disputed by contrary evidence presented by the environmental plaintiffs. Here, while Defendants' showing is imprecise, it is not completely conjectural. It is not fantasy, for example, to extrapolate from documented harms that have resulted from low water deliveries in order to advance the proposition that greater harm would result from <u>no</u> water deliveries.

Moreover, unlike in *PEER*, in response to Federal Defendants' and Defendant Intervenors' imperfect, but nonetheless pertinent, factual showing, Plaintiffs present <u>no evidence</u> in the context of these motions regarding the consequences of <u>not</u> vacating the Interim Contracts. Plaintiffs argue that "the environmental harm from remanding without vacatur is profound," Doc. 44 at 13, but cite only to

general holdings from prior cases as well as the <u>allegations</u> in their own complaint. For example,

Plaintiffs quote a footnote from the Introduction to this Court's summary judgment ruling in *PCFFA*, in

which the Court notes it "is indisputable that <u>delivery</u> of CVP water to contractors impacts the

environment in significant ways." *PCFFA*, Doc. 88 at 6 n. 3 (emphasis in original). In that sentence, the

Court was explaining why "operational decisions . . . rather than the Interim Contracts themselves,

actually control deliveries" to water contractors. *Id*. at 5. That generic statement cannot be used as

evidence of harm for purposes of the present equitable analysis, particularly given the extremely generic

nature of the statement, as compared to the very specific scope of environmental harms relevant to the

NEPA analysis under review in the present case, which, according to the Ninth Circuit, is properly

"limited to the delivery areas." *PCFFA Appellate Ruling*, 655 Fed. Appx. 595 at *3. The Complaint

certainly alleges "the worsening contamination of ground and surface water resources in the Central

Valley resulting from the harmful irrigation practices th[e] [Interim Contracts] perpetuate" and suggests

impacts to the California least tern and giant garter snake, Doc. 2 at ¶¶ 4, 28, all of which plausibly may

include impacts within the Interim Contractors' delivery areas. Yet, again, these allegations are not

evidence. *See F.D.I.C. v. Deglau*, 207 F.3d 153, 172 (3d Cir. 2000) (refusing to consider allegations in

complaint in evaluating propriety of injunctive relief). Despite several rounds of supplemental briefing,

Plaintiffs have not submitted any evidence in support of their claimed harms.

Particularly in light of the limited geographic scope of the harms that are to be considered in the

NEPA review at issue, the Court concludes that the disruptive consequences of rescinding the 2016-18

Interim Contracts outstrip the consequences that would flow from leaving the Interim Contracts in place.

### b.     Impact of EA/FONSI Vacatur on Interim Contract Implementation

Federal Defendants argue that the above conclusion—that rescinding the 2016-18 Interim

Contracts would be more disruptive than not doing so—should control the Court's evaluation of whether

the EA/FONSI should be vacated. In support of this argument, Federal Defendants rely in large part on

40 C.F.R. §§ 1505.2 and 1506.1 to support the proposition that setting aside the EA/FONSI would have

1   the same practical effect as setting aside the Interim Contracts. Doc. 46 at 2. Whenever an agency

2   determines it must prepare an EIS, 40 C.F.R. § 1505.2 requires the agency to "prepare a concise public

3   record of decision" ("ROD") and sets forth the required content of any such ROD.  40 C.F.R. §

4   1506.1(a), in turn provides:

5                 Until an agency issues a record of decision as provided in § 1505.2 (except
                  as provided in paragraph (c) of this section), no action concerning the
6                 proposal shall be taken which would:

7                        (1) Have an adverse environmental impact; or

8                        (2) Limit the choice of reasonable alternatives.

9   Therefore, in any case requiring the preparation of an EIS, the agency may not take any action

10  concerning the proposed project that would have an adverse environmental impact unless and until the

11  required ROD issues.

12       In the present case, the agency determined that no EIS and ROD were required, and instead

13  issued the EA and FONSI. This is in accordance with 40 C.F.R. § 1501.4, which commands the agency

14  "based on the [EA] [to] make its determination whether to prepare an [EIS]," and further requires the

15  issuance of a FONSI whenever "the agency determines on the basis of the environmental assessment not

16  to prepare a statement."

