# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **NORTH COAST RIVERS ALLIANCE,** *et al.*, | **1:16-cv-00307-LJO-MJS** |
| Plaintiffs, | **ORDER GRANTING MOTION TO DISMISS SECOND CLAIM FOR RELIEF (ECF NO. 71)** |
| v. | |
| **UNITED STATES DEPARTMENT OF THE INTERIOR,** *et al.*, | |
| Defendants, | |
| **WESTLANDS WATER DISTRICT,** *et al.*, | |
| Intervenor-Defendants. | |

# I. INTRODUCTION

This case concerns approval by the United States Department of the Interior and its member agency, the United States Bureau of Reclamation (collectively, "Federal Defendants," "Reclamation," or the "Bureau"), of six interim renewal contracts that authorize delivery of water from March 1, 2016, through February 28, 2018, from federal reclamation facilities to certain water districts served by the federal Central Valley Project ("CVP") ("2016-18 Interim Contracts").[1] Doc. 64 (First Amended and Supplemental Complaint ("FASC")). The 2016-18 Interim Contracts at issue in this case provide water service to Westlands Water District, Santa Clara Valley Water District, and Pajaro Valley Water Management Agency (collectively, "Interim Contractors"). *See* FASC at ¶ 2. A coalition of

---

[1] Even though the relevant contract period has expired, the claims in the FASC are not moot. "The short duration and serial nature of Reclamation's interim water contracts place plaintiffs' claims within the mootness exception for disputes capable of repetition yet evading review." *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Dep't of the Interior*, 655 F. App'x 595, 597 (9th Cir. 2016).

1

environmental organizations led by the North Coast Rivers Alliance (collectively, "Plaintiffs") allege in the FASC's first claim for relief that Federal Defendants issued a deficient Revised Environmental Assessment ("EA") and associated Finding of No Significant Impact ("FONSI")[2] prior to approval of the Interim Contracts, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. FASC at ¶¶ 45-65. The second claim for relief alleges that Reclamation violated NEPA by failing to prepare an Environmental Impact Statement ("EIS") for the 2016-18 Interim Contracts. *Id*. at ¶¶ 56-59.

Before the Court for decision is Westlands Water District's and Panoche Water District's ("Defendant Intervenors") motion to dismiss the second claim for relief in the FASC for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) on the ground that the proposed action does not alter the status quo and therefore cannot trigger NEPA's requirement for preparation of an EIS. ECF No. 69. Federal Defendants join the motion, provided it is decided under the Rule 12(b)(6) standard and note cases declining to limit summary judgment briefing by federal agency defendants based upon denial of an intervenor's motion to dismiss. ECF No. 72. Plaintiffs oppose the motion. ECF No. 71. Defendant Intervenors replied. ECF No. 73. The matter was taken under submission on the papers pursuant to Local Rule 230(g). ECF No. 74.

## II. **BACKGROUND**

This case is related to an earlier case, *Pacific Coast Federation of Fishermen's Ass'ns v. U.S. Dep't of the Interior* ("*PCFFA*"), 1:12-cv-01303-LJO-MJS, which concerned a similar challenge to the NEPA review performed in connection with eight interim contracts that covered the period of time from

---

[2] NEPA requires agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA's implementing regulations provide that an agency shall prepare an EA to determine whether a proposed federal action will have a significant impact and to determine whether preparation of an EIS will be necessary. 40 C.F.R. § 1508.9. An EA is a "concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(E)], [and] of the environmental impacts of the proposed action and alternatives." 40 C.F.R. §§ 1508.9(a), (b). If the agency concludes in the EA that there is no significant effect from the proposed project, the federal agency may issue a FONSI in lieu of preparing an EIS. 40 C.F.R. § 1508.9(a)(1).

2

March 1, 2012 through the end of February 2014 ("2012-2014 Interim Contracts"). *See PCFFA*, ECF No. 47. The first amended complaint in that case ("*PCFFA* FAC"), filed December 4, 2012, contained two causes of action similar to those alleged here: (1) that the EA prepared by Federal Defendants in connection with the eight Interim Contracts is inadequate; and (2) that Federal Defendants should have prepared an EIS. *Id*.

