STEPHAN C. VOLKER (CSB #63093)
ALEXIS E. KRIEG (CSB #254548)
STEPHANIE L. CLARKE (CSB #257961)
JAMEY M.B. VOLKER (CSB #273544)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703
Tel:   510/496-0600
Fax:  510/845-1255

Attorneys for Plaintiffs
NORTH COAST RIVERS ALLIANCE, CALIFORNIA
SPORTFISHING PROTECTION ALLIANCE, PACIFIC
COAST FEDERATION OF FISHERMEN'S
ASSOCIATIONS, SAN FRANCISCO CRAB BOAT
OWNERS ASSOCIATION, INC., and INSTITUTE
FOR FISHERIES RESOURCES

10.582.02

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| NORTH COAST RIVERS ALLIANCE, CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION, INC., and INSTITUTE FOR FISHERIES RESOURCES, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, and UNITED STATES BUREAU OF RECLAMATION, <br><br> Defendants, <br><br> WESTLANDS WATER DISTRICT, SAN LUIS WATER DISTRICT, and PANOCHE WATER DISTRICT, <br><br> Intervenor-Defendants. | Civ. No. 16-cv-307-DAD-SKO <br><br> **SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Judge Dale A. Drozd |

**INTRODUCTION**

1.      Plaintiffs NORTH COAST RIVERS ALLIANCE, CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION, INC., and INSTITUTE FOR FISHERIES RESOURCES (collectively, "plaintiffs") hereby sue defendants UNITED STATES DEPARTMENT OF THE INTERIOR and UNITED STATES BUREAU OF RECLAMATION (collectively, "Reclamation") for violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. section 4321 et seq., and the Central Valley Project Improvement Act ("CVPIA"), Public Law No. 102-575, 108 Stat. 4600, Title XXXIV (1992).  Plaintiffs challenge, under the Administrative Procedure Act ("APA"), 5 U.S.C. sections 701-706, three sets of decisions by Reclamation that allow environmentally harmful diversions by Reclamation's Central Valley Project of massive quantities of freshwater from the Delta formed by the Sacramento and San Joaquin rivers for consumptive use without the comprehensive environmental reviews required by NEPA and the CVPIA.

2.      First, plaintiffs seek this Court's judgment overturning Reclamation's approval in 2016 of six water service contracts based on Reclamation's deficient Revised Environmental Assessment ("2016 Revised EA") and Finding of No Significant Impact ("FONSI," collectively "2016 EA and FONSI").  Reclamation calls this project the *Central Valley Project Interim Renewal Contract for Westlands Water District, Santa Clara Valley Water District, and Pajaro Valley Water Management Agency 2016-2018* ("2016 interim contracts").  The 2016 interim contracts reauthorize two years of water delivery from Reclamation's Central Valley Project ("CVP") to Pajaro Valley Water Management Agency, Santa Clara Valley Water District, and Westlands Water District (collectively, the "interim contractors").  The 2016 EA and FONSI violate NEPA because (1) they fail to fully consider and disclose the environmental consequences of the reduced-contract-quantity and no-action alternatives as required by this statute; (2) they fail to consider a reasonable range of alternatives;

(3) their statement of purpose and need is inadequate; (4) they ignore the Project's environmental impacts outside the contractors' delivery and service areas; (5) they fail to disclose the environmental impacts of the Project on source watersheds; (6) they fail to fully analyze and disclose the Project's impact on listed species including the giant garter snake and the California least tern; (7) they fail to consider the extent to which climate change will affect the environmental impacts of the Project; and (8) they do not disclose the cumulative impacts of an extended series of interim contract renewals.  As a consequence of these erroneous assumptions, omissions and mischaracterizations, the 2016 EA and FONSI erroneously conclude that water deliveries under the interim contracts will have *no effect on the environment*.

3.      Second, plaintiffs seek this Court's judgment overturning Reclamation's reauthorization in 2020 of these same six interim water service contracts based on Reclamation's deficient 2020 Environmental Assessment ("2020 EA") and FONSI ("2020 FONSI," and collectively with the 2020 EA, the "2020 EA and FONSI") for another two years.  The 2020 EA and FONSI violate NEPA in the same eight respects as the 2016 EA and FONSI, as summarized above.  For more than two decades, Reclamation has been using these interim contracts and their similar predecessors to avoid preparation of the long-overdue Environmental Impact Statement ("EIS") that would otherwise be required by NEPA and the CVPIA for approving long-term contracts under the CVPIA.  Congress required Reclamation to conduct a thorough environmental review of the impacts of entering into long-term contracts and then to enter into those contracts with appropriate mitigations based on that comprehensive review.  Nearly thirty years later, Reclamation still has not completed this task, relying instead on repeated renewals of the interim contracts without adequate environmental review.  Reclamation may not evade meaningful environmental review under NEPA by entering into an assembly-line cycle of interim contracts based on essentially meaningless EAs that ignore those contracts' significant individual and cumulative environmental impacts.

4.      Third, plaintiffs seek this Court's judgment overturning Reclamation's decision on or about February 28, 2020 to enter into permanent repayment (or "conversion") contracts with intervenor-defendant Westlands Water District ("Westlands"), East Bay Municipal Utility District, City of Folsom, Placer County Water Agency, City of Roseville, Sacramento County Water Agency, Sacramento Municipal Utility District, and San Juan Water District, and decisions on or about May 29, 2020 and later, to enter into additional conversion contracts with intervenor-defendant Westlands and others, effective on or about June 1, 2020 and later, without:  (1) conducting the environmental review required by NEPA and the CVPIA, (2) requiring the contractors to first obtain and provide court judgments validating the repayment contracts as required under 43 U.S.C. §§ 423e and 511, and (3) complying with other requirements of Reclamation Law.  Plaintiffs are informed and believe that Reclamation is approving and entering into scores of other repayment contracts similarly without compliance with NEPA, the CVPIA, and other requirements of Reclamation Law, and accordingly seek declaratory and injunctive relief against those ongoing unlawful approvals as well.

5.      With respect to the first of these three grounds for Plaintiffs' challenge to the repayment contracts–Reclamation's failure to conduct the environmental analysis required by NEPA and the CVPIA–Reclamation entered, and is entering, into these repayment contracts to supersede the 2020 EA and FONSI (and other similar interim contract EAs and FONSIs), and to replace the 2020 interim water service contracts between these parties and other similar interim water contracts, without conducting required environmental reviews.  Reclamation failed to conduct *any* environmental analysis in connection with its approval of the repayment contracts, despite the requirements of NEPA and the CVPIA that it do so, on the fallacious grounds that it lacked discretion to conduct the environmental reviews required by NEPA and the CVPIA.  This Court should reject Reclamation's erroneous claims of impotence to conduct an adequate environmental review and remedy Reclamation's error by setting

1  aside its unlawful approval of the repayment contracts and ordering Reclamation to
2  comply with NEPA and the CVPIA.

3       6.      With respect to the second of Plaintiffs' three grounds for challenging the
4  repayment contracts–Reclamation's failure to require the contractors to obtain
5  validation judgments– Reclamation has failed to require the contractors to secure
6  validation judgments confirming their authority to enter into those contracts despite its
7  plain statutory duty to do so.  Section 423e  of Title 43 of the United States Code
8  provides in pertinent part that "[n]o water shall be delivered [by a federal reclamation
9  project] until a contract or contracts in form approved by the Secretary of the Interior
10  shall have been made with an irrigation district or irrigation districts organized under
11  State law providing for payment by the district or districts of the cost of constructing,
12  operating and maintaining the works during the time they are in control of the United
13  States . . . , and the execution of said contract or contracts shall have been confirmed by
14  a court of competent jurisdiction."  Section 511 similarly provides in pertinent part that
15  "[i]n carrying out the purposes of the Act of June 17, 1902 (32 Stat. 388), and Acts
16  amendatory thereof and supplementary thereto, and known as the reclamation law, . . . .
17  no contract with an irrigation district under this section [511] and sections 512 and 513
18  of this title [title 43 of the United States Code] shall be binding on the United States
19  until the proceedings on the part of the district for the authorization of the execution of
20  the contract shall have been confirmed by decree of a court of competent jurisdiction, or
21  pending appellate action if ground for appeal be laid."  Reclamation failed to comply
22  with both of these statutes when it entered into the repayment contracts.

23       7.      With respect to the third of Plaintiffs' three grounds for challenging the
24  repayment contracts, Reclamation failed to comply with several other requirements of
25  Reclamation Law.  First, Reclamation failed to make the repayment contracts as
26  ultimately modified available for public review prior to their approval in violation of 43
27  C.F.R. § 426.22(b) and(d), which respectively direct in pertinent part that Reclamation
28  must "[p]rovide copies of revised proposed contracts to all parties who requested copies

1  of the proposed contract in response to the initial notice," and insure that "[a]nyone can

2  get copies of a proposed contract from the appropriate regional director. . . ."

3       8.      Second, Reclamation's repayment contract with Westlands exceeds by

4  more than 200,000 acres the maximum acreage authorized to receive Central Valley

5  Project water by Congress in the San Luis Act of 1960,  Public law No. 86-466, 74 Stat.

6  156 (1960).

7       9.      Third, Reclamation's repayment contract with Westlands fails, and its

8  repayment contracts with other contractors fail, to assure Westlands' and the other

9  contractors' compliance with applicable water quality standards as required by the

10  CVPIA.  The CVPIA provides in 43 U.S.C. § 3405(c) that "[a]ll Central Valley Project

11  water service or repayment contracts for agricultural, municipal or industrial purposes

12  that are entered into, renewed, or amended under any provision of Federal Reclamation

13  law after the date of enactment of this title, shall provide that the contracting district or

14  agency shall be responsible for compliance with all applicable State and Federal water

15  quality standards applicable to surface and subsurface agricultural drainage discharges

16  generated within its boundaries."  The CVPIA directs further in 43 U.S.C. § 3404(c)(2)

17  that "[u]pon renewal of any long-term repayment or water service contract providing for

18  the delivery of water from the Central Valley Project, the Secretary shall incorporate all

19  requirements imposed by existing law, including provisions of the title, within such

20  renewed contracts."

21       10.     Contrary to these mandates, Reclamation's repayment contract with

22  Westlands does not, and its repayment contracts with other contractors do not, expressly

23  incorporate any specific State or Federal water quality standards.  Instead, its repayment

24  contracts leave implementation of such standards to the discretion of Reclamation's

25  contracting officer, and to Westlands and the other contractors.  But applicable water

26  quality standards and permit requirements are not discretionary under the law.  And,

27  they are being violated by Reclamation's excessive diversions of water from the Delta

28  for delivery to its contractors, and by the contaminated agricultural drainage that has

1  resulted in the past, and will foreseeably result in the future, from those diversions and

2  deliveries.

3    11.    In sum, Reclamation's environmental review of the interim contracts has

4  been a meaningless charade, devoid of any effective disclosure and analysis of the

5  interim contracts' cumulative adverse effects, and of alternatives and mitigations that

6  would avoid or reduce those effects.  Even worse, Reclamation evaded and is evading

7  environmental review altogether in approving the successor repayment contracts.