17       The Court agrees with Federal Defendants that if the EA is vacated, the FONSI cannot stand

18  alone because it is "supported by" the EA. *See* Finding of No Significant Impact & Final Environmental

19  Assessment, Central Valley Project Interim Renewal Contract for Westlands Water District, Santa Clara

20  Valley Water District, and Pajaro Valley Water Management Agency 2016- 2018 (February 2016)

21  ("FONSI"), Doc. 51-1, at ECF p. 5[9]. With neither the EA nor the FONSI in place, water deliveries

22

_____

23  [9] The Court takes judicial notice of this public record. *See* Fed. R. Evid. 201(b); *San Luis & Delta–Mendota Water Auth. v.*
    *Salazar,* 686 F. Supp. 2d 1026, 1031 (E.D. Cal. 2009) (taking judicial notice of public records published by administrative
24  bodies). While the court may take judicial notice of these types of documents, the documents are judicially noticeable "only
    for the purpose of determining what statements are contained therein, not to prove the truth of the contents or any party's
25  assertion of what the contents mean." *United States v. S. Cal. Edison Co.,* 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004).

pursuant to the 2016-18 Interim Contracts during the remand period would then be subject to 40 C.F.R. § 1506.1. In the absence of a ROD specific to the 2016-18 Interim Contracts, to the extent deliveries under those Interim Contracts are found to have any "adverse environmental impact," Defendants would need to reduce or potentially even suspend deliveries. Doc. 46 at 2. Accordingly, because even the flawed EA mentions some forms of adverse environmental impact within the Interim Contractors' delivery areas, *see, e.g.*, EA/FONSI, Doc. 51-1 at ECF p. 48 ("[T]he resumption of agricultural activities on lands fallowed for more than one year has the potential to remove dens, reduce prey and force kit foxes into unfamiliar areas."), reduction or suspension of deliveries is a real possibility as a result of 40 C.F.R. § 1506.1, the applicability of which does not turn on the "significance" of environmental harm. The Court also notes that it has been unable to identify a single case in which a NEPA document has been vacated but an ongoing project approved by that document has been permitted to continue in whole or in part.

The Court is unpersuaded by Plaintiffs' citation to *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007). In that case, the Ninth Circuit considered the propriety of a district court's decision to enjoin partially coal bed methane extraction after finding that an EIS reviewing the extraction project, while "generally sufficient under NEPA, . . . improperly failed to consider" a certain alternative. *Id.* at 841. Plaintiffs in that case cited 40 C.F.R. § 1506.1(c)(3), which prohibits any agency in the process of preparing a programmatic EIS from "undertak[ing] in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action: (1) Is justified independently of the program; (2) Is itself accompanied by an adequate environmental impact statement; and (3) Will not prejudice the ultimate decision on the program." The Ninth Circuit rejected the plaintiffs' argument that this provision "requires that no development proceed until after a valid EIS is completed," instead holding that "a NEPA violation is subject to traditional standards in equity for injunctive relief and does not require an automatic blanket injunction against all development." 503 F.3d at 843. *Northern Cheyenne Tribe* answers (in the negative) only the question of

1  whether a NEPA violation mandates an absolute stop to any project approved by a flawed NEPA

2  document. Because the issue was not raised, *Northern Cheyenne Tribe* does not address the question of

3  whether vacatur of the EIS itself would have made it impossible for the action agency to implement the

4  project in question in light of 40 C.F.R. § 1506.1.

5       The Court therefore concludes that vacatur of the EA/FONSI would likely cause the same

6  disruptive consequences as suspending implementation of the Interim Contracts. At least on the present

7  record, the consequences of Interim Contract suspension outstrip the consequences that would flow from

8  leaving the Interim Contracts in place. This must be balanced against the agency's error. As discussed

9  above, regarding the Ninth Circuit's concern in the *PCFFA Appellate Ruling* that any reduced quantity

10 alternative evaluated in an EA covering the Interim Contracts should take into consideration up-to-date

11 and accurate water needs information, the Court believes it is likely that the agency will be able to cure

12 this error on remand. As to the admitted errors regarding the no-action alternative, the use of such a

13 "meaningless" alternatives analysis calls into question the validity of the agency's issuance of an

14 EA/FONSI, rather than an EIS. However, because the scope of the impacts to be considered is limited to

15 impacts within the delivery area, it is possible the impacts revealed by a comparison of the proposed

16 Interim Contracts to a proper "baseline" no-action alternative would still warrant the re-issuance of an

17 EA/FONSI. The present record simply does not permit a firm determination of the likelihood that the

18 agency can cure the faulty alternatives analysis defect on remand. Although this failure of proof by the

19 moving party weighs in favor of vacatur, the Court believes the actual evidence of harm that would be

20 caused by vacatur outweighs the seriousness factor. As a result, any intervention that would suspend

21 implementation of the 2016-18 Interim Contracts would be inappropriate on the present record, and,

22 relatedly, vacatur of the EA/FONSI would likewise be inappropriate because vacatur of the NEPA

23 document likely would have the same practical effect as suspension of the Interim Contracts.