Federal Defendants and Defendant Intervenors moved to dismiss both claims in the *PCFFA* FAC. *PCFFA* ECF No. 45-46. A March 8, 2013 Order granted the motions in part. *PCFFA* ECF No. 52; *Pac. Coast. Fed'n of Fishermen's Ass'ns v. U.S. Dep't of the Interior*, 929 F. Supp. 2d 1039, 1044-46 (E.D. Cal. 2013). Among other things, Plaintiffs, whose opposition to the motion to dismiss primarily focused upon undermining Federal Defendants' choice of a "status quo" alternative as the "No Action Alternative," appeared to concede that that the Proposed Action, which proposed only a small water pricing difference from the No Action Alternative, would not alter the "status quo" of CVP operations. *See PCFFA* ECF No. 48 at 12-13 (indicating assent to the proposition that the No Action Alternative as defined in this EA was the continuation of the status quo). Accordingly, after finding the No Action Alternative to be appropriate, the Court dismissed Plaintiffs' second cause of action demanding that an EIS be prepared, relying in part on a line of cases which stand for the proposition that no EIS is required for a project that does not alter the status quo. *PCFFA* ECF No. 52 at 10-20. After cross motions for summary judgment decided the remaining claims concerning the EA and FONSI in February 2014, *PCFFA* ECF No. 88, an appeal was taken in March 2014. *PCFFA* ECF No. 93.

While the *PCFFA* appeal was pending, Reclamation issued its EA and FONSI for the 2016-18 Interim Contracts. Plaintiffs sued, raising claims substantially similar to those in *PCFFA*: (1) that the EA/FONSI was inadequate under NEPA; and (2) that Reclamation should have prepared an EIS for the 2016-18 Interim Contracts. ECF No. 2.

On July 25, 2016, the Ninth Circuit reversed in part this Court's summary judgment ruling in *PCFFA*, remanding for further proceedings in connection with the EA/FONSI claim. Specifically, the

Ninth Circuit found that, despite the fact that the Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4700 (1992), mandates renewal of long-term water service contracts, the CVPIA does not require Reclamation to enter into interim contracts and therefore the "no action" alternative articulated in the EA for the 2012-2014 Interim Contracts unlawfully assumed interim contract renewal. *PCFFA* ECF No. 102 (Amended Memorandum); *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Dep't of the Interior*, 655 Fed. App'x 595, at *1-2 (9th Cir. July 25, 2016) ("*PCFFA Appellate Ruling*"). The Ninth Circuit also held that "Reclamation's decision not to give full and meaningful consideration to the alternative of a reduction in maximum interim contract water quantities was an abuse of discretion, and the agency did not adequately explain why it eliminated this alternative from detailed study." *Id*. at *2. While acknowledging that the Reclamation Project Act mandates renewal of existing contract quantities when water is beneficially used, *id*. (citing 43 U.S.C. § 485h-1(1) & (4)), the Ninth Circuit found that Reclamation "acted unreasonably by relying on stale water needs data." *Id*. The Ninth Circuit also affirmed this Court's ruling regarding the geographic scope of the EA. *Id*. at *3. The matter was remanded to this Court with instructions to vacate the grant of summary judgment in favor of defendants on plaintiffs' claim that the EA for the 2012-14 Interim Contracts was inadequate because it did not give full and meaningful consideration to the alternative of a reduction in maximum water quantities. *Id*. Reclamation was directed to "consider such an alternative in any future EA for an interim contract renewal." *Id*. In particular, the Ninth Circuit indicated that "[i]n satisfying this duty, Reclamation may rely upon any water needs assessment for which the data remain accurate." *Id*.

In light of the *PCFFA Appellate Ruling*, Federal Defendants moved for voluntary remand without vacatur of the EA/FONSI prepared in connection with the 2016-18 Interim Contracts. ECF No. 42 at 4-5. Plaintiffs did not oppose remand but requested that the Court vacate, set aside, or otherwise rescind the 2016-18 Interim Contracts. ECF No. 44. The Court granted Federal Defendants' motion and denied Plaintiffs' request for vacatur. ECF No. 52. The Case was stayed until further notice, the Court

retained jurisdiction, and Federal Defendants were required to submit periodic status reports on the progress of remand. *Id*.