8  Reclamation violated and is violating Congress's clear mandate that any such contracts

9  first be validated by a court judgment, comply with other procedural and substantive

10  standards of Reclamation Law, and assure thorough public review and implementation

11  of federal water quality standards.  Plaintiffs seek speedy adjudication of this matter to

12  address and reverse the accelerating decline of water quality and fish and wildlife

13  caused by the water diversions authorized by the interim contracts and the repayment

14  contracts.

15              **JURISDICTION AND VENUE**

16    12.    The Court has jurisdiction over this action under 28 U.S.C. sections 1331

17  (federal question), 1337 (regulation of commerce), 1346 (United States as defendant),

18  1361 (mandamus against an officer of the United States), 2201 (declaratory judgment),

19  and 2202 (injunctive relief), and under the APA, 5 U.S.C. sections 701-706, because (1)

20  the action arises under the APA, NEPA and the CVPIA; (2) Reclamation is an agency of

21  the United States government and the individual defendants are sued in their official

22  capacities as officers of the United States; (3) the action seeks a declaratory judgment

23  that Reclamation's 2016 EA and FONSI and 2020 EA and FONSI are inadequate; and

24  (4) the action also seeks declaratory and injunctive relief declaring unlawful and

25  vacating Reclamation's approval of the repayment contracts because they violate the

26  requirements of NEPA and the CVPIA.

27    13.    Venue is proper in this judicial district pursuant to 28 U.S.C. sections

28  1391(b)(2) and 1391(e)(2) because a substantial part of the events giving rise to

1  plaintiffs' claims occurred, and a substantial part of the property that is the subject of

2  the action is situated, in this judicial district.

3      14.    The parties have an actual, justiciable controversy.  Plaintiffs are entitled to

4  a declaration of their rights and of Reclamation's obligations, and to injunctive relief to

5  enforce Reclamation's statutory duties and prevent further irreparable environmental

6  harm.

7      15.    This Complaint is timely filed within the applicable six-year statute of

8  limitations set forth in 28 U.S.C. section 2401(a).  Reclamation approved the 2016

9  interim contracts on or about February 29, 2016, and Reclamation signed the updated

10  FONSI based on the deficient Revised EA on May 31, 2017.  Reclamation issued the

11  2020 EA and signed the 2020 FONSI on or about February 24, 2020, and approved the

12  2020 interim contracts effective March 1, 2020.  Reclamation commenced approving

13  the repayment contracts on or about February 28, 2020, with an effective date on or

14  about June 1, 2020, and, on information and belief, has subsequently approved scores of

15  additional repayment contracts.

16      16.    Plaintiffs have standing to assert their claims because they suffer tangible

17  harm from Reclamation's violations of law as alleged herein.  Plaintiffs' interests in

18  restoring water quality and quantity and dependent fish and wildlife species in the Bay-

19  Delta and its tributary rivers and watershed will continue to be harmed by the massive

20  diversions of public water permitted by the interim contracts and repayment contracts.

21  The contracts' diversion and consumptive use of vast quantities of freshwater not only

22  harm fish and wildlife directly through reduced freshwater flows in the Delta and

23  entrainment at the pumping plants.  The contracts also harm plaintiffs indirectly through

24  the discharge of polluted return flows from the contractors' use of the diverted water for

25  irrigation of contaminated soils in the southern and western San Joaquin Valley.  A

26  ruling from this Court requiring Reclamation to conduct a thorough environmental

27  review of these impacts as required by NEPA and the CVPIA would redress plaintiffs'

28  harms in several ways.  First, Reclamation would be required to disclose and analyze the

harms that the contracts cause to the Delta and its watershed and their fish and wildlife.
Second, Reclamation would be ordered to evaluate less harmful alternatives and
consider mitigation measures to avoid or reduce the harms that the contracts cause.
Third, Reclamation would be ordered to comply with the environmental restrictions on
its diversions of water from the Delta that are set forth in the CVPIA, thereby conferring
environmental benefits, including protection of water quality and dependent fish and
wildlife, on plaintiffs.

17.     Plaintiffs have suffered and are suffering procedural injuries due to
Reclamation's failure to fulfill its NEPA and CVPIA duties.  As explained in *Hall v.
Norton*, "plaintiff[s] seeking to enforce a procedural requirement the disregard of which
could impair a separate concrete interest of theirs, can establish standing without
meeting all the normal standards for redressability and immediacy.  Instead, they need
only establish the reasonable probability of the challenged action's threat to [their]
concrete interest."  266 F.3d 969, 975 (9th Cir. 2001) (quotation marks and citations
omitted); *see also Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir.
2011) ("Once a plaintiff has established an injury in fact under NEPA, the causation and
redressability requirements are relaxed").  Plaintiffs' interests in the preservation and
restoration of water quality and quantity and dependent fish and wildlife species in the
Bay-Delta and its watershed are just such "concrete interests."  *Hall v. Norton*, 266 F.3d
at 975.

18.     Plaintiffs have associational standing because (1) their members would
have standing to sue in their own right to seek redress for the injuries outlined above;
(2) the interests at stake are germane to plaintiffs' purposes, as detailed below; and (3)
neither the claims asserted nor the relief requested requires the participation of
plaintiffs' members in this lawsuit.  *Western Watersheds Proj. v. Kraayenbrink*, 632
F.2d 472, 482-485 (9th Cir. 2010).

19.     Plaintiffs have exhausted available administrative remedies.  Moreover, the
exhaustion requirement is inapplicable, because Reclamation had independent

1  knowledge of the legal defects described below, and because those defects are

2  procedural in nature. '*Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1092-1093

3  (9th Cir. 2006).

4  **PARTIES**

5  20.     Plaintiff NORTH COAST RIVERS ALLIANCE ("NCRA") is a non-profit

6  unincorporated association with members throughout Northern California.  NCRA was

7  formed for the purpose of protecting California's rivers and their watersheds from the

8  adverse effects of excessive water diversions, ill-planned urban development, harmful

9  resource extraction, pollution, and other forms of degradation.  Its members use and

10  enjoy California's rivers and watersheds for recreational, aesthetic, scientific study, and

11  related non-consumptive uses.  The interests of NCRA and its members have been, are

12  being, and unless the relief requested herein is granted, will be adversely affected and

13  injured by Reclamation's approval of the interim contracts and repayment contracts (and

14  its threatened future approvals of other repayment contracts) without proper NEPA

15  review and CVPIA compliance, and by the contracts' consequent unexamined and

16  inadequately mitigated impacts on the environment.

17  21.     Plaintiff PACIFIC COAST FEDERATION OF FISHERMEN'S

18  ASSOCIATIONS ("PCFFA") is a non-profit, tax-exempt corporation which represents

19  a coalition of 14 fishermen's organizations in California, Oregon, and Washington with

20  a combined membership of more than 750 fishing men and women.  Each of its

21  members depends on the ocean's fishes for his or her livelihood.  PCFFA has a vital and

22  direct interest in Reclamation's environmental review and management of the CVP

23  because its operation directly affects water quality and quantity in the Central Valley

24  and Bay-Delta and the health and population of anadromous fishes including salmon

25  and steelhead on which PCFFA's members rely for their sustainable harvest of the

26  ocean's fishes.  The interests of PCFFA and its members have been, are being, and

27  unless the relief requested herein is granted, will be adversely affected and injured by

28  Reclamation's approval of the interim contracts and repayment contracts (and its

1  threatened future approvals of other repayment contracts) without proper NEPA review

2  and CVPIA compliance, and by the contracts' consequent unexamined and inadequately

3  mitigated impacts on the environment.

4       22.     Plaintiff SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION,

5  INC. ("Crab Boat Owners Association") is a California corporation whose members rely

6  on a sustainable harvest of crustaceans and fishes from San Francisco Bay and the

7  Pacific Ocean for their livelihoods.  The Crab Boat Owners Association has been

8  protecting the rich seafood fisheries of San Francisco Bay and the Pacific Ocean since

9  1913.  The Crab Boat Owners Association's members operate small, family-owned

10  fishing boats that catch Dungeness crab, wild California king salmon, herring, and many

11  other fish species that live in the cold waters of San Francisco Bay and the Pacific

12  Ocean.  Its members are also actively involved in community education, and fishing

13  resource advocacy to ensure that the rich heritage of commercial fishing for Bay Area

14  residents will survive for future generations.  The interests of the Crab Boat Owners

15  Association and its members have been, are being, and unless the relief requested herein

16  is granted, will be adversely affected and injured by Reclamation's approval of the

17  interim contracts and repayment contracts (and its threatened future approvals of other

18  repayment contracts) without proper NEPA review and CVPIA compliance, and by the

19  contracts' consequent unexamined and inadequately mitigated impacts on the

20  environment.

21       23.     Plaintiff INSTITUTE FOR FISHERIES RESOURCES ("IFR") is a non-

22  profit public benefit corporation headquartered in San Francisco, California.  Since

23  1993, IFR has engaged in fishery research and conservation activities for working

24  fishing men and women.  IFR works on conservation projects and policy issues at the

25  regional, national and international levels, with a particular focus on salmon protection

26  and water diversions.  The interests of IFR and its members have been, are being, and

27  unless the relief requested herein is granted, will be adversely affected and injured by

28  Reclamation's approval of the interim contracts and repayment contracts (and its

1   threatened future approvals of other repayment contracts) without proper NEPA review
2   and CVPIA compliance, and by the contracts' consequent unexamined and inadequately
3   mitigated impacts on the environment.

4        24.     Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE
5   ("CSPA") is a non-profit corporation organized under the laws of the State of
6   California.  CSPA has thousands of members who reside and recreate throughout
7   California.  CSPA's members are citizens who, in addition to being duly licensed sport
8   fishing anglers, are interested in the preservation and enhancement of California's
9   public trust fishery resources and vigorous enforcement of California's environmental
10  laws.  CSPA members have been involved for decades in public education and advocacy
11  efforts to protect and restore the public trust resources of California's rivers.  CSPA
12  members use California's rivers  and the Bay-Delta for recreation, scientific study and
13  aesthetic enjoyment.  The interests of CSPA and its members have been, are being, and
14  unless the relief requested herein is granted, will be adversely affected and injured by
15  Reclamation's approval of the interim contracts and repayment contracts (and its
16  threatened future approvals of other repayment contracts) without proper NEPA review
17  and CVPIA compliance, and by the contracts' consequent unexamined and inadequately
18  mitigated impacts on the environment.

19       25.     Plaintiffs' injuries are fairly tracable to Reclamation's actions.  These
20  injuries are actual, concrete, and imminent and cannot be adequately remedied by
21  money damages.  Plaintiffs have no plain, speedy, or adequate remedy at law.
22  Accordingly, plaintiffs seek injunctive, mandamus and declaratory relief from this Court
23  to rectify Reclamation's unlawful acts and thereby redress plaintiffs' injuries.

24       26.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the
25  agency of the United States charged with managing the CVP.  The United States
26  Department of the Interior approved the interim contracts and repayment contracts
27  challenged in this action without compliance with NEPA and the CVPIA.