24      **4.    <u>Dismissal</u>**

25      Federal Defendants argue that the Court should dismiss this case upon remand because the

claims in this case are no longer ripe for review. Doc. 28 at 5. Federal Defendants cite *American Wild Horse Preservation Campaign v. Salazar*, 115 F. Supp. 3d 1 (D.D.C. 2012), in which the district court granted an agency's request for voluntary remand of an administrative decision authorizing rounding up, castrating, and returning of gelded wild horses to public land, a decision alleged to be in violation of the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340. The court further concluded that the claims based upon the remanded administrative decision should be dismissed because no relevant agency decision remained for the Court to consider. *Id.* at *4. Of particular note, nothing in the case suggested any disputed activities would be ongoing during the period of remand, nor could any party anticipate what the agency's decision would be at the conclusion of remand. *See id.*

The situation here is very different. The Court is permitting continued implementation of the Interim Contracts despite the agency's admission that the NEPA document covering those contracts is flawed. Moreover, one of Federal Defendants' central arguments—that vacatur of the EA/FONSI will likely have the same disruptive consequences as any order prohibiting implementation of the Interim Contracts themselves—depends in part on the underlying assumption that implementation of the Interim Contracts will cause some environmental harm.

"District courts have the authority to stay court proceedings and retain jurisdiction over cases even when an agency's request for a voluntary remand is granted." *XP Vehicles, Inc. v. United States Dep't of Energy*, 156 F. Supp. 3d 185, 193 (D.D.C. 2016). "While this is not always done, courts have exercised their discretion to do so when, for example, the court wishes to ensure that a voluntary remand will not, in fact, prejudice the non-movant." *Id.*; *see also Greater Yellowstone Coal. v. U.S. E.P.A.*, No. 4:12-CV-60-BLW, 2013 WL 1760286, at *5 (D. Idaho Apr. 24, 2013) (after granting motion for voluntary remand, retaining jurisdiction to "ensure a timely remand process and to allow the parties to challenge any new [agency] decision in this case."); *Friends of Park v. Nat'l Park Serv.*, No. 2:13-CV-03453-DCN, 2014 WL 6969680, at *4 (D.S.C. Dec. 9, 2014) (after granting motion for voluntary

remand, retaining jurisdiction to "ensure compliance" with the regulation alleged to have been violated). The Court will order periodic status reports on the progress of the remand.

**5.**    **Fees and Costs**

Finally, Federal Defendants' opening brief suggested that if voluntary remand is authorized in this case "each party should bear its own costs for the limited duration of this case." In the Briefing Order, the Court reasoned that *Li v. Keisler*, 505 F. 3d 913, 919 (9th Cir. 2007), cited by Federal Defendants, did not support the position advanced. Briefing Order at 7. Rather, *Li* suggests a case-by-case inquiry into whether substantial justification was present by, for example, examining whether the government's action was contrary to clearly established law. 505 F.3d at 920. The Court invited further briefing, Briefing Order at 7, but Federal Defendants have not provided any. Therefore, the Court will treat this issue as abandoned.

## IV. CONCLUSION AND ORDER

For the reasons set forth above:

(1) Federal Defendants' motion for voluntary remand WITHOUT VACATUR of the EA/FONSI is GRANTED;

(2) Plaintiffs' request to vacate, set-aside, or otherwise rescind the 2016-18 Interim Contracts is DENIED on the present record;

(3) All proceedings in this case are STAYED until further notice;

(4) The Court will retain jurisdiction over this matter; and

(5) Federal Defendants shall submit a brief status report on the progress of remand every ninety days, starting ninety days from electronic service of this order.

IT IS SO ORDERED.

Dated:    **December 15, 2016**            **/s/ Lawrence J. O'Neill**
                                         UNITED STATES CHIEF DISTRICT JUDGE