On May 31, 2017, Reclamation issued a revised final EA and FONSI for the 2016-18 Interim Contracts. *See* ECF No. 56. Plaintiffs amended their complaint to address these new documents. *See* FASC. Defendant Intervenors' motion to dismiss the second claim for relief followed. ECF No. 69.

### III. **STANDARD OF DECISION**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In determining whether a complaint states a claim upon which relief may be granted, the Court accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion. *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

Under Rule 8, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

While Rule 8 does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it

offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged[.]" *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. In other words, the complaint must describe the alleged misconduct in enough detail to lay the foundation for an identified legal claim. "Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008). To the extent that the pleadings can be cured by the allegation of additional facts, the Court will afford the plaintiff leave to amend. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

## IV. ANALYSIS

Defendant Intervenors argue that Plaintiffs' second claim for relief, which alleges that Federal Defendants violated NEPA by failing to prepare an EIS prior to approving the 2016-18 Interim Contracts, should be dismissed because the challenged contracts do not alter the status quo. ECF No. 69-1. NEPA requires all federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234 (9th Cir. 1990). Determining whether a particular project triggers NEPA's EIS requirement has evolved into a fairly complex analysis that, among other things, blends the question of significance with an inquiry into whether the project will alter the status quo. The Ninth Circuit recently provided an overview of the analytical framework in *Idaho Conservation League v. Bonneville Power Administration*, 826 F.3d 1173, 1175 (9th Cir. 2016):

> A federal action that may have significant environmental impacts need not "also be 'major' in an economic or some other nonenvironmental sense to trigger the EIS requirement." *City of Davis v. Coleman*, 521 F.2d 661, 673 n.15 (9th Cir. 1975); *see* 40 C.F.R. § 1508.18 ("Major reinforces but does not have a meaning independent of significantly."). But when an agency, responding to changing conditions, makes a decision to operate a completed facility "within the range originally available" to it, the action is not major. *Upper Snake River*, 921 F.2d at 235 (quoting *Cty. of Trinity v. Andrus*, 438 F. Supp. 1368, 1388 (E.D. Cal. 1977)). In other words, "where a proposed federal action would not change the status quo, an EIS is not necessary." *Id.*; *accord San Luis & Delta–Mendota Water Auth. v. Jewell*, 747 F.3d 581, 646 (9th Cir. 2014).

The "status quo" jurisprudence was born out of the fact that ongoing projects "such as the CVP and SWP, constructed prior to the date on which NEPA became effective, January 1, 1970, are not retroactively subject to NEPA." *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1044 (E.D. Cal. 2009) (citing *Upper Snake River*, 921 F.2d at 234). "However, if an ongoing project undergoes changes which themselves amount to major Federal actions, the operating agency must prepare an EIS." *Upper Snake River*, 921 F.2d at 234-35 (citing *Andrus v. Sierra Club*, 442 U.S. 347, 363 n.21, (1979) (explaining that major federal actions include the "expansion or revision of ongoing programs")). In such circumstances, the critical inquiry is whether the project in question causes a change to the operational status quo of an existing project. *Upper Snake River*, 921 F.2d at 235.

*Upper Snake River* concerned Palisades Dam and Reservoir, constructed in 1956 and continuously managed and controlled by the Bureau since that time. *Id.* at 233. Reclamation proposed to reduce flows in the Snake River below the dam to below 1,000 cubic feet per second ("cfs") "[d]ue to lack of precipitation . . . to increase water stored for irrigation . . . ." *Id.* at 234. Although it had been standard operating procedure since 1956 to maintain flows below that dam above 1,000 cfs, during previous dry periods, the average flow had "been lower than 1,000 cfs for 555 days (or 4.75% of the total days in operation)." *Id.* at 233. Because the challenged flow fluctuations were within historic operational patterns, no NEPA compliance was required:

> The Federal defendants in this case had been operating the dam for upwards of ten years before the effective date of the Act. During that

7

> period, they have from time to time and depending on the river's flow level, adjusted up or down the volume of water released from the Dam. What they did in prior years and what they were doing during the period under consideration were no more than the routine managerial actions regularly carried on from the outset without change. <u>They are simply operating the facility in the manner intended. In short, they are doing nothing new, nor more extensive, nor other than that contemplated when the project was first operational. Its operation is and has been carried on and the consequences have been no different than those in years past</u>.