28       27.     Defendant UNITED STATES BUREAU OF RECLAMATION

1   (individually, and also collectively with the United States Department of the Interior,

2   "Reclamation") is the federal agency within the United States Department of the Interior

3   charged with managing the CVP.  Reclamation approved the interim contracts and

4   repayment contracts challenged in this action without compliance with NEPA and the

5   CVPIA.

6                                    **BACKGROUND**

7                        **I.      Environmental Setting**

8          28.      As a result of widespread habitat degradation caused by the construction

9   and operation of dams on nearly all major California rivers flowing into the Delta,

10  including many dams built and managed by Reclamation such as Shasta Dam on the

11  Sacramento River, Folsom Dam on the American River, and Friant Dam on the San

12  Joaquin River, anadromous and other imperiled fishes dependent on the Delta and its

13  tributaries have suffered severe population declines.  The Sacramento River winter and

14  spring run Chinook salmon, Central Valley steelhead, North American green sturgeon

15  and Delta smelt, for example, have been driven perilously close to extinction.  Winter

16  run Chinook salmon were initially listed as a federally threatened species in 1990 (55

17  Fed.Reg. 46515), and then due to continuing losses in population, declared endangered

18  in 2005 (70 Fed.Reg. 37160).  Their critical habitat in the Sacramento River and its

19  tributaries was designated in 1993.  58 Fed.Reg. 33212.  Spring run Chinook salmon

20  were listed as threatened, and their critical habitat designated, in 2005.  70 Fed. Reg.

21  37160, 52488.  Central Valley steelhead were listed as threatened in 2000 (65 Fed.Reg.

22  52084) and their critical habitat was designated in 2005 (70 Fed.Reg. 52488).  The

23  Southern Distinct Population Segment ("DPS") of North American green sturgeon was

24  listed at threatened in 2006 (71 Fed.Reg. 17757) and their critical habitat was

25  designated in 2008 (73 Fed.Reg. 52084).  Delta smelt were listed as endangered in 1993

26  (58 Fed.Reg. 12854) and their critical habitat was designated in 1994 (59 Fed.Reg.

27  65256).  Many species of fish indigenous to the Delta have already gone extinct; just 12

28  indigenous species remain.  Habitat for the Sacramento River winter and spring run

1   Chinook salmon, Central Valley steelhead, Southern DPS of the green sturgeon, and the

2   Delta smelt has been increasingly degraded over the last several decades by excessive

3   Delta water exports by the CVP and the State Water Project ("SWP").  Those exports

4   decrease freshwater flows, and increase salinity and the concentration of herbicides,

5   pesticides and toxic agricultural runoff, in Central Valley water bodies including the

6   Delta.

7        29.     On June 4, 2009, pursuant to its consultation duties under section 7 of the

8   Endangered Species Act ("ESA"), 16 U.S.C. section 1536, the National Marine

9   Fisheries Service ("NMFS") informed Reclamation that:

10          Based on the best available scientific and commercial information, NMFS'

11          final [Biological] Opinion concludes that the CVP/SWP operations are

12          *likely to jeopardize* the continued existence of Federally listed:

13          •      Endangered Sacramento River winter-run Chinook salmon (*Oncorhynchus*

14                 *tshawytscha*),

15          •      Threatened Central Valley spring-run Chinook salmon (*O. tshawytscha*),

16          •      Threatened Central Valley steelhead (*O. mykiss*),

17          •      Threatened Southern Distinct Population Segment (DPS) of North

18   American

19                 green sturgeon (*Acipenser medirostris*), and

20          •      Southern Resident killer whales (*Orcinus orca*) [who feed on the salmon].

21                 NMFS also concludes that the proposed action is *likely to destroy or*

22                 *adversely modify* the  designated critical habitats of

23          •      Central Valley spring-run Chinook salmon,

24          •      Central Valley spring-run Chinook salmon, and

25          •      Central Valley steelhead, and

26          •      proposed critical habitat for the Southern DPS of North American green

27                 sturgeon.

28   NMFS' letter to defendant Donald R. Glaser transmitting final Biological Opinion on

1    CVP/SWP operations dated June 4, 2009, at pages 1-2 (emphasis added).

2        30.    On December 15, 2008, pursuant to its consultation duties under section 7

3    of the ESA, the United States Fish and Wildlife Service ("FWS") informed Reclamation

4    that "the coordinated operations of the CVP and SWP, as proposed, are *likely to*

5    *jeopardize the continued existence of the delta smelt*." FWS Biological Opinion on

6    Proposed Coordinated Operations of the CVP and SWP, dated December 15, 2008, at

7    page 276 (emphasis added). FWS further concluded that coordinated operation of the

8    CVP and SWP is "likely to adversely modify delta smelt critical habitat." *Id.* at 278.

9        31.    The Sacramento River winter and spring run Chinook salmon, Central

10   Valley steelhead, Southern DPS of the green sturgeon and Delta smelt are all indicator

11   species for the health of the San Francisco Bay-Delta ecosystem and for the other

12   special status-- fish species that inhabit this fragile estuary such as the Sacramento

13   splittail, longfin smelt and white sturgeon. These species are harmed by Reclamation's

14   continuing failure to conduct a meaningful analysis of the environmental impacts of the

15   CVP's interim water contracts, and to conduct any environmental analysis at all of the

16   repayment contracts approved on or about February 28, 2020, and of other, similar

17   repayment contracts that Reclamation is threatening to approve. All of these species

18   depend on clean, cold and plentiful freshwater flows through the Delta from its

19   tributaries. Reclamation's diversions of staggering quantities of water from the Delta

20   for consumptive use by Westlands and other water contractors by means of these

21   interim contracts and repayment contracts is depriving these fishes of the clean, cold

22   and abundant freshwater flows they require to survive and recover their ecological

23   health.

24       32.    The environmental harm caused by Reclamation's water diversions from

25   the Delta is not limited to the direct loss of clean, cold water from the Delta.

26   Reclamation's water diversions also harm the environment through their contaminated

27   agricultural return flows back to the Delta. When the CVP water delivered by

28   Reclamation is used for irrigation, it passes through the topsoil and enters the

1    groundwater, which then flows down gradient toward the Delta.  Much of this soil,

2    particularly in the southern and western San Joaquin Valley, is heavily contaminated

3    with selenium and other pollutants, many of which occur naturally in these soils.  As

4    this irrigation water passes below the surface, it leaches pollutants from the soil and

5    carries those pollutants into ground and surface waters in the San Joaquin Valley.  The

6    contaminated subsurface and surface drainage water discharges pollutants including

7    selenium, arsenic, boron, mercury, uranium, chromium, molybdenum and sodium

8    sulfates into Central Valley rivers and ultimately the Delta.  This pollution degrades the

9    Delta's water quality and exacerbates the existing threats to its endangered and

10   threatened fish species, including the Delta smelt, salmon, steelhead, and sturgeon.  The

11   contractors' polluted discharge is also drawn into drinking water supplies through the

12   CVP and SWP, thereby degrading drinking water for 20 million Californians.

13        33.    Reclamation's water deliveries also harm several imperiled terrestrial

14   species, including the California least tern and the giant garter snake.  FWS concluded

15   in its Biological Opinion for the 2016 interim contracts that "the proposed project may

16   affect, and is likely to adversely affect the California least tern and giant garter snake."

17   Appendix C to Revised EA at 1.  FWS concluded that both the California least tern and

18   the giant garter snake are likely to be harmed by exposure to polluted drainwater from

19   agricultural users.  *Id.* at 19, 21.  While FWS stated that the least tern population in the

20   area "is expected to be low," FWS also stated that it "anticipate[s] biological effects

21   similar to those observed at Kesterson Reservoir in the 1980s could occur to least terns

22   if exposed to drainage water originating from [Westlands Water District]."  *Id.* at 19.

23   Kesterson received drainage water containing high levels of selenium, and as a result

24   "[a]bout 40 percent of nests of ducks and other waterbirds contained one or more dead

25   or deformed embryos and four species of waterbirds . . . *experienced complete*

26   *reproductive failure*."  *Id.* (emphasis added).

27                              **II.    CVPIA**

28        34.    The CVPIA was enacted by Congress on October 30, 1992, for the express

1  purpose of ameliorating the adverse environmental impacts that result from CVP

2  operations.  CVPIA, *supra*, §§ 3402(a)-(b), 3406(b).  In order "[t]o address impacts of

3  the Central Valley Project on fish, wildlife and associated habitat," the CVPIA requires

4  "appropriate environmental review" under NEPA – which in this case means

5  preparation of an environmental impact Statement ("EIS") – before any long-term water

6  service or repayment contracts can be renewed by Reclamation.  CVPIA §§ 3402(a),

7  3404(c)(1).

8       35.     The CVPIA directed that Reclamation was to protect the fish and wildlife

9  in the Delta and its tributary rivers to assure a doubling *by 2002* of the Central Valley's

10  average anadromous fisheries populations during the baseline period of 1967-1991.

11  CVPIA § 3406(b)(1).  This fish doubling goal was never met.

12      36.     Despite the fact that Congress enacted the CVPIA nearly 30 years ago,

13  Reclamation never completed its required NEPA review of the long-term contracts.

14  Instead, it has repeatedly issued short-term, interim contract renewals devoid of

15  adequate environmental review in a series of nearly identical, essentially meaningless

16  EAs that ignore these interim contracts' significant cumulative environmental impacts,

17  prompting plaintiffs' filing of this action.

18              **III.     Short-Term Contract EAs**

19      37.     The short-term, interim contracts were authorized by the CVPIA to bridge

20  the gap between expiration of the initial long-term contracts and completion of

21  comprehensive environmental review for, and finalization of, the subsequent,

22  discretionary, long-term contracts.  The informed approval – or disapproval – of these

23  subsequent short-term, interim contracts is expressly within the discretion of

24  Reclamation.  CVPIA § 3404(c)(1).  Specifically, the CVPIA distinguishes between the

25  initial renewals, which "shall" be granted upon request, and the subsequent, interim

26  contracts, which "may" be approved:

27      (c) Renewal of Existing Long-Term Contracts. – Notwithstanding the provisions

28          of the Act of July 2, 1956 (70 Stat. 483), the Secretary *shall,* upon request, renew

1    any existing long-term repayment or water service contract for the delivery of

2    water from the Central Valley Project for a period of 25 years and *may* renew

3    such contracts for successive periods of up to 25 years each.

4              (1) No such renewals shall be authorized until appropriate environmental

5              review, including the preparation of the environmental impact statement

6              required in section 3409 of this title, has been completed.  Contracts which

7              expire prior to the completion of the environmental impact statement

8              required by section 3409 *may be renewed for an interim period* not to

9              exceed three years in length, and for successive interim periods of not more

10             than two years in length, until the environmental impact statement required

11             by section 3409 has been finally completed, at which time such interim

12             renewal contracts shall be eligible for long-term renewal as provided

13             above. . . .

14   CVPIA § 3404(c)(1) (emphasis added).  Thus, under the CVPIA's plain language,

15   Reclamation lacks discretion to disapprove the initial long-term contract renewals, but

16   retains full discretion to disapprove or alter the interim contracts, which "*may* be

17   renewed for an interim period."  *Id*. (emphasis added).  The Ninth Circuit adopted this

18   interpretation of the CVPIA when it issued an amended memorandum of decision in

19   *Pacific Coast Federation of Fishermen's Associations v. United States Department of*

20   *Interior* ("*PCFFA*"), 655 Fed. Appx. 595, 598 (9th Cir. 2016).