*Id*. at 235 (emphasis added).

*Upper Snake River* specifically cited *County of Trinity v. Andrus*, 438 F. Supp. 1368 (E.D. Cal. 1977), as "particularly instructive." *Upper Snake River*, 921 F.2d at 235. In *Trinity*, the plaintiffs sought to enjoin the Bureau from lowering the level of a reservoir during at drought year because of the potential damage to the fish population in the reservoir. 438 F. Supp. 1371-73. The district court explained that the issue was "not whether the actions are of sufficient magnitude to require the preparation of an EIS, but rather whether NEPA was intended to apply at all to the continuing operations of completed facilities." *Id*. at 1388. The situation presented was distinguished from circumstances in which "a project takes place in incremental stages of major proportions," and from cases where "a revision or expansion of the original facilities is contemplated." *Id*. As the *Trinity* court observed:

> The Bureau has neither enlarged its capacity to divert water from the Trinity River nor revised its procedures or standards for releases into the Trinity River and the drawdown of reservoirs. It is simply operating the Division within the range originally available pursuant to the authorizing statute, in response to changing environmental conditions.

*Id*. at 1388-89. The Ninth Circuit has interpreted *Trinity*'s reasoning as a holding that the "actions taken in operating the system of dams and reservoirs (in particular, operational responses in a drought year) were not 'major Federal actions' within the meaning of NEPA." *Upper Snake River,* 921 F.2d at 235.

This line of authority was developed further in *Idaho Conservation League*, where the Ninth Circuit examined plans to modify operation of the Albeni Falls Dam on the Columbia River during the winter months. 826 F.3d at 1174-75. In 1995, the operating federal agencies determined that allowing the lake's elevation to drop during the winter months had adverse effects on fish populations. *Id*. at

1175. So, beginning in 1997, operators began holding the lake's elevation constant. *Id*. In 2009, the Bonneville Power Administration ("BPA") urged federal regulators to return to a more flexible approach to winter dam management. *Id.* Eventually, in 2011, the agencies confirmed in an EA that they planned to implement the flexible approach, which would allow the lake behind the dam to rise and fall by as much as five feet during the winter. *Id.* The Ninth Circuit reasoned that "[i]f the agencies . . . have consistently fluctuated winter lake levels, formalizing that approach would not be a major federal action because the agencies would be 'doing nothing new, nor more extensive, nor other than that contemplated when the [Albeni Falls Dam] was first operational.'" *Id*. at 1176. The Ninth Circuit first examined whether holding lake levels constant from 1997 to 2011 changed the status quo, reasoning that if it did not "then reverting to the previous regime doesn't change the status quo either." *Id*. Focusing on whether holding lake levels constant during these years constituted a "significant shift of direction in operating policy," the Ninth Circuit emphasized that "for purposes of NEPA, the term '[m]ajor reinforces but does not have a meaning independent of significantly.'" *Id*. (internal citations omitted). The Ninth Circuit reasoned that the "<u>short term decision, which was found to have no significant environmental impact, could not have constituted a major federal action because it wasn't a significant or long-term change in operating policy. In short, it did not change the status quo.</u>" *Id*. (emphasis added). "Because the period when the agencies held winter lake levels constant did not change the operational status quo, neither [did] the decision to revert to flexible winter operations." *Id*. at 1177. The Ninth Circuit further noted that the EA in that case indicated that "in some winters the lake has fluctuated, and in others it hasn't." *Id*. Accordingly, the agencies would be "doing 'nothing new, nor more extensive, nor other than that contemplated when the project was first operational.'" *Id*. (*quoting Upper Snake River*, 921 F.2d at 235). Critically for purposes of the present case, while whether a project would have significant impacts was a consideration, the primary focus was on whether the action constituted a "significant or long-term change in operating policy."