21        38.    As it had done previously for earlier interim contracts, on or about

22   February 29, 2016, Reclamation issued another, similar FONSI and EA for the 2016

23   renewal contracts with the water contractors.  Based on that FONSI and EA,

24   Reclamation approved the six interim contracts initially challenged in this action,

25   involving water deliveries to the Pajaro Valley Water Management Agency, Santa Clara

26   Valley Water District, and Westlands Water District.

27        39.    On March 4, 2016, plaintiffs filed a Complaint for Declaratory and

28   Injunctive Relief, challenging Reclamation's issuance of the 2016 FONSI and EA.

1    40.    On July 25, 2016, the Ninth Circuit Court of Appeals issued an amended

2    memorandum of decision in *PCFFA*.  The Ninth Circuit determined that Reclamation's

3    prior EA did not comply with NEPA because (1) the EA used an improper no action

4    alternative, (2) the agency abused its discretion in failing "to give full and meaningful

5    consideration to the alternative of a reduction in maximum interim contract water

6    quantities," and (3) "the agency did not adequately explain why it eliminated this

7    alternative from detailed study." *PCFFA*, 655 Fed. Appx. at 598, 599 (quote).

8    41.    On August 2, 2016, defendants filed a Motion for Voluntary Remand to

9    prepare a new EA in light of the Ninth Circuit's decision in *PCFFA*.  ECF No. 28.  In

10   response, on December 16, 2016, Judge O'Neill issued an Order granting defendants'

11   Request for Voluntary Remand Without Vacatur, stayed all proceedings, and retained

12   jurisdiction over this matter.  ECF No. 52.

13   42.    In March 2017, Reclamation released a Revised Draft EA.

14   43.    Plaintiffs submitted timely comments regarding the sufficiency of the

15   Revised Draft EA by letter to Reclamation dated April 6, 2017.

16   44.    On or about May 31, 2017, Reclamation released its Final Revised 2016

17   EA and FONSI ("2016 EA and FONSI") for the Project.

18   45.    In its 2016 EA and FONSI, Reclamation failed to address the

19   environmental consequences of the pivotal choices before it, namely:  whether or not to

20   provide the contractors with water, and if so, in what quantities.  Although the 2016 EA

21   states that an alternative of  halting water deliveries could have "beneficial effects to

22   biological resources, including listed species and/or their associated habitat," it fails to

23   provide *any* detail about the magnitude or consequence of these "beneficial effects."

24   2016 EA 29, 44.  In comparing the impacts of contract renewal verses the no-action

25   alternative, the 2016 EA illogically assumes that under either scenario, Reclamation

26   would in most circumstances continue to deliver the *same* amount of water to CVP

27   contractors in the south-of-Delta region, and would operate the CVP at the *same* rate of

28   pumping.  While the 2016 EA concedes that in some years, the operations would differ,

1   it fails to examine the circumstances or environmental consequences of those differing

2   operations – and thus it fails to present a true comparison of the action and no-action

3   alternatives.  2016 EA 11.

4       46.    The 2016 EA lacks any substantive analysis of the interim contracts'

5   impacts on the giant garter snake and the California least tern, despite the fact that FWS

6   concluded that approval of the interim contracts is *likely* to adversely affect these

7   species.  *Compare* 2016 EA 31 (no mention of either species under the EA's "Migratory

8   Birds" and "Federally-listed Species" headings addressing environmental consequences

9   of Project approval) *with* the FWS' February 29, 2016 Biological Opinion (i.e., 2016

10  EA Appendix C) at 1 ("the proposed project may affect, and is likely to adversely affect

11  the California least tern and giant garter snake").

12      47.    The 2016 EA fails to study in detail a reduced contract quantity alternative,

13  and fails to use a water needs assessment "for which the data remain accurate" to

14  determine whether such an alternative is appropriate.  *PCFFA*, 655 Fed. Appx. at 600-

15  601.  In the 2016 EA, Reclamation provided a water needs assessment that showed that

16  for the most recent water year with available data, Westlands Water District had a 6%

17  water surplus despite receiving just an 80% allocation.  Ignoring this *actual surplus*,

18  Reclamation's Revised EA dismissed a reduced contract quantity alternative from

19  detailed consideration because the speculative water needs *projections for over 30 years*

20  *hence* – in 2050 and 2051 – showed unmet demand.  2016 EA 13-1-6.  But the reduced

21  contract quantity alternative should have been given full consideration, in light of the

22  fact that Westlands was enjoying a water surplus even when its supply was curtailed by

23  20 percent.

24      48.    The Revised EA erroneously limits its Study Area of the impacts of the

25  interim contracts to their delivery or service areas.  In doing so, Reclamation ignored the

26  interim contracts' principal environmental impacts.  Those impacts take place in the

27  water bodies that are upstream of the CVP's diversions of water from the Delta.  They

28  include manipulation of the reservoir levels and releases, and timing and quantity of

those releases and resulting downstream river flows, of the CVP's tributary watersheds:
the American, Trinity, Sacramento and San Joaquin rivers.  They also necessarily
include the environmental effects of those reservoir level and release manipulations on
their downstream rivers, and on the Delta into which they flow, and on the imperiled
fish and wildlife of these inextricably intertwined lake, river and delta ecosystems.

49.     On or about November 14, 2019, Reclamation circulated a draft EA for the
latest round of interim contracts.  Plaintiffs submitted timely comments on the
sufficiency of this draft EA on or about December 14, 2019.

50.     On or about February 24, 2020, Reclamation issued the Final 2020 EA and
FONSI for the latest round of interim contracts.  The 2020 EA and FONSI are
substantially similar to the previous, 2016 versions, and thus repeat their deficiencies as
detailed above.

## IV.     Long-Term Contract Environmental Review

51.     The CVPIA required Reclamation to expeditiously conduct comprehensive
environmental review of the long-term contract renewals.  The CVPIA recognizes that
the "direct and indirect [environmental] impacts and benefits" of its water diversion and
delivery contracts extend throughout "the Sacramento, San Joaquin, and Trinity River
basins and the San Francisco Bay/Sacramento-San Joaquin River Delta Estuary."  It
states:

> Not later than three years after the date of enactment of this title [in 1992],
> the Secretary shall prepare and complete a programmatic environmental
> impact statement pursuant to the National Environmental Policy Act
> analyzing the direct and indirect impacts and benefits of implementing this
> title, including all fish, wildlife, and habitat restoration actions and the
> potential renewal of all existing Central Valley Project water contracts.
> Such statement shall consider impacts and benefits within the Sacramento,
> San Joaquin, and Trinity River basins, and the San Francisco
> Bay/Sacramento-San Joaquin River Delta Estuary.

1

2   CVPIA § 3409.  The CVPIA expressly requires Reclamation to undertake "appropriate

3   environmental review" before entering into any long-term contract renewals.  CVPIA §

4   3404(c)(1).

5       52.    Reclamation completed a Programmatic Environmental Impact Statement

6   ("PEIS") in October 1999, four years after the required statutory deadline.  In it,

7   Reclamation generally reviewed the broad, overarching impacts of implementing

8   various aspects of the CVPIA on a regional level.  However, because its programmatic

9   review did not address the project-level, site- and contract-specific environmental

10  impacts of the long-term contracts, the "appropriate environmental review" required

11  under the CVPIA and NEPA for these project-level long-term contracts required

12  preparation of an EIS.  In recognition of this legal requirement, Reclamation began the

13  process of preparing project-level EISs for specific long-term contract renewals.

14  Accordingly, in September 2005, Reclamation prepared and released a Draft EIS for its

15  anticipated long-term contract renewals for the West San Joaquin Division and San Luis

16  Unit contractors.

17      53.    However, that NEPA review was never completed.  Since 2005,

18  Reclamation's environmental review of the long-term contracts has stalled, despite

19  Congress' requirement that Reclamation conduct "appropriate environmental review"

20  for the long-term contracts in an expeditious manner.  CVPIA § 3404(c)(1).  Instead,

21  Reclamation has evaded this mandated review by relying for decades on interim

22  contracts such as the 2016 and 2020 interim contracts challenged in this action.

23                          **V.    The WIIN Act**

24      54.    The Water Infrastructure Improvements for the Nation Act ("WIIN Act"),

25  Pub. L. 114-322, 130 Stat 1628, was enacted December 16, 2016, and expires on

26  December 16, 2021.

27      55.    The WIIN Act allows water contractors with existing water service

28  contracts to request conversion of those contracts to repayment contracts.  WIIN Act §

4011.  It states that "[u]pon request of the contractor, the Secretary of the Interior shall convert any water service contract in effect on the date of enactment . . . under mutually agreeable terms and conditions."

56.     In order to convert water service contracts into repayment contracts, water contractors must pay Reclamation the "remaining construction costs identified in water project specific irrigation rate repayment schedules, as adjusted to reflect payment not reflected in such schedules . . . such amount to be discounted by 1/2 the Treasury rate" under an accelerated time-table.  WIIN Act § 4011(a)(2)(A).

57.     The WIIN Act provides:

> Upon a contractor's compliance with and discharge of the obligation of
> repayment of the construction costs pursuant to a contract entered into
> pursuant to subsection (a)(2)(A), subsections (a) and (b) of section 213 of
> the Reclamation Reform Act of 1982 (96 Stat. 1269) shall apply to affected
> lands.

WIIN Act § 4011(c)(1).  Subsections (a) and (b) of section 213 of the Reclamation Reform Act of 1982 relieve the contractor of the "ownership and full cost pricing limitations" of Federal reclamation law.  43 U.S.C. § 390mm(a) and (b) (Public law 97-293, October 12, 1982 (96 Stat 1269).  In other words, upon repayment, the WIIN Act removes the acreage and full cost pricing limitations that would otherwise apply to land within the water contractors' service areas.  *Id.*

58.     Absent the WIIN Act, water contractors could not make "lump sum or accelerated repayment of construction costs" in order to remove the acreage or full cost pricing limitations.  43 U.S.C. § 390mm.

59.     Removal of the acreage and full cost pricing limitations that would otherwise apply allows individual landowners within the service area to apply CVP water to more land at lower cost.  This change enables these users to increase the acreage of lands that are served by (and thus dependent upon) CVP deliveries, and

1  thereby increases the impact of the delivery of CVP water by expanding the acreage of

2  irrigated lands that generate and discharge contaminated irrigation return flows, among

3  other impacts, and induces additional demand for CVP water.

4       60.     The WIIN Act provides that the obligations of the CVPIA continue to

5  apply to Reclamation's actions, with the sole exception for "savings provisions for the

6  Stanislaus River predator management program."  WIIN Act § 4012 (a)(2).  Further, the

7  WIIN Act grants Reclamation broad discretion to negotiate "mutually agreeable terms

8  and conditions" in converting existing contracts to repayment contracts.  WIIN Act §

9  4011(a)(1).