  *Westlands Water District v. U.S. Department of Interior*, 850 F. Supp. 1388 (E.D. Cal. 1994),

followed a similar tack. That case concerned a NEPA challenge to the Bureau's decision in 1993 to limit water deliveries to certain CVP contractors in light of environmental protection mandates included in the CVPIA, and the Endangered Species Act, 16 U.S.C. § 1531 *et seq*. *Id*. at 1394-98. The contractors argued that the Bureau's decision triggered NEPA's EIS requirement because the reduction in deliveries – which amounted to a reallocation of over 1.2 million acre feet[3] of water from agricultural to environmental use – directly resulted "in changes in air and water quality, soil subsidence, and diminution of soil quality and the quantity of groundwater." *Id.* at 1415-16. The district court in *Westlands* reasoned that whether or not an EIS was required "will, of necessity, depend heavily upon the unique factual circumstances of each case." *Id*. at 1415 (citing *Westside Property Owners v. Schlesinger*, 597 F.2d 1214, 1224 (9th Cir. 1979)).

> To some extent, the finding is based on whether the proposed agency action and its environmental effects were within the contemplation of the original project when adopted or approved. [Citations]. The inquiry requires a determination of whether plaintiffs have complained of actions which may cause significant degradation of the human environment. [Citations].

*Westlands*, 850 F. Supp. at 1415 (internal citations omitted). In *Westlands* "the taking of water for non-agricultural purposes [was] alleged to have changed the operational requirements of the CVP, imposed new standards for reverse flows in the Western Delta, carryover storage in the Shasta reservoir, and caused closure of the Delta cross-channel. Such actions and the environmental effects alleged are not routine managerial changes." *Id*. at 1421. In sum, the actions represented a "<u>change in normal CVP operations</u> having a 'significant effect on the human environment.'" *Id*. at 1416 (citing 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.27) (emphasis added).

Likewise, implementation of components of the massive biological opinions that govern the operation of the CVP and SWP have been found to be "major federal actions" because they significantly

---

[3] An acre foot of water is the volume of water required to cover one acre of surface area to the depth of one foot, or approximately 43,560 cubic feet. *United States v. Westlands Water Dist*., 134 F. Supp. 2d 1111, 1139 n. 61 (E.D. Cal. 2001).

impacted operations at CVP and SWP pumping plants and other facilities and substantially affected flows in the Delta. *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1049 (E.D. Cal. 2009); *Consol. Salmonid Cases*, 688 F. Supp. 2d 1013, 1032 (E.D. Cal. 2010).

Plaintiffs maintain that under the analytical framework set forth in *Idaho Conservation League*, an EIS should be required here because "the cumulative consequences of the interim contracts" are far worse than in past years. *See* ECF No. 71 at 5. They assert in their brief that "the *cumulative* amount of water diverted from the Delta *has* increased" and that this "indisputable cumulative increase has taken its toll on the Delta's fish and wildlife." *Id*. (emphasis in original).[4] Plaintiffs do not assert that an EIS should be required because the Interim Contracts themselves have effected a significant or long-term change in operating policy. Rather, they argue that other factors (such as increased overall diversions from the Delta and further deterioration of the Delta ecosystem) have rendered the cumulative impact of contract implementation significant. *See, e.g.*, FASC at ¶¶ 27 & 54 (describing how incremental effect of bioaccumulation of pollutants may be significant over time). This is a novel and clever argument, but it cannot take Plaintiffs where they want to go in the face of the over-arching pattern of existing authority.

In those cases discussed above in which changes were deemed sufficient to rise above "routine managerial actions," to amount to "significant or long-term change in operating policy" the allegations were indicative of real, substantive changes to operational parameters. In *Westlands*, for example, CVP operations were alleged to have re-directed 1.2 million acre feet of water away from agricultural use. 850 F. Supp. at 1415-16. In *San Luis*, 686 F. Supp. 2d at 1049, and the *Consolidated Salmonid Cases*, 688 F. Supp. 2d at 1032-33, protective measures required by ESA biological opinions indisputably and significantly impacted flows in the Delta. Here, Plaintiffs can point to no managerial action that changed anything whatsoever from the prior management approach, namely, implementation of previous Interim

---

[4] The Court notes that the FASC does not allege that cumulative diversions from the Delta have increased over time. But, for the sake of discussion, the Court will assume that Plaintiffs could amend the complaint to include such allegations.