10      61.     However, because the provisions of the CVPIA continue to apply to

11 Reclamation, Reclamation must still conduct "appropriate environmental review" under

12 NEPA before it may enter into long-term water delivery contracts.  And, because the

13 Programmatic EIS that Reclamation prepared in 1999 does not address the project-level,

14 site-specific impacts of any of the repayment contracts (just as it previously failed to

15 address the project-level, site-specific impacts of the interim contracts), Reclamation is

16 still required by NEPA to prepare an EIS detailing the environmental impacts of each

17 draft repayment contract.  Hence, Reclamation must prepare an EIS for the repayment

18 contracts that Reclamation approved on or about February 28, 2020, and for the

19 additional repayment contracts that Reclamation has subsequently approved and is

20 threatening to approve in the future.

21                    **FIRST CLAIM FOR RELIEF**

22     (**Violation of the National Environmental Policy Act – Inadequate EAs**)

23                      (Against All Defendants)

24      62.     The paragraphs set forth above and below are realleged and incorporated

25 herein by reference.

26      63.     NEPA requires the preparation of an EIS if a proposed major federal action

27 has the potential to significantly affect the quality of the human environment.  42 U.S.C.

28 § 4332.  Even if a project's risks of environmental harm are uncertain, if they are

1    potentially significant, an EIS is required.  *City of Davis v. Coleman*, 521 F.2d 661, 676
2    (9th Cir. 1975).

3        64.    However, a proper finding by an agency that a proposed action will

4    produce no significant impact on the environment relieves the agency of its duty to

5    prepare an EIS.  40 C.F.R. §1501.4(e).  But an agency cannot simply issue a conclusory

6    statement claiming without factual analysis the absence of significant impacts.  Instead,

7    the agency must support each finding of "no significant impact" with a "concise public

8    document," known as an environmental assessment, or EA.  40 C.F.R. § 1501.4(a)-(b),

9    1508.9.  The EA must "[b]riefly provide sufficient evidence and analysis for

10   determining whether to prepare an environmental impact statement or a finding of no

11   significant impact."  40 C.F.R. § 1508.9(a)(1) (emphasis added).  Although an EA need

12   not be as thorough as an EIS, the agency must still conduct a "comprehensive

13   assessment of the expected effects of a proposed action" to determine if that action

14   poses potentially significant environmental impacts.  *Foundation on Economic Trends*

15   *v. Weinberger*, 610 F.Supp. 829, 837 (D.C.D.C. 1985) (quoting *Lower Alloways Creek*

16   *Tp. v. Public Service Elec.*, 687 F.2d 732, 740 (3rd Cir. 1982)).  Reclamation failed to

17   do so here for both the 2016 EA and FONSI and the 2020 EA and FONSI.

18       65.    Reclamation's 2016 EA and FONSI and 2020 EA and FONSI fail to

19   comply with *PCFFA*'s holding that Reclamation must fully disclose the environmental

20   impacts of the no-action alternative.  The 2016 EA's vague and conclusory analysis of

21   the ways that declining to provide water to Westlands would benefit the environment is

22   no substitute for the meaningful analysis required by NEPA and *PCFFA*.  For example,

23   the 2016 EA merely states, in the broadest possible terms, that "beneficial effects to

24   biological resources, including listed species and/or their associated habitat, could occur

25   if water that would have been made available to Westlands is instead re-allocated to

26   wildlife refuges or re-apportioned to pass through the Delta un-diverted by

27   Reclamation; however, these effects would also be dependent on how much of

28   Westlands' otherwise available water supply is available for re-apportionment."  This

1   sentence is repeated in the 2020 EA.  2020 EA p. 26.  It does not provide the reader with

2   any substantive, let alone specific, disclosure and analysis of the interim contracts'

3   environmental impacts compared to the impacts of not providing the subject water

4   deliveries, or of providing them at a reduced quantity.  It provides no meaningful

5   information to the public or Reclamation about the specific environmental effects of

6   Reclamation's choice of whether or not to supply Westlands with water.

7          66.     The 2016 Revised EA and 2020 EA also fail to consider a reasonable range

8   of alternatives as required by *PCFFA*.  The Revised EA considers only two alternatives,

9   the Proposed Action and the No Action Alternative, thus presenting only the simple

10  binary choice between approving or disapproving the proposed action.  Limiting the

11  public to this single, either/or option violates NEPA.  *Save Our Cumberland Mountains*

12  *v. Kempthorne*, 453 F.3d 334, 345 (6th Cir. 2006) (NEPA "prevents federal agencies

13  from effectively reducing the discussion of environmentally sound alternatives to a

14  binary choice between granting or denying an application").  Alternatives proposing

15  reduced contract quantities were improperly eliminated from consideration with the

16  flawed justification that Westlands can make beneficial use of its entire contract

17  quantity, but this justification is refuted by the fact that the most recent data available

18  indicated the Westlands had *too much water* in a year in which it only received an 80%

19  allocation.  Nor could Reclamation sidestep its duty to consider alternatives that reduced

20  the quantity of water diverted on the grounds that it lacked discretion to do so.  Because,

21  as noted, Reclamation had broad discretion to reject the interim contracts entirely, it

22  necessarily had broad discretion to approve a reduced-quantity contract.  And, because

23  such alternatives would reduce environmental harm, Reclamation had a duty under

24  NEPA to consider them.

25         67.     The 2016 Revised EA's and 2020 EA's narrow statements of purpose and

26  need – to extend existing interim contracts that would otherwise expire – are likewise

27  inadequate, because each is based on Reclamation's erroneous premise that it had no

28  discretion to consider a broader purpose and range of options that included denial of the

1  requested extension, or an extension at a reduced contract quantity.  An EA's purpose

2  and need statement is fatally flawed if, as here, it is based on the agency's erroneous

3  premise that "it had no discretion to consider" a broader purpose and range of options.

4  *Center for Biological Diversity v. National Highway Traffic Safety Admin.*, 538 F.3d

5  1172, 1219 (9th Cir. 2008).

6       68.    The 2016 Revised EA and 2020 EA also ignore the environmental impacts

7  of the interim contracts' water deliveries on the source watersheds – the Delta and its

8  tributaries including the American, Trinity, Sacramento and San Joaquin rivers – and

9  their imperiled fish and wildlife.  Both EAs artificially and illogically exclude these

10 directly impacted natural resources from their unduly narrow study area.  Conversely,

11 both EAs artificially and illogically restrict that study area to the service (i.e., delivery)

12 areas of the interim contractors.  Yet the service areas are the lands that would mostly

13 benefit from, rather than be harmed by, the deliveries.  Consequently, the areas that

14 would be most harmed by the contracts – the Delta and its tributary rivers whose flows

15 would be reduced by the diversions allowed under the contracts – are completely

16 excluded from analysis of the harm those diversions would cause.  In short, the EAs'

17 methodology is deliberately skewed to exaggerate the benefits, and ignore the harms, of

18 the water diversions allowed by the contracts.

19      69.    As a result of this skewed analysis, both the 2016 Revised EA and the 2020

20 EA ignore NMFS' finding that Reclamation's continued operation of the CVP as

21 enabled by the interim contracts jeopardizes the continued existence of numerous

22 aquatic species including salmon, steelhead and green sturgeon.  But this "contrived

23 ignorance" is contrary to NEPA.  NEPA prohibits agencies from arbitrarily

24 circumscribing the geographic scope of their environmental analysis in order to avoid

25 analysis of a project's adverse environmental effects.  *Save Our Sonoran, Inc. v.*

26 *Flowers*, 408 F.3d 1113, 1121-23 (9th Cir. 2004).

27      70.    The 2016 Revised EA and 2020 EA provide no substantive analysis of the

28 interim contracts' effects on any species, let alone listed ones.  Each EA's empty

1  assertion that approval of the interim contracts will not have *any* impacts on listed

2  species is refuted by FWS' and NMFS's directly contrary findings.  And, these claims

3  reflect Reclamation's concerted effort to ignore the contracts' impacts on the imperiled

4  species that inhabit the Delta and its tributary rivers.

5       71.    The 2016 Revised EA and 2020 EA fail to consider the extent to which

6  climate change will exacerbate the environmental impacts of the interim contracts, due

7  to increased water temperatures, reduced dissolved oxygen, increased aridity,

8  diminished precipitation, reduced snowfall, diminished storage of precipitation as snow,

9  increased saltwater intrusion and salinity, and increasingly erratic weather patterns.

10       72.    The 2016 Revised EA and 2020 EA ignore the fact that each subsequent

11  interim contract renewal has had an incremental environmental effect, resulting in

12  cumulative effects.  These cumulative effects are growing, because selenium and other

13  pollutants carried into the Delta by irrigation return flows bioaccumulate in the

14  ecosystem – meaning that concentrations of these pollutants increase over time when a

15  constant quantity of these pollutants is discharged.  The adverse impacts of these

16  cumulative effects are also worsening because at the same time the contamination is

17  worsening, the populations of affected species are declining.  Put simply, as pollution

18  worsens, species weaken.  Together, these cumulative effects are accelerating and

19  snowballing as they share a positive feedback loop.  Because the EAs lack "quantified"

20  and "detailed" information about these impacts, they violate NEPA.  *Neighbors of*

21  *Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1379-1380 (9th Cir. 1998).

22       73.    In sum, Reclamation's failure to prepare legally adequate EAs and FONSIs

23  for the 2016 and 2020 interim contracts is arbitrary and capricious, a failure to proceed

24  in the manner required by law, and not supported by substantial evidence, and thus in

25  violation of NEPA.  Accordingly, those interim contracts and their EAs and FONSIs

26  should be declared unlawful and set aside under the APA.

27

28

# SECOND CLAIM FOR RELIEF

**(Violation of National Environmental Policy Act –
Failure to Prepare an EIS for Repayment Contracts)**

(Against All Defendants)

74.     The paragraphs set forth above and below are realleged and incorporated herein by reference.

75.     Reclamation violated NEPA by failing to prepare an EIS for the repayment contracts it approved in 2020, and it continues to violate NEPA by failing to prepare an EIS for the repayment contracts it is continuing to approve.  Reclamation began negotiations with Westlands and other CVP water contractors, including East Bay Municipal Utility District, City of Folsom, Placer County Water Agency, City of Roseville, Sacramento County Water Agency, Sacramento Municipal Utility District, and San Juan Water District, to convert their existing water contracts from water service contracts to repayment contracts under the WIIN Act on May 29 and May 30, 2019. Defendants participated in additional negotiation sessions in August 2019.

76.     Reclamation and Westlands "finalized on Westlands' primary and largest WIIN Act contract conversion" and then Reclamation invited public comment on that draft repayment contract through January 8, 2020.

77.     Plaintiffs submitted timely comments to Reclamation on December 24, 2019,  addressing Reclamation's proposed repayment contract with Westlands.

78.     In late 2019 and early 2020, Reclamation also negotiated the terms of five additional repayment contracts with Westlands.  Plaintiffs submitted timely comments on those contracts on February 17, 2020.  Reclamation approved these contracts on or about May 29, 2020.