11

Contracts. Moreover, requiring an EIS under the present circumstances would undermine practical considerations the Ninth Circuit has deemed important. In *Idaho Conservation League*, for example, the Ninth Circuit emphasized that "[r]equiring an agency to prepare an EIS every time it takes an action consistent with past conduct would grind agency decisionmaking to a halt." 826 F.3d at 1177. Nothing in the FASC alleges Reclamation's operational activities are inconsistent with past conduct and Plaintiffs have pointed to no authority that even tangentially supports their suggestion that NEPA's EIS requirement can be triggered based upon cumulative impact in the absence of significant or long-term change in operating policy.

Plaintiffs attempt to sidestep entirely the "status quo" aspect of the analysis by focusing on the significance of the potential environmental impact. They cite 40 C.F.R. § 1508.27(b), which identifies ten factors an agency should consider when determining whether a NEPA action would significantly impact the human environment.[5] As Plaintiffs point out, the Ninth Circuit has held that any "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005). In order to understand why

---

[5] The ten listed factors are:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.
(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.
(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b).

40 C.F.R. § 1508.27 and *Ocean Advocates* are not dispositive here, the Court returns to the paragraph initially quoted above from *Idaho Conservation League*:

> A federal action that may have significant environmental impacts need not "also be 'major' in an economic or some other nonenvironmental sense to trigger the EIS requirement." *City of Davis v. Coleman*, 521 F.2d 661, 673 n.15 (9th Cir. 1975); *see* 40 C.F.R. § 1508.18 ("Major reinforces but does not have a meaning independent of significantly."). But when an agency, responding to changing conditions, makes a decision to operate a completed facility "within the range originally available" to it, the action is not major. *Upper Snake River*, 921 F.2d at 235 (quoting *Cty. of Trinity v. Andrus*, 438 F. Supp. 1368, 1388 (E.D. Cal. 1977)). In other words, "where a proposed federal action would not change the status quo, an EIS is not necessary." *Id.*; *accord San Luis & Delta–Mendota Water Auth. v. Jewell*, 747 F.3d 581, 646 (9th Cir. 2014).

826 F. 3d at 1173. This, put simply, instructs courts to avoid requiring a federal action to independently be "major" in some non-environmental way (e.g., physically large, economically important). As this language emphasizes, "major reinforces but does not have a meaning independent of significantly." This does not, however, mean that "major" is not a requirement. Rather, as *Idaho Conservation League* specifically explains, where a proposed federal action amounts to operating a facility or program within pre-existing parameters, the action is not major. In other words, where a project does not change the status quo, an EIS is not necessary. 40 C.F.R. § 1508.27 and *Ocean Advocates* cannot therefore be independently dispositive of the "major federal action" analysis, which, according to *Idaho Conservation League*, at least requires consideration of the status quo issue.

Plaintiffs are also incorrect that the *PCFFA Appellate Decision* undermines Defendant Intervenors' argument that the 2016 Interim Contracts do not alter the status quo for purposes of NEPA's EIS requirement. The *PCFFA Appellate Decision* did not address NEPA's EIS requirement or the cases discussed herein. 655 Fed. App'x at 595. The Ninth Circuit did reject Federal Defendants' attempts to define the "no action" alternative used in the EA as the status quo (i.e., as continued operations under the existing management strategy), because such a no action alternative would only be appropriate if Interim Contract renewal was mandatory. *Id*. at 598. Concluding that the relevant statutory

13

language did not mandate Interim Contract renewal, the Ninth Circuit found unlawful a "no action" alternative that assumed renewal. *Id*. This inquiry is legally distinct from the one outlined in *Upper Snake River* and *Idaho Conservation League* which examines the proposed action itself, not its alternatives.