79.     Reclamation negotiated other repayment contracts in early 2020.  Plaintiffs submitted timely comments addressing Reclamation's proposed repayment contracts with the American River Division contractors, including East Bay Municipal Utility District, City of Folsom, Placer County Water Agency, City of Roseville, Sacramento

County Water Agency, Sacramento Municipal Utility District, and San Juan Water District, on February 19, 2020.  Reclamation approved these contracts on or about February 28, 2020.  Plaintiffs submitted additional timely comments addressing Reclamation's additional proposed repayment contracts with other water contractors on April 22 and April 24, 2020.

80.     Reclamation's approval of each of these repayment contracts is a "major Federal action[] significantly affecting the quality of the human environment" for which an environmental impact statement ("EIS") must be prepared.  42 U.S.C. § 4332(2)(C)(i)-(v).  These repayment contracts are "major" Federal actions because they allow the diversion of over one million acre-feet of freshwater annually from the largest estuary on the west coast of the Americas, degrading vital freshwater habitat for some of the most imperiled species in the world, such as the winter-run and spring-run Chinook salmon and Delta smelt.

81.     The environmental effects of these repayment contracts are clearly significant under the governing NEPA regulations, under which significance is measured both by the impacts' "context" and by their "intensity."  40 C.F.R. § 1508.27.

82.     The contracts' context demonstrates significance, because the Delta is the largest estuary on the west coast of the United States, and supports an extraordinarily diverse fishery of unparalleled importance both commercially and recreationally.  And, the Delta also provides freshwater supplies for over 20 million Californians, as well as irrigation water for millions of acres of highly productive Central Valley farmland.

83.     The "intensity" of the repayment contracts likewise demonstrates their significance.  Intensity is determined with reference to ten sub-factors, the presence of *any* one of which is sufficient to require an EIS.  40 C.F.R. § 1508.27(b); *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2004).  The intensity of the contracts' effects is indisputably significant because (1) the contracts' diversion of over 1 million acre-feet annually from the Delta, and the contractors' use of the water for irrigation in a manner that releases contaminated return flows into the

1    Delta's ground and surface tributary waters, directly affect the health and safety of the

2    public that relies on the Delta and its tributary rivers for their livelihoods, drinking

3    water, and recreation; (2) the loss of freshwater flows and reduction in water quality

4    harm the fish and wildlife of the unique and beleaguered Delta ecosystem; (3) the

5    contracts' environmental impacts are highly controversial and the extent of their

6    harmful environmental impacts is uncertain; (4) Reclamation's approval of these

7    contracts of potentially permanent duration "establish[es] a precedent for future actions

8    with significant effects;" (5) the contracts will have potentially significant cumulative

9    impacts on the Delta's ecological health and the survival of its imperiled fish and

10   wildlife; and (6) the contracts will have significant impacts on many endangered

11   species, each of which has significant scientific value.  40 C.F.R. § 1508.27(b).

12       84.    Reclamation nonetheless contends that its approval of these repayment

13   contracts is exempt from NEPA, on two grounds.  Both fail.  First, Reclamation claims

14   that under the WIIN Act, it lacks discretion to disapprove the repayment contracts and

15   thus its approval of them falls within the "non-discretionary" or "ministerial" exception

16   to NEPA.  That assertion is refuted by the plain language of this statute.  Section

17   4011(a)(1) of the WIIN Act states that '[u]pon request of the contractor, [Reclamation]

18   shall convert any water service contract in effect on the date of enactment  . . .and

19   between the United States and a water users' association to allow for prepayment of the

20   repayment contract . . . *under mutually agreeable terms and conditions.*"  Public Law

21   114-322, 130 Stat. 1628, section 4011(a)(1) (emphasis added).  This language makes

22   clear that the terms and conditions of these contracts are to be negotiated by the parties.

23   Since these terms and conditions are negotiable, it follows that Reclamation necessarily

24   exercises discretion in their formulation and approval.  Therefore these contracts are

25   discretionary rather than ministerial.  Accordingly, NEPA applies to Reclamation's

26   exercise of that discretion, to ensure that Reclamation is fully informed regarding the

27   environmental impacts of the terms and conditions of the contracts as they are

28   formulated and negotiated.

85.     Reclamation also claims that the WIIN Act impliedly repeals NEPA to the extent it might otherwise apply to the contracts.  This claim too is readily dispatched. Repeals by implication are disfavored, particularly when a remedial statute such as NEPA is in play.  "'When confronted with two Acts of Congress allegedly touching on the same topic, [we are] not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both.'"  *Stand Up for California v. U.S. Department of the Interior* ("*Stand Up*"), ___ F.3d.___, 2020 WL 2745320 *7 (9th Cir. May 27, 2020), quoting *Epic Sys. Corps. v. Lewis*, 138 S.Ct. 1612, 1624 (2018) (citations and quotation marks omitted) (enforcing NEPA against Department of Interior notwithstanding applicability of Indian Gaming Regulatory Act).

86.     "[A] statute [is not] repealed by a subsequent act unless Congress's intention is 'clear and manifest.'"  *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1230 (9th Cir. 2017) (citations omitted).  "This is especially true in the case of NEPA, which "directs that, 'to the fullest extent possible . . . public laws of the United States shall be interpreted and administered in accordance with [it].'"  *Stand Up* at *7, quoting *Jamul Action Comm. v. Chaudhuri ("Jamul")*, 837 F.3d 958, 961 (9th Cir. 2016) (in turn quoting *Westlands Water Dist. v. Nat. Res. Def. Council* ("*Westlands*"), 43 F.3d 457, 460 (9th Cir. 1994).  In *Westlands*, the court ruled that "[t]he lack of discretion exception to NEPA compliance does not apply" where a section of the CVPIA directed that the Secretary of the Interior take certain action if the Hoopa Valley Tribe and the Secretary reached agreement, explaining that "[t]he automatic, non-discretionary language was only operative after both the Hoopa Valley Tribe and the Secretary concurred," and that the Secretary had full discretion to scope, analyze, and make any recommendations before any concurrence.  *Id*. at 1180.  Likewise here, Reclamation has full discretion to negotiate "*mutually agreeable* terms and conditions" for any repayment contract.  Public Law 114-322, 130 Stat. 1628, section 4011(a)(1) (emphasis added).

87.     These rulings are consistent with the Ninth Circuit's settled rule that "[w]e

have recognized only 'two circumstances where an agency need not complete an EIS even in the presence of major federal action and "despite an absence of express statutory exemption"'": (1) "'where doing so "would create an irreconcilable and fundamental conflict" with the substantive statute at issue,' and (2) where, 'in limited instances, a substantive statute "displaces" NEPA's procedural requirements.'" *Stand Up* at *7, quoting *Jamul*, 837 F.3d at 963 (quoting *San Luis & Delta Mendota Water Auth. v. Jewell*, 747 F.3d. 581, 648 (9th Cir. 2014)). Neither circumstance is present here. The WIIN Act contains no language implying, let alone expressly stating as required to effect a repeal, that compliance with NEPA "would create an irreconcilable and fundamental conflict" with the WIIN Act as necessary to foreclose NEPA's application to contracts authorized by that Act. *Id.* Nor does the WIIN Act "'displace[]' NEPA's procedural requirements," the only other means by which a repeal could occur. *Id.*

88.     Accordingly, NEPA is fully applicable to Reclamation's approval of the repayment contracts. Therefore Reclamation should have prepared an EIS addressing the potentially significant impacts associated with each of them. Because it failed to do so, Reclamation's approval of the repayment contracts is arbitrary and capricious, a failure to proceed in the manner required by law, and not supported by substantial evidence, and thus in violation of NEPA. Therefore it should be declared unlawful and set aside under the APA.

89.     Reclamation's threatened entry into other repayment contracts without compliance with NEPA is likewise arbitrary and capricious, a failure to proceed in the manner required by law, and not supported by substantial evidence. Accordingly, Reclamation's threatened approval of additional repayment contracts should be declared unlawful and enjoined.

//

//

//

//

**THIRD CLAIM FOR RELIEF**

(**Violation of Central Valley Project Improvement Act –
Failure to Prepare an EIS for Repayment Contracts**)

(Against All Defendants)

90.     The paragraphs set forth above and below are realleged and incorporated herein by reference.

91.     The CVPIA requires Reclamation to conduct a comprehensive environmental review before it may enter into new long-term contracts with existing water contractors as a means of correcting the growing imbalance between excessive water diversions and declining fish and wildlife populations.  "To address impacts of the Central Valley Project on fish, wildlife and associated habitat," the CVPIA requires Reclamation to complete "appropriate environmental review, including the preparation of the environmental impact statement required in section 3409 of [the CVPIA]," before Reclamation may "renew any existing long-term repayment or water service contract for the delivery of water from the Central Valley Project for a period of 25 years. . . . ."  CVPIA §§ 3402(a), 3404(c)(1), 3409.  As noted, the Programmatic EIS that Reclamation prepared in 1999 pursuant to section 3409 does not address the project-level, site- and other contract-specific impacts of any of the repayment contracts.  Consequently, Reclamation is still required by NEPA to prepare an EIS detailing the environmental impacts of each draft repayment contract.  Hence, Reclamation must prepare an EIS for the repayment contracts that Reclamation approved on or about February 28, 2020, and for the additional repayment contracts that Reclamation has subsequently approved and is threatening to approve in the future.

92.     The CVPIA defines the scope of contracts subject to this imperative broadly, to include "*any* long-term water service or repayment contract for the delivery of water from the Central Valley Project for a period of 25 years."  CVPIA § 3404(c) (emphasis added).  The repayment contracts Reclamation is now approving authorize the delivery of CVP water for at least 25 years.  Indeed, they potentially authorize the

1   delivery of CVP water in perpetuity.  That means that their impacts will extend at least
2   as long, and probably much longer, than will the impacts of the 25-year renewal
3   contracts for which Congress mandated "appropriate environmental review" under
4   NEPA.  CVPIA §§ 3402(a), 3404(c)(1), 3409.  Hence, the need for environmental
5   review of their impacts is at least as great as, and probably even greater than, it is for the
6   25-year contracts for which Congress mandated preparation of appropriate
7   environmental review under NEPA in the CVPIA.

8       93.    The WIIN Act does not abrogate this CVPIA mandate that "appropriate
9   environmental review" take place before any long-term water service or repayment
10  contract may be renewed by Reclamation.  To the contrary, the WIIN Act specifically
11  directs that it "shall not be interpreted or implemented in a manner that . . . (2) affects or
12  modifies *any* obligation under the [CVPIA] except for the savings provisions of the
13  Stanislaus River predator management program."  WIIN Act § 4012(a)(2) (emphasis
14  added).  Hence, the CVPIA mandate that appropriate environmental review (which as
15  explained, necessarily requires an EIS) is required for long term contracts, applies fully
16  to the repayment contracts that Reclamation is now approving.

17      94.    Accordingly, Reclamation's failure to prepare *any* environmental
18  review–let alone the required EIS– before entering into the repayment contracts violates
19  the CVPIA.  Therefore, Reclamation's entry into these repayment contracts is arbitrary
20  and capricious, a failure to proceed in the manner required by law, and not supported by
21  substantial evidence.  For these reasons, Reclamation's entry into these repayment
22  contracts should be declared unlawful and set aside under the APA.