More persuasively, Plaintiffs cite *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768 (9th Cir. 2006), which addresses the status quo issue in an arguably analogous context.[6] *Pit River* concerned the Bureau of Land Management's ("BLM") issuance of geothermal leases to private entities. *Id*. at 772-78. A programmatic EIS issued in 1973 addressed the nationwide geothermal lease program generally, while several EAs issued in the early 1980s focused more specifically on the region in which the contested leases were located. *Id*. at 773-74. In 1988, relying on those earlier environmental documents, BLM issued the initial round of geothermal leases to a private company, each for a ten year term. *Id*. at 775. "Little activity occurred during the initial lease term." *Id*. at 776. Then, in the mid-1990s, the successor in interest to the initial 1988 leases, Calpine Corporation ("Calpine"), began to explore plans for a geothermal power plant. *Id*. The relevant agencies prepared an EIS for the power plant, the draft of which received "much criticism from the public." *Id*. at 777. Then, in 1998, BLM extended the leases for another five years without performing any environmental review. *Id*.

The BLM argued that the 1998 lease extensions did not require separate environmental review because the extensions "preserved the status quo." *Id*. at 784. The BLM relied in part on *National Wildlife Federation v. Espy*, 45 F.3d 1337, 1343-44 (9th Cir. 1995), in which the Ninth Circuit held that government action to seize title to a ranch from a delinquent borrower and sell it to a new ranger that continued to graze cattle on the land did not require NEPA analysis because cattle had grazed on the land prior to the title transfer. The Ninth Circuit distinguished the circumstances in *Pit River* from the "continued use" scenario in *Espy*:

---

[6] It is notable that *Pit River* (decided in 2006) does not discuss *Upper Snake River* (decided in 1990). Nor does *Idaho Conservation League* (decided in 2016) discuss *Pit River*.

14

> Without the affirmative re-extension of the 1988 leases, Calpine would have retained no rights at all to the leased property and would not have been able to go forward with the [planned geothermal plant]. The status quo before the 1998 extensions was that Calpine owned rights to produce geothermal steam valid through May 31, 1998, after which Calpine owned nothing. Instead of preserving the status quo, the lease extensions gave Calpine an extra five years to develop the land and the possibility of obtaining a future lease extension of up to forty years.
>
> Like the original 1988 leases, the 1998 extensions of Calpine's leases did not reserve to the agencies the absolute right to deny development and did not merely preserve the status quo. Under NEPA and our case law, the agencies were required to complete an environmental impact statement before extending the leases. This obligation was not satisfied by the earlier environmental reviews.

*Id*. at 784.

Plaintiffs argue that *Pit River* controls here because the 2016-18 Interim Contracts, like the geothermal leases in *Pit River*, are a "new grant of rights to the intervenors that would otherwise have expired, and constitute an irretrievable commitment of resources mandating an EIS." ECF No. 71 at 6. At first glance, the parallels are compelling. *Pit River* concerned a lease arrangement. The Interim Contracts are, unsurprisingly, contracts, arguably distinguishing their execution from the managerial decision-making at issue in *Idaho Conservation League* (dam management), *Upper Snake River* (same), and *Westlands* (delivery of water from the CVP to contractors). It is also true that the Ninth Circuit concluded that renewal of the Interim Contracts is not mandatory:

> [W]e do not agree with the district court that the Central Valley Project Improvement Act ("CVPIA"), a part of the Reclamation Projects Authorization and Adjustment Act of 1992, required Reclamation to enter into the interim contracts. The CVPIA requires "appropriate environmental review," including the preparation of a programmatic EIS ("PEIS"), before Reclamation is authorized to renew an existing long-term water service contract. CVPIA § 3404(c)(1). After the completion of the PEIS, Reclamation "shall, upon request, renew any existing long-term repayment or water service contract for the delivery of water from the Central Valley Project for a period of twenty-five years." *Id*. Prior to the completion of the PEIS, Reclamation "may" renew water service contracts for interim three- or two-year periods. *Id*. As the district court acknowledged, normally, when "may" and "shall" are used in the same statute, the " 'inference is that each is being used in its ordinary sense— the one being permissive, the other mandatory.' " *Ctr. for Biological*

15

> *Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 935 (9th Cir. 2006)
> (quoting *Haynes v. United States*, 891 F.2d 235, 239-40 (9th Cir. 1989))
> (interpreting Endangered Species Act). We also reject Reclamation's
> argument that the contracts themselves mandated renewal. NEPA imposes
> obligations on agencies considering major federal actions that may affect
> the environment. An agency may not evade these obligations by
> contracting around them.