**FOURTH CLAIM FOR RELIEF**

**(Violation of 43 U.S.C. §§ 423e and 511 Requiring
Validation Judgments for CVP Water Contracts)**

(Against All Defendants)

27      95.    The paragraphs set forth above and below are realleged and incorporated
28  herein by reference.

96.     For nearly a century, Reclamation has acknowledged and adhered to the fundamental and unwavering Congressional mandate that "[i]n carrying out the purposes of the Act of June 17, 1902 (32 Stat. 388), and Acts amendatory thereof and supplementary thereto, and known as the reclamation law, . . . . no contract with an irrigation district under this section [511] and sections 512 and 513 of this title [title 43 of the United States Code] shall be binding on the United States until the proceedings on the part of the district for the authorization of the execution of the contract shall have been confirmed by decree of a court of competent jurisdiction, or pending appellate action if ground for appeal be laid."  Act of May 15, 1922, section 1, codified at 43 U.S.C. § 511.

97.     Section 46 of the Omnibus Adjustment Act of 1926 sets forth a similar Congressional directive that "[n]o water shall be delivered [by a federal reclamation project] until a contract or contracts in form approved by the Secretary of the Interior shall have been made with an irrigation district or irrigation districts organized under State law providing for payment by the district or districts of the cost of constructing, operating and maintaining the works during the time they are in control of the United States . . . , and the execution of said contract or contracts shall have been confirmed by a court of competent jurisdiction."  Act of May 25, 1926, ch. 383, § 46, 44 Stat. 649, as amended, codified at 43 U.S.C. § 423e.

98.     The purpose of Congress's century-old and consistent command that irrigation districts demonstrate their lawful authority to enter into each and every contract for the delivery of public water from federally-owned and operated reclamation facilities is to assure that water from those facilities is only delivered to districts with judicially confirmed authority and ability to receive and pay for such waters so that the public's expense in constructing and operating these facilities is protected against fraud and fully reimbursed.  As explained by the Office of the Solicitor of the Department of the Interior:

"[t]he Act of May 15, 1922 requires the judicial confirmation of contracts with

1    irrigation districts as a measure of protection for the United States.  This

2    confirmation assures the validity of the contract by making sure the irrigation

3    district has complied with all state law requirements. . . . Congress has required

4    the proceeding to take place before the United States will be bound by the terms

5    of the contract."

6   Memorandum of the Office of the Solicitor dated July 9, 1984, citing Solicitor's

7   Opinion, 71 Interior Decisions 496, 517-18 (1964) and 43 U.S.C. § 511.

8        99.    In tacit recognition of this settled law and practice, on or about October 25,

9   2019 Westlands filed a Complaint for Validation Judgment in Fresno County Superior

10  Court seeking a court judgment validating Westlands' proposed repayment contract

11  with Reclamation.  See, *Westlands Water District v. All Persons Interested in the Matter*

12  *of the Contract Between the United States and Westlands Water District Providing for*

13  *[Central Valley] Project Water Service, San Luis Unit and Delta Division and Facilities*

14  *Repayment*, Fresno County Superior Court Case No. 19CECG03887.  On or about

15  December 30, 2019 Westlands filed a Motion for Validation of Contract in which it

16  requested the Superior Court to enter a judgment validating Westlands' repayment

17  contract with Reclamation.  After hearing, the Superior Court, per the Honorable Alan

18  Simpson, denied Westlands' motion by Minute Order filed March 16, 2020.  A true and

19  complete copy of Judge Simpson's Minute Order is attached as Exhibit 1 hereto.

20       100.   In his Minute Order denying validation, Judge Simpson ruled that

21  Westlands' repayment contract could not be validated under either California Water

22  Code §35855 (*see* Exhibit 1 hereto at ¶ 3.a), or California Government Code § 53511

23  (*id*. at ¶ 3.b).  Judge Simpson further ruled that the repayment contract "does not meet

24  [validation] requirements for provisions unrelated to debt because it is a proposed

25  contract, not an executed contract."  *Id*. at ¶ 3.c.  Judge Simpson next ruled that the

26  repayment contract could not be validated because the contract's "absence of the actual

27  final amount and payment schedule render the proposed contract lacking in material

28  terms and incomplete," and the "validation statutes do not encompass judicial approval

of incomplete contracts." *Id.* at ¶ 4.  Finally, Judge Simpson ruled that validation was not possible because "the requested finding of compliance with the Brown Act [California Government Code §§ 54950 et seq.] cannot be made." *Id.* at ¶ 5.

101.   Westlands did not timely seek reconsideration, or appellate review, of Judge Simpson's Minute Order.  Accordingly, that ruling is now final.  This Minute Order precludes Westlands from contending that its repayment contract is validated.

102.   Because Westlands has failed to secure judicial validation of its repayment contract, and indeed, has instead received a final Order from the Fresno County Superior Court refusing to validate that repayment contract, Reclamation is forbidden by the Act of May 15, 1922 from entering into, and delivering water pursuant to, that repayment contract. *Barcellos & Wolfsen, Inc. v. Westlands Water Dist.*, 491 F. Supp. 263, 265 n.1 (E.D. Cal. 1980) (noting that section 46 of the Omnibus Adjustment Act of 1926 requires that "'no water shall be delivered pursuant to any contract entered into with an irrigation district until such contracts have been confirmed by a State court of competent jurisdiction.' *See* 43 U.S.C. § 511." ).

103.   Notwithstanding Westlands' failure to secure judicial validation of its repayment contract, and Judge Simpson's Minute Order setting forth at least five separate grounds for denying Westlands' Motion for Validation of Contract, by letter dated May 26, 2020, Westlands' General Manager Thomas Birmingham represented to Ernest Conant, Regional Director of the Bureau of Reclamation, that judicial confirmation of Westlands' authority to enter into the Repayment Contract with Reclamation had merely been delayed, due to the Covid-19 pandemic and other undisclosed factors, and was on track for completion soon.

104.   Mr. Birmingham stated that "[t]he District filed an action to obtain [a judicial] decree on October 25, 2019, but for multiple reasons, the Court was not able to validate the District's proceedings prior to the Court closing for judicial business in response to the COVID-19 pandemic and the proclamations of emergency by Governor Gavin Newsom."  Letter from Thomas W. Birmingham to Ernest A. Conant dated May

26, 2020, a true and correct copy of which is attached as Exhibit 2 hereto, at 1.

105.   Mr. Birmingham did not disclose that several parties had filed Answers opposing Westlands' validation action, and that after hearing their grounds for opposing validation, Judge Simpson had ruled that the District's Repayment Contract could not be validated for at least five separate reasons. *Id*.  Nor did Mr. Birmingham provide Mr. Conant with Judge Simpson's detailed ruling denying Westlands' motion for validation. *Id*.

106.   Instead of disclosing these material facts revealing that the Fresno County Superior Court had concluded that Westlands' Repayment Contract could not be validated, Mr. Birmingham strived to persuade Mr. Conant of just the opposite.  He represented, in direct contradiction of Judge Simpson's specific findings and final Order rejecting validation, that "[t]he proceedings on the part of the District to authorize execution of the Repayment Contract complied with the law, and no one has initiated legal action to challenge the lawfulness of those proceedings." *Id*. at 1.

107.   Mr. Birmingham went on to represent that "[u]nder California's 'reverse validation' statute, any action seeking to challenge the District's proceedings to authorize execution of the Repayment Contract would be barred by the 60-day statute of limitations in California Code of Civil Procedure sections 860 and 863." *Id*. at 2.  But Mr. Birmingham failed to disclose that there was no need for any party opposed to validation to file such a "reverse validation" action, since Westlands had itself filed a validation action to which opposition could, and was in fact, presented by way of the four Answers that were in fact filed in opposition to Westlands' validation action and the four opposition memoranda that were filed in response to Westlands' subsequent validation motion.

108.   Based on these misrepresentations, Mr. Birmingham "request[ed] that [Reclamation] confirm the District's understanding that its inability to obtain a validation judgment does not render the Repayment Contract void." *Id*.  Mr. Birmingham closed by reassuring Mr. Conant that "the District is confident it will

1  obtain a final decree confirming the proceedings on its part for the authorization of the

2  execution of the Repayment Contract." *Id.* at 2-3.

3      109.   Mr. Birmingham's ploy worked perfectly.  Just two days later, apparently

4  without conducting any independent factual or legal research or even checking the

5  Fresno County Superior Court's docket to ascertain the true state of Westlands'

6  validation proceedings, Mr. Conant gave Reclamation's complete blessing to

7  Westlands' request that Reclamation deem the repayment contract valid.  Mr. Conant's

8  single-page letter uncritically accepted and indeed, repeated like an echo chamber, Mr.

9  Birmingham's representation that "for various reasons, the court was not able to validate

10  the District's proceedings prior to the court closing for business in response to the

11  COVID-19 pandemic and emergency proclamations by California Governor Newsom."

12  A true and complete copy of Mr. Conant's May 28, 2020 letter to Mr. Birmingham is

13  attached as Exhibit 3 hereto.

14      110.   Based solely on Mr. Birmingham's incomplete and misleading

15  representation of the facts surrounding Westlands' inability to secure judicial validation

16  of the repayment contract, and in disregard of the actual facts and ruling by Judge

17  Simpson denying validation, Mr. Conant concluded his letter by stating " Reclamation

18  confirms its understanding that the Repayment Contract will govern the rights and

19  obligations of the United States and the District after the Repayment Contract's

20  effective date, June 1, 2020, notwithstanding the District's inability to obtain a final

21  decree confirming its proceedings to authorize the execution of this Repayment

22  Contract.  See, 43 U.S.C. § 511." *Id.*

23      111.   Reclamation's execution of its repayment contract with Westlands on or

24  about February 28, 2020, and purported waiver, by letter dated May 28, 2020, of

25  Reclamation's statutory duty to confirm that Westlands had in fact secured a judicial

26  validation of that contract, are both final agency actions subject to this Court's

27  jurisdiction and review under the APA, 5 U.S.C. § 706.

28      112.   Reclamation's execution on or about February 28, 2020 of its repayment

1  contract with Westlands notwithstanding Westlands' failure to first secure a judicial

2  decree confirming and validating Westlands' authority to enter into that contract, and

3  Reclamation's purported disavowal, by letter dated May 29, 2020, of its statutory duty

4  to require Westlands to secure that judicial decree before recognizing that contract as

5  valid and enforceable against Reclamation, violate 43 U.S.C. §§ 423e and 511.

6      113.   Accordingly, Reclamation's entry into its repayment contract with

7  Westlands notwithstanding Westlands' failure to first secure a judicial decree validating

8  its authority to enter into that contract, and Reclamation's purported disavowal of its

9  duty to require Westlands to secure that judicial decree, are arbitrary and capricious,

10  failures to proceed in the manner required by law, and not supported by substantial

11  evidence.  For these reasons, Reclamation's entry into its repayment contract with

12  Westlands and purported disavowal of its duty to require Westlands to secure that

13  judicial decree, should be declared unlawful and set aside under the APA.