*PCFFA*, 655 F. App'x at 598. Accordingly, Plaintiffs appear to be correct that the 2016-18 Interim Contracts constitute a "new grant of right to the intervenors that would otherwise have expired."

However, Plaintiffs are incorrect that the Interim Contracts constitute "an irreversible and irretrievable commitment of resources," akin to the geothermal leases in *Pit River*. *Pit River* focused on a line of cases requiring the preparation of an EIS "before any irreversible and irretrievable commitment of resources." 469 F.3d at 781-83 (citing *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1998) ("Our circuit has held that an EIS must be prepared before any irreversible and irretrievable commitment of resources.").[7] The Ninth Circuit determined that it must "resolve whether the leases and lease extensions at issue . . . reserve to the agencies the right to preclude surface-disturbing activity altogether." *Id.* at 782. Critically, the leases "did not reserve to the agencies the absolute right to deny development." *Id.* at 784. As a result of the lease language, the agencies recognized as far back as 1973 that such leases "may constitute major Federal action significantly affecting the quality of the human environment." *Id.* at 783. It was in this context that the Ninth Circuit rejected the agency defendants' argument that because the plaintiffs "did not challenge the 1998 leases, . . . they were free to do as they wished in 1998," finding instead that "the agencies were required to complete an [EIS] before extending the leases." *Id.* at 784.

On this issue the 2016-18 Interim Contracts are facially distinguishable from the geothermal

---

[7] *Conner* explained in a footnote that:

> The "irreversible and irretrievable commitment of resources" criterion is derived from 42 U.S.C. § 4332(C)(v) which requires an EIS to include a statement of "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." Obviously this requirement only makes sense if the EIS is prepared prior to the commitment of resources.

848 F.2d at 1446 n.13.

16

leases in *Pit River* for reasons this Court has discussed at length in related cases. Specifically, the Interim Contracts at issue here contain a shortage provision that allows Reclamation to <u>completely withhold water deliveries</u>. *See Nat. Res. Def. Council v. Norton*, 236 F. Supp. 3d 1198, 1208 (E.D. Cal. 2017) (reviewing relevant decisions in related cases).[8] Because of this, execution of the Interim Contracts was not an irreversible and irretrievable commitment of resources. This renders the line of cases requiring EIS's in the case of such commitments of resources – a line of which *Pit River* is a part – inapplicable. In this way the Court is able to at least partially reconcile the seemingly conflicting holdings of *Idaho Conservation League* and *Pit River* under the circumstances of this particular case. It is not a perfectly satisfying reconciliation, but it is the most logical outcome the Court can conceive of in light of the present state of the law.

The second claim for relief in the FASC must be dismissed because the 2016-18 Interim Contracts do not alter the status quo as that concept is outlined in *Upper Snake River* and *Idaho Conservation League*. NEPA does not require an EIS under such circumstances.

## V. CONCLUSION AND ORDER

For the reasons set forth above, Defendant Intervenors' motion to dismiss the second claim for relief is GRANTED. The case shall remain OPEN.

IT IS SO ORDERED.

Dated: **March 12, 2018**  /s/ Lawrence J. O'Neill
UNITED STATES CHIEF DISTRICT JUDGE

---

[8] The Court does not believe the conclusion reached herein conflicts with the Ninth Circuit's holding in *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014), which held that, despite the presence of these shortage provisions in the so-called "Delta-Mendota Canal Unit Water Service" long term contracts, environmental Plaintiffs had standing to raise ESA challenges against those contracts because the shortage provision "does not provide the delta smelt with the greatest possible protection." The Ninth Circuit did not call into question, however, the fact that the shortage provision operates to allow the Bureau to withhold water deliveries, thereby distinguishing the present circumstances from the geothermal leases in *Pit River*.

17