14      114.   Plaintiffs are informed and believe, and on that basis allege, that

15  Reclamation has approved, or is threatening to approve, additional repayment contracts

16  with other water districts without requiring the districts to first secure a judicial decree

17  confirming their authority to enter into such contracts.  Such approvals are, or would be,

18  contrary to law in the same respects as Reclamation's approval of the repayment

19  contract with Westlands alleged above, and for that reason are, or would be, arbitrary

20  and capricious, failures to proceed in the manner required by law, and not supported by

21  substantial evidence, and accordingly should be declared unlawful and set aside under

22  the APA.

23              **FIFTH CLAIM FOR RELIEF**

24  **(Violation of Reclamation Law Requirements for CVP Water Contracts)**

25              (Against All Defendants)

26      115.   The paragraphs set forth above and below are realleged and incorporated

27  herein by reference.

28      116.   Reclamation's repayment contracts with Westlands violate several

1   additional substantive and procedural requirements applicable to Reclamation's entry

2   into water service and repayment contracts that arise under the Reclamation Law.  First,

3   Reclamation failed to release the repayment contracts as ultimately modified for public

4   review prior to their approval in violation of 43 C.F.R. § 426.22(b) and(d), which

5   respectively direct in pertinent part that Reclamation must "[p]rovide copies of revised

6   proposed contracts to all parties who requested copies of the proposed contract in

7   response to the initial notice," and insure that "[a]nyone can get copies of a proposed

8   contract from the appropriate regional director. . . ."

9        117.    Second, Reclamation's repayment contracts with Westlands exceed by

10   more than 200,000 acres the maximum acreage authorized to receive Central Valley

11   Project water by Congress in the San Luis Act of 1960, Public Law No. 86-466, 74 Stat.

12   156 (1960).  When Congress passed the San Luis Act in 1960, it imposed limits on the

13   acreage available to receive water from the San Luis Project.  It directed in section 1(a)

14   of the Act that Reclamation was authorized to "construct, operate, and maintain the San

15   Luis unit as an integral part of the Central Valley Project" in accordance with the 1956

16   San Luis Unit Feasibility Study for the purpose of irrigating a service area that is limited

17   to just 496,000 acres, based on a long-term crop utilization pattern for 440,000 acres, in

18   the entire San Luis Unit in three counties–Merced, Fresno and Kings–as delineated in

19   the map prepared as part of that study.  *See*, U.S. Department of the Interior, Feasibility

20   Report (approved by President Roosevelt, December 2, 1935), reprinted in House

21   Committee on Interior & Insular Affairs, Central Valley Project, Documents-Part One:

22   Authorizing Documents, H.R. Doc. No. 416, 84th Cong., 2d Sess. 563 (1956) at p. 36

23   (map).

24        118.    Exhibit A–the Map of the Contractor's Service Area–to Reclamation's first

25   repayment contract with Westlands, however, reveals that a much larger area would be

26   served by Central Valley Project water delivered pursuant to the repayment contracts

27   than is permitted under the San Luis Act.  It shows, after subtracting the acreage for the

28   San Luis, Panoche and Pacheco water districts, and deducting an additional roughly

100,000 acres that has already been retired with taxpayer dollars and largely put to

industrial uses, that roughly 300,000 acres of land with Westlands Water District are

eligible to receive water from the San Luis Unit.  Yet contrary to this acreage limitation,

Reclamation's repayment contracts with Westlands would irrigate more than 600,000

acres of land within Westlands Water District as shown in Exhibit A to the first

repayment contract.  Under the contract, that acreage would be allocated between 2.2

and 1.7 acre-feet of water per year.  The repayment contract's inclusion of this

additional acreage therefore represents the delivery of roughly 400,000 acre-feet of

additional public water not authorized by Congress in the San Luis Act.  The subsequent

repayment contracts likewise allow excess deliveries.  This unauthorized reallocation of

these scarce waters unlawfully takes water from other Central Valley Project

contractors, communities, and the environment.  It also leads to increased impacts on

the areas from with the water would be exported, including the watersheds of the

Trinity, Sacramento and American rivers, and the San Joaquin-Sacramento Delta and

Estuary, as well as increased contamination of ground and surface waters from the

polluted irrigation return flows draining the lands irrigated with this water.

119.   Third, Reclamation's repayment contracts with Westlands violate

Reclamation's duty under the Coordinated Operations Act of 1986, Public Law 99-546,

100 Stat. 3050, § 305 (amending 43 U.S.C. § 422d) to demonstrate that lands receiving

Central Valley Project water are capable of "successful irrigability of those lands and

[that] their susceptibility to sustained production of agricultural crops by means of

irrigation has been demonstrated in practice."  This Act also requires Reclamation to

show that it has conducted "an investigation of soil characteristics which might result in

toxic or hazardous irrigation return flows."  Contrary to this duty, Reclamation has

conducted no studies and provided no evidence or documentation in support of the

permanent allocation of water to irrigate these lands as described in Exhibit A of the

first repayment contract.  In fact, the San Luis Drainage Feature Re-evaluation EIS

found that roughly 300,000 acres of the lands proposed for irrigation under these

1   contracts within Westlands' service area are drainage-impaired and will generate "toxic
2   or hazardous irrigation return flows" to ground or surface water.

3       120.   Fourth, Reclamation's repayment contracts with Westlands fail to assure
4   Westlands' compliance with applicable water quality standards as required by the
5   CVPIA.  The CVPIA provides in 43 U.S.C. § 3405(c) that "[a]ll Central Valley Project
6   water service or repayment contracts for agricultural, municipal or industrial purposes
7   that are entered into, renewed, or amended under any provision of Federal Reclamation
8   law after the date of enactment of this title, shall provide that the contracting district or
9   agency shall be responsible for compliance with all applicable State and Federal water
10  quality standards applicable to surface and subsurface agricultural drainage discharges
11  generated within its boundaries."  The CVPIA directs further in 43 U.S.C. § 3404(c)(2)
12  that "[u]pon renewal of any long-term repayment or water service contract providing for
13  the delivery of water from the Central Valley Project, the Secretary shall incorporate all
14  requirements imposed by existing law, including provisions of the title, within such
15  renewed contracts."

16      121.   Contrary to these Congressional mandates requiring adherence to state and
17  federal water quality standards, Reclamation's repayment contracts with Westlands do
18  not expressly incorporate any specific water quality standards, and impermissibly leave
19  compliance with such standards to the discretion of Reclamation's contracting officer
20  and Westlands.  But applicable water quality standards and permit requirements are not
21  discretionary under the law, and are being violated by Reclamation's excessive
22  diversions of water from the Delta for delivery to its contractors, and by the
23  contaminated agricultural drainage that has resulted in the past, and will foreseeably
24  result in the future, from those diversions and deliveries.  For example, although the
25  repayment contract will generate irrigation return flows that contaminate ground and
26  surface waters with selenium and other pollutants, including discharges from point
27  sources requiring permits under the Clean Water Act's National Pollutant Discharge
28  Elimination System under 33 U.S.C. §1342, the contract makes no provision for

compliance with that statutory duty.  And, although the repayment contracts will cause continuing and worsening declines in Delta water quality due to excessive diversions of water from the Delta for irrigation, they make no provision for complying with the federal water quality standards adopted by the United States Environmental Protection Agency some 25 years ago pursuant to federal court orders and codified at 40 C.F.R. § 131.37.

122.   In sum, Reclamation's approval of its repayment contracts with Westlands conflict with numerous procedural and substantive requirements of the CVPIA and other components of Reclamation Law, and fails to protect water quality as required by those laws.  Accordingly, Plaintiffs seek speedy adjudication of this matter to address and reverse the accelerating decline of water quality and fish and wildlife caused by the water diversions and irrigation return flows authorized by Reclamation's approval of the repayment contracts with Westlands, and the other similar repayment contracts it has recently approved and is approving.

**PRAYER FOR RELIEF**

As relief for the above violations of law, plaintiffs respectfully request the following:

1. A declaration that defendants acted contrary to law by issuing FONSIs for the 2016 and 2020 interim contract renewals based on EAs that are legally and factually inadequate.

2. An injunction ordering defendants to withdraw their FONSIs for the 2016 and 2020 interim contract renewals and to prepare an adequate EA for each of those interim contract renewals before considering them for approval as required by NEPA.

3. A declaration that defendants acted contrary to law by approving and entering into repayment contracts with Westlands and others without first preparing appropriate environmental review including an EIS as required

1     by NEPA and the CVPIA.

2     4.    An injunction ordering defendants to withdraw their approval of and entry

3           into their repayment contracts with Westlands and others without first

4           preparing appropriate environmental review including an EIS  as required

5           by NEPA and the CVPIA.

6     5.    A declaration that defendants acted contrary to law by approving and

7           entering into their repayment contracts with Westlands and others

8           notwithstanding the failure of those contractors to first secure a judicial

9           decree confirming their authority to enter into the repayment contracts.

10    6.    An injunction ordering defendants to withdraw their approval of and entry

11          into their repayment contracts with Westlands and others notwithstanding

12          the failure of those contractors to first secure a judicial decree confirming

13          their authority to enter into the repayment contracts.

14    7.    A declaration that defendants may not approve and enter into any

15          repayment contracts without compliance with all substantive and

16          procedural requirements of Reclamation Law, including protection and

17          restoration of water quality where mandated by applicable state and federal

18          environmental laws.

19    8.    An injunction ordering defendants to withdraw, or to refrain from granting,

20          their approval of any repayment contracts unless those contracts comply

21          with all substantive and procedural requirements of Reclamation Law,

22          including protection and restoration of water quality where mandated by

23          applicable state and federal environmental laws.

24    9.    An award of costs and reasonable attorney's fees and expenses that

25          plaintiffs incurred in the litigation of this action under the Equal Access to

26          Justice Act, 28 U.S.C. section 2412, and any other applicable fee recovery

27          law or doctrine.

28    //

1        10.    Any other relief that this Court deems just and proper.

2

3    Dated:   July 8, 2020                Respectfully submitted,

4                                         s/ *Stephan C. Volker*
                                          STEPHAN C. VOLKER
                                          Attorney for Plaintiffs
5                                         NORTH COAST RIVERS ALLIANCE,
                                          CALIFORNIA SPORTFISHING PROTECTION
6                                         ALLIANCE, PACIFIC COAST FEDERATION OF
                                          FISHERMEN'S ASSOCIATIONS, SAN
7                                         FRANCISCO CRAB BOAT OWNERS
                                          ASSOCIATION, INC., AND INSTITUTE FOR
8                                         FISHERIES RESOURCES

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I, Alexis E. Krieg, hereby declare:

3

My business address is the Law Offices of Stephan C. Volker, 1633 University Street,

4

Berkeley, California 94703.

5

On August 26, 2020, I served the following documents described as:

6

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

7

8

by electronic filing with the Clerk of the Court using the CM/ECF system, which sends

9

notification of such filing to the email addresses registered in the above entitled action.

10

I declare under penalty of perjury that the foregoing is true and correct.

11

Dated: August 26, 2020            */s/ Alexis E. Krieg*
                                  ALEXIS E. KRIEG

12

                                  Attorney for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28