1

2

3

4

5

6

7

8                              **UNITED STATES DISTRICT COURT**

9                             **EASTERN DISTRICT OF CALIFORNIA**

10

11   CENTER FOR BIOLOGICAL                Case No. 1:20-cv-00706 JLT EPG
     DIVERSITY, et al.,
12                                        ORDER RE CROSS MOTIONS FOR
                   Plaintiffs,            SUMMARY JUDGMENT
13
                                          (Docs. 144, 150, 160)
14   v.

15   UNITED STATES BUREAU OF
     RECLAMATION, et al.,
16
                   Defendants.
17   ─────────────────────────────
     NORTH COAST RIVERS ALLIANCE, et     Case No. 1:16-cv-00307 JLT SKO
18   al.,
                                          ORDER RE MOTION FOR SUMMARY
19                 Plaintiffs,            JUDGMENT AS TO FIRST AND SECOND
                                          CLAIMS FOR RELIEF
20   v.
                                          (Docs. 230, 233)
21   UNITED STATES DEPARTMENT OF
     THE INTERIOR, et al.,
22
                   Defendants.
23

24   **I.      INTRODUCTION**

25           Before the Court are overlapping challenges to the U.S. Bureau of Reclamation's[1]

26   ───────────────────────────────

27   [1] The original complaint in *Center for Biological Diversity, et al., v. U.S. Bureau of Reclamation*, Case. No. 1:20-cv-
     00706 JLT EPG, named Reclamation, the acting Secretary of the Interior, and the U.S. Department of the Interior as
28   Defendants (collectively, "Federal Defendants"). (Doc. 1.) On February 16, 2021, Plaintiffs were ordered to join
     absent water contractors (Doc. 23), which was accomplished in the amended complaint. (Doc. 25.)

                                              1

1    application of provisions of the 2016 Water Infrastructure Improvements for the Nation (WIIN)

2    Act, Pub. L. No. 114-322, 130 Stat. 1628 (2016), governing certain kinds of contracts for delivery

3    of water from the federal Central Valley Project (CVP). According to Reclamation's

4    interpretation of the relevant WIIN Act provisions, upon receiving a request from an existing

5    contractor holding a "water service" contract for delivery of CVP water, Reclamation <u>must</u>

6    convert the water service contract, which by statutory command has a finite term, into a

7    <u>permanent</u>, accelerated "repayment" contract and must do so <u>without altering any material water</u>

8    <u>service-related contractual rights</u> set forth in the pre-existing water service contract. Following

9    this interpretation, Reclamation concluded that contracts converted under the WIIN Act were not

10   required to undergo environmental review under either the National Environmental Policy Act

11   (NEPA), 42 U.S.C. §§ 4321, et seq., or the Endangered Species Act (ESA), 16 U.S.C. § 1531, et

12   seq. Thus, Reclamation converted numerous contracts addressing the delivery of approximately

13   three million acre-feet (AF)[2] of water without performing any contract-specific environmental

14   review. These lawsuits followed.[3]

15          The operative first amended complaint in *Center for Biological Diversity, et al., v. U.S.*

16   *Bureau of Reclamation*, Case. No. 1:20-cv-00706 JLT EPG ("*CBD*"), (Doc. 25), asserts three

17   claims for relief. The first and second allege that Reclamation had a duty to perform

18   environmental review under NEPA before converting the disputed contracts (*id.*, ¶¶ 166–71), and

19   that Reclamation's conversion of those contracts without the requisite environmental review

20   violated the Administrative Procedure Act (APA), 5 U.S.C. § 706 (*id.*, ¶¶ 171–72). The third

21   claim alleges that Reclamation's conversion of the contracts directly or indirectly impacted ESA-

22   listed species and/or their critical habitats; and Reclamation therefore violated the ESA by

23   approving the conversions without first consulting with the U.S. Fish and Wildlife Service (FWS)

24

25   [2] An acre foot of water is the volume of water required to cover one acre of surface area to the depth of one foot, or
     approximately 43,560 cubic feet. *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1139 n. 61 (E.D. Cal.
26   2001).

27   [3] A third lawsuit, *Hoopa Valley Tribe v. U.S. Bureau of Reclamation, et al.*, 1:20-cv-1814 JLT EPG, raises some
     overlapping claims about conversion of these contracts as well as some distinct claims. (*Hoopa*, Doc. 142.) Because
28   that case is in a different procedural posture, with motions to dismiss pending and summary judgment briefing
     stayed, the Court is not addressing that case in this order.

1   and/or the National Marine Fisheries Service (NMFS). (*Id.*, ¶¶ 174–181.) Three-way cross

2   motions for summary judgment addressing these claims were filed by Plaintiffs (Doc. 150),

3   Federal Defendants (Doc. 144), and joined Contractor Defendants (Doc. 160).[4]

4        The operative third amended complaint in *North Coast Rivers Alliance, et al., v. United*

5   *States Department of the Interior*, et al., Case. No. 1:16-cv-00307 JLT EPG, (*North Coast*, Doc.

6   156[5]), overlaps with the *CBD* complaint in part. As to the overlapping claims (the first and

7   second), the *North Coast* parties agreed to rely on the cross motions for summary judgment

8   briefing in *CBD*. (*North Coast*, Doc. 228.)[6] *North Coast* also advances unique claims, which the

9   Court plans to address by separate order.[7]

10       The briefs are voluminous, the Parties' arguments cover a wide range of issues, and the

11  applicable legal framework has shifted in significant ways since these cases were taken under

12  submission. The Court could not possibly address every argument raised but has attempted to

13  address those arguments and issues necessary to resolve the disputes.

14  **II.   BACKGROUND**

15       The CVP and California's State Water Project (SWP), "operated respectively by

16

17  [4] The *CBD* summary judgment record includes the following documents, which the Court has reviewed and
considered in detail, even if not directly mentioned herein: Docs. 130, 142–45, 148, 150–51, 153, 156–162, 170–74,

18  179–83, 185–86, 194, 199, 201, 203. This includes a sur-reply (Doc. 183-1), response (Doc. 185), and reply thereto
(Doc. 186), which the Court permitted. (*See* Doc. 214.)

19  [5] Filings from the *CBD* Docket will be referenced simply as "Doc. ##"; filings from *North Coast*, will bear the case

20  name as well.

21  [6] Because of this adoption, when the Court generically references the parties (e.g., "Plaintiffs") in the context of
discussing the overlapping claims, the Court is referring to the parties in both *CBD* and *North Coast*. When the Court

22  wishes to distinguish between the parties to these cases, it does so explicitly.

23  [7] The third claim for relief in *North Coast* alleges that Reclamation violated 43 U.S.C. §§ 423e and 511 by executing
the WIIN Act repayment contract with Westlands Water District notwithstanding the fact that Westlands failed to

24  first secure a judicial decree confirming and validating Westlands' authority to enter into that contract. (*North Coast*,
Doc. 156, ¶¶ 160–183.) *North Coast*'s fourth claim for relief advanced a multi-part claim that Reclamation's

25  execution of the Westlands' repayment contract violated other substantive and procedural requirements of
Reclamation Law. (*Id.*, ¶¶ 184–192.) The third and fourth claims were to be the subject of an entirely separate round

26  of cross motions for summary judgment. (*See* Doc. 228.) However, the *North Coast* Plaintiffs ultimately did not file
any motion for summary judgment and failed to oppose (Doc. 235) the *North Coast* Defendants' motions for

27  summary judgment (Docs. 233, 230) on certain claims/issues. This has narrowed the dispute as to the non-
overlapping claims considerably, leaving only the claim under 43 U.S.C. § 423e to be resolved. (*See North Coast*,
Docs. 238 (Federal Defendants' reply), 239 (Defendant Intervenors' reply).) The Court intends to address *North

28  Coast*'s third and fourth claims separately, likely alongside related claims addressed in the pending motions to
dismiss in the *Hoopa Valley* case. (*See supra* note 3.)

1  [Reclamation] and the State of California, are perhaps the two largest and most important water

2  projects in the United States." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581,

3  592 (9th Cir. 2014). "These combined projects supply water originating in northern California to

4  more than 20,000,000 agricultural and domestic consumers in central and southern California."

5  *Id.* As one part of CVP operations, Reclamation releases water stored in CVP reservoirs in

6  northern California; this water then flows down the Sacramento River to the Sacramento-San

7  Joaquin Delta (Delta). *See id.* at 594. Pumping plants in the southern region of the Delta (South

8  Delta) then divert the water to various users south of the Delta. *See id.* at 594–95.

9      "Although the [Water] Projects provide substantial benefits to people and to state

10  agriculture, they arguably harm species native to the Delta by modifying those species' natural

11  habitats." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 986 (9th Cir. 2014).

12  The Water Projects do so in several ways. First, the dams that make the CVP and SWP possible

13  have blocked access to the colder water upstream spawning and rearing habitat of migratory fish

14  species. *Nat. Res. Def. Council v. Norton*, 236 F. Supp. 3d 1198, 1204 (E.D. Cal. 2017). This has

15  limited spawning and rearing habitat for these species and confined certain populations to

16  spawning areas where flows and temperatures are largely controlled by releases from upstream

17  dams. *See id.* In addition, the Water Projects pump fresh water out of the "Old and Middle River"

18  (OMR) branches of the San Joaquin River in volumes sufficient to reverse the flow in OMR. *San*

19  *Luis v. Locke*, 776 F.3d at 996. "Absent pumping, [these] rivers would flow north into the Delta.

20  Under pumping operations, the rivers flow south to the [CVP's] Jones and [SWP's] Banks

21  pumping plants." *Id.* at 986. Listed species—particularly juveniles—can be caught in the negative

22  current and drawn towards the pumping facilities. *Id.* The essential nature of these impacts is not

23  materially disputed in the present litigation. (Doc. 143, Joint Statement of Undisputed Facts

24  ("JSUF") ## 17–19.) Reclamation admits that deliveries/diversions under CVP contracts have

25  adverse environmental impacts, including by entraining fish, altering flow patterns in the Delta,

26  and reducing freshwater flows. (JSUF ##17–19.) Reclamation further admits that several ESA-

27  listed species have designated critical habitat in areas impacted by CVP operations. (*See* JSUF

28  20.)

"The CVP supplies water to over 250 long-term water contractors under contracts with the Bureau." *See State Water Res. Control Bd. Cases*, 136 Cal. App. 4th 674, 692 (2006). "Most of those contractors put the water to agricultural use." *Id*. Among other things, these contracts are the means through which the government recoups some of federal funds spent constructing the CVP, along with a share of the project's operation and maintenance expenses. *See Grant Cnty. Black Sands Irrigation Dist. v. U.S. Bureau of Reclamation*, 579 F.3d 1345, 1351–52 (Fed. Cir. 2009); *see also* 43 U.S.C. § 485h(e). *Grant County* provides additional background on the "general principles of reclamation law and the different types of contracts for the delivery of project water," which provides helpful context for this case.

> Modern reclamation law has its roots in the Reclamation Act of 1902, Pub. L. No. 57–161, 32 Stat. 388, as amended, 43 U.S.C. §§ 371 et seq., which laid the groundwork for a vast and ambitious federal program to irrigate the arid lands of the western states. Under the 1902 Act, the Secretary of the Interior was charged with building dams, canals, and other irrigation facilities to be financed through the sale of federally owned lands. 43 U.S.C. §§ 391, 411. It was expected that the owners of the newly irrigated lands would repay their share of the construction costs of the reclamation projects over a 10–year period. Reclamation Act of 1902, § 4, 32 Stat. 388, 389 (current version at 43 U.S.C. §§ 419, 461). The operation and maintenance costs of the projects, however, were to be the responsibility of the federal government until such time as the construction payments had been made for the major portion of the lands irrigated by the projects, at which point the management and operation of the projects would pass to the landowners. 43 U.S.C. § 498.
>
> It soon became clear that the landowners' repayment obligations far exceeded their ability to pay. Congress therefore extended the repayment period to 20 years in 1914 and to 40 years in 1926. 43 U.S.C. §§ 423e, 475; *see* S.T. Harding, Background of California Water & Power Problems, 38 Cal. L. Rev. 547, 557 (1950). In light of the repayment extensions, Congress required the landowners to reimburse the federal government for their share of the annual operation and maintenance costs of the projects. 43 U.S.C. §§ 492, 493. The Secretary of the Interior, however, was granted discretionary authority to transfer the operation and maintenance of all or any part of the irrigation project works to a water users' association or an irrigation district. *Id*. § 499.
>
> In the wake of the Great Depression, as landowners became increasingly unable to meet their repayment obligations, Congress enacted the Reclamation Project Act of 1939. The goal of the 1939 legislation was to restructure the landowners' repayment obligations on the basis of ability to pay, while still protecting the federal government's financial investment in the reclamation projects. *See* 43 U.S.C. § 485. To that end, the 1939 Act addressed the Secretary's

contracting authority in two respects . . . .

First, in section 9(d) of the 1939 Act Congress authorized the Secretary of the Interior to enter into the classic repayment-type contract contemplated by the 1902 Act. Such contracts, typically called "9(d) contracts," were made available only to irrigation districts, water users' associations, and other organizations "satisfactory in form and powers to the Secretary." 43 U.S.C. § 485h(d). Under a 9(d) contract, the organization would receive project water in exchange for assuming a "general repayment obligation," which had to be repaid "over a period of not more than 40 years." *Id*. § 485h(d)(3). The repayment obligation was defined in the 1939 Act as that "part of the construction costs allocated by the Secretary" to the organization. *Id*. § 485h(d)(2). Thus, the 9(d) contract was in form and substance a straightforward application of the repayment principle that governed reclamation law prior to the 1939 Act.

Second, in section 9(e) of the 1939 Act Congress created a new source of contracting authority for the Secretary, known as a "9(e) contract." Section 9(e) provided that, "[i]n lieu of entering into a repayment contract pursuant to the provisions of subsection (d)," the Secretary had discretion to enter into "either short- or long-term contracts to furnish water for irrigation purposes." The water supplied under 9(e) contracts was supposed to be provided "at such rates as in the Secretary's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper." Although 9(e) contracts were described as either "short-term" or "long-term," the 1939 Act did not define those terms or indicate that any legal consequences would turn on the "short-term/long-term" distinction. 43 U.S.C. § 485h(e).

The principal difference between 9(d) and 9(e) contracts under the 1939 Act was that under a 9(d) contract, the irrigation district or water users' association assumed an obligation to repay the construction costs of the project works in fixed annual installments over a predetermined period of time. By contrast, a 9(e) contract was merely a contract to receive project water at an annual rate set by the Secretary.

\*\*\*

[T]he Bureau of Reclamation soon began entering into 9(e) contracts in connection with a number of existing and newly constructed reclamation projects. Irrigation districts and landowners, particularly in the San Joaquin Valley of California, vigorously contested the use of such utility-type contracts, arguing that the Bureau of Reclamation was not authorized to enter into water rental contracts. *See* Sheridan Downey, They Would Rule the Valley 243 (1947). The Bureau of Reclamation also encountered considerable resistance to its standard form water rental contracts, which did not guarantee any permanent water rights or grant any credit toward repayment of the construction costs of the project. *See* Ciriacy–Wantrup, *supra*, at 189–192; Downey, *supra*, at 226–29, 243–46; Huffman, *supra*, at 93;

Raymond Moley, What Price Federal Reclamation? 20–22 (1955); Robert de Roos, The Thirsty Land 154–58 (1948).

In 1956, Congress took up the landowners' cause and supplemented sections 9(d) and 9(e) of the 1939 Act. *See* Pub. L. No. 84–643, 70 Stat. 483 (1956) (codified at 43 U.S.C. §§ 485h–1 to 485h–6). It did so principally by conferring new benefits on holders of "long-term" 9(e) contracts, which were defined as 9(e) contracts having a term of more than 10 years. 43 U.S.C. § 485h–3. Those benefits included (1) the right to renew the contract on "terms and conditions mutually agreeable to the parties," (2) the right to convert the contract into "a contract under [section 9(d)]," and (3) the right to cease paying the "construction component" of the total use charge when the payments in excess of the government's operation and maintenance charges equaled the construction cost of the project. *Id*. § 485h–1. . . .

As the committee reports on the 1956 Act make clear, the purpose of the legislation was to address the landowners' concerns

> (1) that no assurance can be given in the contract itself or in any other document binding upon the Government that the contract will be renewed upon its expiration; (2) that the water users who have this type of contract are not assured that they will be relieved of payment of construction charges after the Government has recovered its entire irrigation investment; and (3) that the water users are not assured of a "permanent right" to the use of water under this type of contract.

S. Rep. No. 84–2241, at 2 (1956); H.R. Rep. No. 84–1754, at 2 (1956); *see also Ivanhoe*, 357 U.S. at 297–98 (the 1956 Act "answered most of the objections lodged against" the requirements of section 9(e) of the 1939 Act).

It was equally clear, however, that Congress did not intend for the 1956 legislation to repudiate the Bureau of Reclamation's general view that the "so-called water service or utility type contracts as authorized by the Reclamation Project Act of 1939 represented an innovation in reclamation law." S. Rep. No. 84–2241, at 2 (1956). The 1956 Act merely made it "possible for the Secretary of the Interior in approving so-called 'water service' and 'utility type' contracts to meet objections" of the landowners with respect to renewability, crediting, and permanent water rights. *Id*. Thus, 9(e) contracts continued to be treated as "water service" or "utility-type" contracts, distinct from 9(d) contracts and the repayment-type contracts envisioned by the 1902 Act. *See* 4 Robert E. Beck, Water & Water Rights 39–58 n. 245, 39–59 n. 247 (1991) ("Contracts under § 9e are not really repayment contracts, but rather water supply contracts that may take into consideration project costs, but do not purport to collect full payment in any set period of time"); Frank J. Trelease & George A. Gould, Cases & Materials on Water Law 697 (4th ed.1986) (section 9(e) contracts have been "likened to the arrangement made by a public utility furnishing water to consumers"); *see also* Reed D. Benson, Whose Water Is It? Private Rights and Public Authority Over Reclamation Project Water, 16 Va.

1
2

  Envtl. L.J. 363, 371 (1997) ("The repayment contract is analogous to
a mortgage, while a water service contract is more like a lease.");
Golze, *supra*, at 247, 256.

3   *Grant Cnty*., 579 F.3d at 1351–54.[8] Reclamation entered into numerous long-term "water supply"

4   contracts to supply water to users south of the Delta. *Id*. These contracts began to expire in the

5   early 2000s. *Id*. By then, the legal landscape had significantly changed.

6     Critically, the 1992 Central Valley Project Improvement Act (CVPIA), Pub. L. No. 102-

7   575, § 3401 *et seq*., 106 Stat. 4600, 4706–31 (1992), reauthorized the CVP and modified

8   Reclamation law in several ways. *See Consol. Delta Smelt Cases*, 717 F. Supp. 2d 1021, 1027

9   (E.D. Cal. 2010).[9] The CVPIA formally added mitigation, protection, and restoration of fish and

10   wildlife as co-equal project purposes of the CVP. *Id*. (citing CVPIA § 3402). Regarding

11   contracting, while contracts of up to 40-year terms were previously authorized, *see* 43 U.S.C.

12   § 485h(d), (e), the CVPIA reduced the maximum term duration to 25 years and imposed various

13   conditions upon contract renewal, including environmental review.

14     Specifically, the CVPIA mandates that the Secretary of the Interior "shall, upon request,

15   renew any existing long-term repayment or water service contract for the delivery of water from

16   the Central Valley Project for a period of twenty-five years and may renew such contracts for

---

17
18   [8] As the parties to these cases are aware, there are even more layers to the CVP's contractual matrix. Before the
CVP's existence, various parties used water from the Sacramento and San Joaquin Rivers for agricultural and other

19   purposes. For example, certain parties (referred to in relevant caselaw as the "Sacramento River Contractors") have
"longstanding water rights to a significant portion of the water available for appropriation from the Sacramento

20   River." *See Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1056 (9th Cir. 2024). "Those rights pre-date federal
Reclamation statutes and are senior to rights held by the federal government for the CVP. . . . Reclamation's ability to

21   operate the CVP therefore depends on the cooperation and agreement of these senior water-rights holders." *Id*. As
*Haaland* noted:

22
  In the 1960s, Reclamation entered into agreements (Settlement Contracts) with the

23     Sacramento River Contractors pursuant to congressional authorization. The original
  Settlement Contracts "grant [Reclamation] some rights to the encumbered water," allowing it
  to operate the CVP, "while also providing senior rights holders a stable supply of water."

24     [*Natural Resources Defense Council v. Jewell*, 749 F.3d 776, 780 (9th Cir. 2014) ("*NRDC v.
  Jewell*").] These original Settlement Contracts had a term of 40 years.

25   *Haaland*, 102 F.4th at 1056. Though these contracts are not directly at issue in this lawsuit, they are mentioned in
relevant caselaw, so the Court finds it prudent to introduce them here.

26
[9] This Court has recognized that the CVPIA "represented a compromise between competing needs for limited CVPIA

27   yield," in that it dedicated 800,000 AF of CVP yield to fish and wildlife restoration purposes on the one hand, while
also seeking to "achieve a reasonable balance among those competing uses, including fish and wildlife, agricultural,

28   municipal, industrial, and power. *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*, 637 F. Supp. 2d
777, 793 (E.D. Cal. 2008).

successive periods of up to 25 years each." CVPIA § 3404(c). However, "[n]o such renewals shall be authorized until appropriate environmental review, including the preparation of the environmental impact statement required in section 3409[10] of this title, has been completed." CVPIA § 3404(c)(1). In addition, CVPIA § 3404(a)(1) applies to "New Contracts" and provides that, subject to some exceptions not relevant here, Reclamation "shall not enter into any new short-term, temporary, or long-term contracts or agreements for water supply from the Central Valley Project for any purpose other than fish and wildlife before: (1) the provisions of subsections 3406(b)-(d) of this title are met." CVPIA § 3406(b)[11] in turn states:

> (b) FISH AND WILDLIFE RESTORATION ACTIVITIES.—The Secretary, immediately upon the enactment of this title, shall operate the Central Valley Project to meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. 1531, et seq., and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project. . . .

Relatedly, CVPIA § 3404(c)(2) further required that:

> Upon renewal of any long-term repayment or water service contract providing for the delivery of water from the Central Valley Project, the Secretary shall incorporate all requirements imposed by existing law, including provisions of this title, within such renewed contracts. The Secretary shall also administer all existing, new, and renewed contracts in conformance with the requirements and goals of this title.

After the CVPIA's enactment, Reclamation initiated a two-tiered process for ESA and NEPA review. The tiered ESA process is described in detail in *Natural Resources Defense Council v. Haaland*, 102 F.4th 1045 (9th Cir. 2024):

> In 1998, Reclamation initiated consultation under section 7 of the ESA with the [U.S. Fish and Wildlife Service (FWS)] on the implementation of the CVPIA and the continued operation and maintenance of the CVP. As part of this consultation, Reclamation and FWS established a two-track process. The first track would

---

[10] CVPIA § 3409 required the Secretary to prepare and complete within three years of the enactment of the CVPIA "a programmatic [EIS] pursuant to [NEPA] analyzing the direct and indirect impacts and benefits of implementing this title, including all fish, wildlife, and habitat restoration actions and the potential renewal of all existing Central Valley Project water contracts." Reclamation's tiered approach to compliance with this provision is discussed in greater detail below.

[11] CVPIA § 3406 also contains a long list of operational mandates, primarily designed to benefit the environment/species. Though Plaintiffs mention § 3406(b)(1), (*see* Doc. 170 at 16–17, 22), they do not make any distinct arguments based on that provision.

involve consultation on the coordinated operation of the CVP and SWP, resulting in a broad, program-wide biological opinion. The second track would involve consultations on narrower, discrete actions, such as the renewal of specific water contracts, and result in decisions that could be based on (or tiered from) the broader biological opinion. Thus, FWS's 2000 CVPIA biological opinion explained that it "addresse[d] the effects upon listed species resulting from implementation of this suite of actions as a whole, and provide[d] a strategy, or process, to determine how ESA compliance will be accomplished for individual activities that cumulatively make up the program." In detailing the strategy for consultation on narrower actions relating to the CVP, the 2000 CVPIA biological opinion explained that "[o]nce the long-term contract renewal negotiations are completed, the renewals will be subject to a separate, tiered analysis," and that "Reclamation will consult either formally or informally with [FWS] before executing a contract." "For some [water] districts, contract consultation could be conducted informally," such as contract renewals involving "water districts at full build out, that have well-established district boundaries, that may affect listed species, and are in compliance with other applicable biological opinions." Reclamation and FWS have adhered to this procedure of engaging in a broader first-track consultation regarding the coordinated operation of the CVP and SWP as a whole (referred to as the CVP "Operations Criteria and Plan" or "OCAP"), including all diversions of water under water supply contracts, and separately engaging in narrower second-track consultations regarding the negotiation of specific water supply contracts or groups of contracts.

After the Contracts began to expire in the 2000s, Reclamation began preparing for a second-track consultation regarding the renewal of the Contracts. It first prepared biological assessments, which concluded that renewing the Contracts would not likely adversely affect listed species. Based on that conclusion, Reclamation initiated informal consultation with FWS.

Around the same time, Reclamation also engaged in a first-track formal consultation with FWS regarding the environmental effects of the OCAP. In July 2004, FWS issued a biological opinion addressing the environmental effects of operating the CVP and SWP. It concluded that CVP and SWP operations, which included the delivery of water pursuant to the proposed renewal Contracts, would not jeopardize the continued existence of the delta smelt. [*See NRDC v. Jewell*, 749 F.3d at 781.] In August 2004, however, our decision in *Gifford Pinchot Task Force v. United States Fish & Wildlife Service* held that a regulation on which that biological opinion had relied was unlawful. 378 F.3d 1059, 1069 (9th Cir. 2004), *amended* by 387 F.3d 968 (9th Cir. 2004).

In response to *Gifford Pinchot*, Reclamation reinitiated formal consultation on the effects of the OCAP with respect to the delta smelt. In February 2005, FWS issued a new OCAP biological opinion which "addressed the operation of the CVP/SWP in the Sacramento Valley, and included all commitments of the SWP and CVP, such as meeting requirements of the [2000 CVPIA biological opinion]," as well as "the obligations contained in the Central Valley

Water Quality Control Board water rights permits, obligations of CVP water service contracts, Sacramento River Settlement contracts, . . . and other requirements." The OCAP biological opinion therefore "addressed all the aquatic effects of operating the CVP/SWP." Once again, FWS concluded that the OCAP would not likely jeopardize the delta smelt.

After issuing this 2005 OCAP biological opinion, FWS responded to Reclamation's second-track consultation on the renewal of the water supply Contracts by issuing four letters of concurrence. The letters of concurrence discussed the difference between the first-track OCAP consultation and the second-track Contract-specific consultations, stating: "The OCAP consultation analyzed the effects of numerous new actions on the delta smelt and its designated critical habitat," including accounting for all CVP commitments, such as the "obligations of CVP water service contracts," whereas FWS's "consultations on the long-term water-service contract renewals and Settlement contract renewals are addressing the diversion of Sacramento River water at prescribed diversion points." "In other words," FWS explained, "the contracts create a demand . . . for CVP water and the OCAP consultation addresses how the CVP/SWP projects are operated to meet those demands." The "linkages" between the "contract renewals and the operation of the CVP/SWP," FWS noted, were "addressed in separate but parallel consultations such that all possible effects on listed species are being identified and consulted on."

*Haaland*, 102 F.4th at 1057–58. As detailed in *Haaland*, both the first- and second-track ESA consultations have been the subject of multiple rounds of overlapping lawsuits. *See id.* at 1058–63.

NEPA review was also tiered. As mentioned, CVPIA § 3409 required the Secretary to prepare and complete within three years of the enactment of the CVPIA "a programmatic [EIS] pursuant to [NEPA] analyzing the direct and indirect impacts and benefits of implementing this title, including all fish, wildlife, and habitat restoration actions and the potential renewal of all existing Central Valley Project water contracts." This EIS was required to "consider impacts and benefits within the Sacramento, San Joaquin, and Trinity River basins, and the San Francisco Bay/Sacramento-San Joaquin River Delta Estuary." *Id.* "This requirement culminated in adoption of the Central Valley Project Improvement Act Final Programmatic Environmental Impact Statement ('CVPIA PEIS'), which was completed in 1999." *Pac. Coast Fed'n of Fishermen's Associations v. U.S. Dep't of the Interior*, 929 F. Supp. 2d 1039, 1043 (E.D. Cal. 2013) ("*PCFFA v. DOI I*"). The CVPIA PEIS deferred certain aspects of the environmental review to be

1  completed during the contract renewal process. *See id.; see also Pac. Coast Fed'n of Fishermen's*

2  *Assns. v. U.S. Dep't of the Interior*, 655 F. App'x 595, 600 (9th Cir. 2016) ("*PCFFA v. DOI II)*

3  (NEPA document for interim contract renewal "was tiered off of the PEIS, which addressed

4  Central Valley Project-wide effects of long-term contract renewal").[12]

5          In the mid-2000s, Reclamation began the process of preparing project-level EISs prior to

6  renewing long term water service contracts for south-of-Delta users, but no final EIS was ever

7  adopted. *PCFFA v. DOI*, 929 F. Supp. 2d at 1043; (*see also North Coast*, Doc. 156, ¶ 130).

8  Instead of finishing the long-term contract renewal process, Reclamation entered into a series of

9  two-year interim contracts which were subjected to a degree of NEPA review, and which were

10  also challenged in court. *See PCFFA v. DOI II*, 655 F. App'x 595. In *PCFFA v. DOI II* the Ninth

11  Circuit held in connection with one set of two-year interim water service contracts that

12  "Reclamation's decision not to give full and meaningful consideration to the alternative of a

13  reduction in maximum interim contract water quantities was an abuse of discretion, and the

14  agency did not adequately explain why it eliminated this alternative from detailed study." *Id*. at

15  599. On remand, Reclamation was directed to "consider such an alternative in any future EA for

16  an interim contract renewal." *Id*. Subsequent interim contracts also became the subject of

17  litigation over the sufficiency of respective NEPA review, *N. Coast Rivers All. v. United States*

18  *Dep't of the Interior*, 1:16-CV-00307-DAD-SKO, 2021 WL 5054394, at *1 (E.D. Cal. Nov. 1,

19  2021), but the most recent of those claims was dismissed without prejudice as moot when the

20  interim contracts were converted under the WIIN Act. *Id*. at  *4 (E.D. Cal. Nov. 1, 2021)

21  ("Because it is possible to imagine a scenario in which one or more of the WIIN Act Repayment

---

[12] Historically, Reclamation has performed some NEPA review for project operations. *PCFFA v. DOI I*, 929 F. Supp. 2d at 1059, but "the scope of the NEPA analyses required by court order in connection with the OCAP BiOps" has generally been "limited to the environmental impacts of specific actions planned to be taken to protect endangered species (including actions that will curtail water deliveries), not the full scope of environmental impacts of the water deliveries themselves." *Id*. (internal citations omitted). However, it has always been "explicit that if and when Reclamation ultimately decides to take a new action that is not within the scope of historical operations that could have a significant impact on the environment, Reclamation will undertake NEPA analysis." *Pac. Coast Fed'n of Fishermen's Ass'n/Inst. for Fisheries Res. v. Gutierrez*, No. 1:06-CV-00245 OWW LJO, 2007 WL 1752289, at *18 (E.D. Cal. June 15, 2007). Recent related cases have raised claims about the sufficiency of NEPA analysis of project operational plans, *see Pac. Coast Fed'n of Fishermen's Ass'n/Inst. for Fisheries Res. v. Ross*, No. 1:20-CV-00431-JLT-EPG, Doc. 52 ¶¶ 192–99, and Reclamation acknowledges that its decision to not apply NEPA to the WIIN Act contract conversions did "not preclude the application of NEPA and Section 7 to the CVP's operations." (Doc. 145 at 7 n 1.)

12

1    Contracts are set aside, it is likewise possible that plaintiffs' claims could be revived.").

2    As of September 2021, when the Joint Statement of Facts was drafted, Reclamation had

3    converted 67 CVP contracts pursuant to the WIIN act, addressing almost 3 million AF of water

4    each year; 23 additional contract conversions were pending, addressing more than 450,000 AF;

5    and 16 more contracts were in early stages of conversion. (JSUF ##5–6, Appendix 1.) These

6    converted contracts do not have any expiration date and "continue so long as the Contractor pays

7    applicable Rates and Charges." (JSUF #22.)

8    It is undisputed that environmental review was not performed specific to any of these

9    conversions under either NEPA or the ESA. (JSUF ##3, 7–8.) It is further undisputed that

10   Plaintiffs have standing to bring the claims presented in this motion and have exhausted their

11   administrative remedies. (*See* JSUF ##15, 16, 21.)

12   **III.    LEGAL STANDARDS**

13   **A.    ESA**

14   The Ninth Circuit took great care to thoroughly explain the most relevant aspects of the

15   ESA and related caselaw in *Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006,

16   1019–21 (9th Cir. 2012), which the Court relies upon here:

17   > We have described Section 7 as the "heart of the ESA." *W.*
18   > *Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir.
     > 2011). Section 7 requires federal agencies to ensure that none of their
19   > activities, including the granting of licenses and permits, will
     > jeopardize the continued existence of listed species or adversely
20   > modify a species' critical habitat. *Babbitt v. Sweet Home Chapter*,
     > 515 U.S. 687, 692 (1995) (citing 16 U.S.C. § 1536(a)(2)).

21   > Section 7 imposes on all agencies a duty to consult with either the
22   > Fish and Wildlife Service or the NOAA Fisheries Service before
     > engaging in any discretionary action that may affect a listed species
     > or critical habitat. *Turtle Island Restoration Network v. Nat'l Marine*
23   > *Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003). The purpose of
     > consultation is to obtain the expert opinion of wildlife agencies to
24   > determine whether the action is likely to jeopardize a listed species
     > or adversely modify its critical habitat and, if so, to identify
25   > reasonable and prudent alternatives that will avoid the action's
     > unfavorable impacts. *Id.* The consultation requirement reflects "a
26   > conscious decision by Congress to give endangered species priority
     > over the 'primary missions' of federal agencies." *Tenn. Valley Auth.*
27   > *v. Hill*, 437 U.S. 153, 185 (1978).

28

Section 7(a)(2) of the ESA provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "*agency action*") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species. . . .

16 U.S.C. § 1536(a)(2) (emphasis added).

Regulations implementing Section 7 provide:

> Each Federal agency shall review its actions at the earliest possible time to determine whether any action *may affect* listed species or critical habitat. If such a determination is made, formal consultation is required. . . .

50 C.F.R. § 402.14(a) (emphasis added).

*Karuk Tribe*, 681 F.3d at 1019–20. Thus, the ESA is triggered when there is (1) "agency action" that (2) "may affect" listed species or critical habitat. *See id*. at 1020. The focus of the dispute in this case is the former (i.e., agency action), a subject *Karuk Tribe* discussed in detail:

### 1. Agency Action

Section 7 of the ESA defines agency action as "any action authorized, funded, or carried out by [a federal] agency." 16 U.S.C. § 1536(a)(2). The ESA implementing regulations provide:

> Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02. There is "little doubt" that Congress intended agency action to have a broad definition in the ESA, and we have followed the Supreme Court's lead by interpreting its plain meaning "in conformance with Congress's clear intent." *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054–55 (9th Cir. 1994) (citing *Tenn. Valley Auth*., 437 U.S. at 173).

The ESA implementing regulations limit Section 7's application to "'actions in which there is discretionary Federal involvement or control.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (quoting 50 C.F.R. § 402.03). The Supreme

Court explained that this limitation harmonizes the ESA consultation requirement with other statutory mandates that leave an agency no discretion to consider the protection of listed species. *Home Builders*, 551 U.S. at 665–66.

Our "agency action" inquiry is two-fold. First, we ask whether a federal agency affirmatively authorized, funded, or carried out the underlying activity. Second, we determine whether the agency had some discretion to influence or change the activity for the benefit of a protected species.

### a. Affirmative Authorization

We have repeatedly held that the ESA's use of the term "agency action" is to be construed broadly. *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir. 2006); *Turtle Island*, 340 F.3d at 974; *Pac. Rivers*, 30 F.3d at 1055. Examples of agency actions triggering Section 7 consultation include the renewal of existing water contracts, *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998), the creation of interim management strategies, *Lane Cnty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 293–94 (9th Cir. 1992), and the ongoing construction and operation of a federal dam, *Tenn. Valley Auth.*, 437 U.S. at 173–74. We have also required consultation for federal agencies' authorization of private activities, such as the approval and registration of pesticides, *Wash. Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1031–33 (9th Cir. 2005), and the issuance of permits allowing fishing on the high seas, *Turtle Island*, 340 F.3d at 974.

An agency must consult under Section 7 only when it makes an "affirmative" act or authorization. *Cal. Sportfishing Prot. Alliance v. Fed. Energy Regulatory Comm'n*, 472 F.3d 593, 595, 598 (9th Cir. 2006); *Matejko*, 468 F.3d at 1108. Where private activity is proceeding pursuant to a vested right or to a previously issued license, an agency has no duty to consult under Section 7 if it takes no further affirmative action regarding the activity. *Cal. Sportfishing*, 472 F.3d at 595, 598–99; *Matejko*, 468 F.3d at 1107–08 ("'inaction' is not 'action' for section 7(a)(2) purposes"). Similarly, where no federal authorization is required for private-party activities, an agency's informal proffer of advice to the private party is not "agency action" requiring consultation. *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1074–75 (9th Cir. 1996); *see also Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) (Section 7 applies to private activity "only to the extent the activity is dependent on federal authorization").

\*\*\*

### b. Discretionary Involvement or Control

The ESA implementing regulations provide that Section 7 applies only to actions "in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. There is no duty to consult for actions "that an agency is required by statute to undertake once certain specified triggering events have occurred." *Home Builders*,

15

551 U.S. at 669 (emphasis in original); *id*. at 672–73 (no duty to consult where Clean Water Act required Environmental Protection Agency ("EPA") to transfer regulatory authority to a state upon satisfaction of nine specified criteria). However, to avoid the consultation obligation, an agency's competing statutory mandate must require that it perform specific nondiscretionary acts rather than achieve broad goals. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 524 F.3d 917, 928–29 (9th Cir. 2008). An agency "cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives." *Wash. Toxics*, 413 F.3d at 1032. The competing statutory objective need only leave the agency "some discretion." *Houston*, 146 F.3d at 1126.

To trigger the ESA consultation requirement, the discretionary control retained by the federal agency also must have the capacity to inure to the benefit of a protected species. *Turtle Island*, 340 F.3d at 974–75; *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of the Navy*, 383 F.3d 1082, 1092 (9th Cir. 2004) (no duty to consult where Navy lacked discretion to cease missile operations for the protection of listed species). If an agency cannot influence a private activity to benefit a listed species, there is no duty to consult because "consultation would be a meaningless exercise." *Sierra Club*, 65 F.3d at 1508–09 (no duty to consult for approval of logging roads where, pursuant to a prior right-of-way agreement, BLM retained discretion over only three specified criteria, none of which related to protecting listed species); *Envtl. Prot. Info. Ctr. v. Simpson Timber Co*., 255 F.3d 1073, 1081–82 (9th Cir. 2001) (no duty to reinitiate consultation for previously issued permits where Fish and Wildlife Service lacked discretion to add protections for newly listed species). The relevant question is whether the agency could influence a private activity to benefit a listed species, not whether it must do so. *Turtle Island*, 340 F.3d at 977.

*Karuk Tribe*, 681 F.3d at 1020–21, 1024–25.

The Ninth Circuit reaffirmed these principles in *Natural Resources Defense Council v. Jewell*, 749 F.3d 776, 784 (9th Cir. 2014) ("*NRDC v. Jewell*"), emphasizing that "[w]hether an agency must consult does not turn on the *degree* of discretion that the agency exercises regarding the action in question, but on whether the agency has any discretion to act in a manner beneficial to a protected species or its habitat." (citing *Karuk Tribe*, 681 F.3d 1024–25) (emphasis in original). Put another way, "[t]he agency lacks discretion only if another legal obligation makes it *impossible* for the agency to exercise discretion for the protected species' benefit." *Jewell*, 749 F.3d at 784 (internal citation omitted) (emphasis added).

Among other things, *NRDC v. Jewell*, applied the "some discretion" standard to pre-WIIN Act renewal of the the Sacramento River Settlement Contracts. 749 F.3d 784–85. The district

16

1    court focused on language in Article 9(a) of the original Settlement Contracts, which provides in

2    pertinent part:

3
> During the term of this contract and any renewals thereof: (1) It shall
> constitute full agreement as between the United States and the
4    Contractor *as to the quantities of water and the allocation thereof*
> between base supply and Project water which may be diverted by the
5    Contractor from its source of supply for beneficial use on the land
> shown on Exhibit B ...; (2) The Contractor shall not claim any right
6    against the United States in conflict with the provisions hereof.

7    *See id.* at 784 (quoting record and adding emphasis). The district court concluded that

8    Reclamation was not required to consult before renewal of the Settlement Contracts because this

9    provision "substantially constrained" the Bureau's discretion to negotiate new terms during the

10   renewal process. *Id.* This was error, according to the Ninth Circuit, because it applied the wrong

11   standard given that "nothing in the original Settlement Contracts requires the Bureau to renew the

12   Settlement Contracts" at all, and "even assuming, *arguendo,* that the Bureau is obligated to renew

13   the Settlement Contracts . . . Article 9(a) simply constrains future negotiations with regard to 'the

14   quantities of water and the allocation thereof. . . .'," leaving the Bureau with discretion as to

15   "contractual terms that do not directly concern water quantity and allocation," such as terms

16   related to pricing or timing of water distribution. *Id.* at 785.

17       As another example, *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv*ice,

18   340 F.3d 969 (9th Cir. 2003), concerned the issuance by NMFS of permits to longline fishermen

19   under the High Seas Fishing Compliance Act. The plaintiffs argued that NMFS violated the ESA

20   by issuing those permits without first consulting about the impacts to ESA listed species. *Id.*

21   NMFS contended that it lacked discretion under the Compliance Act to impose conditions

22   furthering the conservation of species. *Id.* at 972. Among other things, the Compliance Act itself

23   contained a "Conditions" subsection, that provides: "[t]he Secretary shall establish such

24   conditions and restrictions on each permit issued under this section as are necessary and

25   appropriate to carry out the obligations of the United States under the [Agreement to Promote

26   Compliance with International Conservation and Management Measures by Fishing Vessels in

27   the High Seas (HSFCA or Agreement)], including *but not limited to*" the markings of the boat and

28   reporting requirements. 16 U.S.C. § 5503(d) (emphasis added). The district court found that

1    NMFS's discretion was "bounded by the text and purpose of the HSFCA" and that "[n]othing in

2    the HSFCA provides the Secretary with the authority to place conditions on permits that inure to

3    the benefit of protected species." *Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv*.,

4    No. C-01-1706 VRW, 2001 WL 1602707, at *3 (N.D. Cal. Nov. 28, 2001). The Ninth Circuit

5    disagreed, focusing on the "including but not limited to" language in the Conditions subsection as

6    well as on the fact that the Compliance Act expressly defines the term "international conservation

7    and management measures" (terms in the title of the Agreement) to mean "measures to conserve

8    or manage one or more species of living marine resources," 16 U.S.C. § 5502(5), of which the

9    Inter–American Convention for the Protection and Conservation of Sea Turtles was one. *Turtle*

10   *Island*, 340 F.3d at 976. Considering these provisions, the Ninth Circuit found that the "plain

11   language of the Compliance Act provides [NMFS] with ample discretion to protect listed species.

12   *Id*. at 975.[13]

13          These cases generally demonstrate that whether a particular set of statutory or contractual

14   provisions leaves an agency "some discretion" such that the ESA's consultation requirements

15   apply is a highly context-specific inquiry.

16                          1.    Repeal by Implication

17          Plaintiffs repeatedly direct the Court's attention to a related line of authority concerning

18   "repeals by implication." (Doc. 170 at 17.) Plaintiffs are correct that generally "repeals by

19   implication are not favored." *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 154 (1978). As the

20   Ninth Circuit explained in *San Luis Obispo Coastkeeper v. Santa Maria Valley Water*

21   *Conservation Dist*., 49 F.4th 1242, 1247 (9th Cir. 2022), a case highlighted in Plaintiffs' notice of

22   supplemental authority (Doc. 194), under general principles of statutory construction, "[a] party

23   seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears

24   the heavy burden of showing 'a clearly expressed congressional intention' that such a result

25   should follow." *Id. San Luis Obispo Coastkeeper* concerned a claim arising under Section 9 of the

26

27   ---
     [13] The Ninth Circuit concluded Congressional intent was clear from the plain language of the statute and therefore
     that the Court of Appeals would not have deferred to NMFS's contrary interpretation had *Chevron* applied. *Turtle*

28   *Island*, 340 F.3d at 976.

1    ESA, which makes it unlawful for all persons, including federal and state agencies, to "take"

2    endangered species. *Id*. at 1246 (citing 16 U.S.C. §§ 1532(13), 1538(a)(1)(B)). In *Coastkeeper*,

3    Applying a rule from *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or*., 515 U.S. 687,

4    696 n. 9, 700 n. 13 (1995), that "[a]n ESA § 9 claim cannot succeed unless the agency's conduct

5    is the proximate cause of the alleged take," the Ninth Circuit concluded that Public Law 744,

6    which authorized construction of a particular dam in the 1950s, did not strip the dam management

7    agency of all discretion to release water from the dam to protect listed fish living below it. *Id*. at

8    1246. This was because PL 744 authorized the dam to be operated for "other purposes" beyond

9    those specifically enumerated. *Id*. This conclusion was "buttressed" by the above-mentioned

10   principle of statutory construction. *Id*. at 1247.

11           However, the Ninth Circuit's reasoning regarding repeals by implication does not directly

12   apply to the ESA claims in this case, which arise under Section 7 of the ESA and are directly

13   governed by *Home Builders* and *Karuk Tribe*. As *Karuk Tribe* explained, the ESA's

14   implementing regulation that limits Section 7's application to "'actions in which there is

15   discretionary Federal involvement or control, harmonizes the ESA consultation requirement in

16   Section 7 with other statutory mandates that leave an agency no discretion to consider the

17   protection of listed species. 681 F.3d at 1020–21. In other words, the ESA's own implementing

18   regulations avoid conflict by only requiring Section 7 consultation when an agency retains

19   discretionary involvement or control over the agency action. Because of this regulatory backstop,

20   the Court's job—at least with respect to the ESA Section 7 claim—is simply to inquire whether

21   the action is one the agency "is required by statute to undertake." *Home Builders*, 524 F.3d at 928

22   If the statutory command does not leave the agency with discretion to act on behalf of the species,

23   there is no duty to consult. *NRDC v. Jewell*, 749 F.3d at 780; *see also Nat'l Wildlife Fed'n v.*

24   *Nat'l Marine Fisheries Serv*., 524 F.3d 917, 928 (9th Cir.2008) (stating that the exception set

25   forth in 50 C.F.R. § 402.03 resolves "the problem of an agency being unable to 'simultaneously

26   obey' both Section 7 and a separate statute which expressly requires an agency to take a

27   conflicting action").

28   ///

**B.      NEPA**

NEPA "is our 'basic national charter for protection of the environment.'" *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (quoting 40 C.F.R. § 1500.1[14]). "Although NEPA does not impose any substantive requirements on federal agencies, it does impose procedural requirements." *N. Idaho Cmty. Action Network v. U.S. Dept. of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). "Through these procedural requirements, NEPA seeks to make certain that agencies will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger public audience." *Id.* (internal citations and quotations omitted).

NEPA requires federal agencies to analyze the potential environmental impacts of any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). When an agency takes major federal action, the agency must prepare an Environmental Impact Statement ("EIS") "where there are substantial questions about whether a project may cause significant degradation of the human environment." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005), *overruled in part on other grounds*, *The Lands Council v. McNair*, 537 F.3d 981, 997 (9th Cir. 2008).

However, for NEPA's requirements to apply, the agency must have some control over preventing the environmental effects—"the so-called 'rule of reason.'" *Stand Up for California! v. U.S. Dep't of the Interior*, 959 F.3d 1154, 1163 (9th Cir. 2020) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767, 770 (2004)). *Public Citizen* stands on one end of a spectrum of

---

[14] The few provisions of 40 C.F.R. relied upon by the cases cited in this section were originally promulgated by the Council on Environmental Quality (CEQ) to implement NEPA. The entire set of CEQ NEPA regulations was repealed effective April 11, 2025. *See* Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10,610—616 (Feb. 25, 2025). This followed the D.C. Circuit's ruling in *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024), which held that the CEQ "had no lawful authority to promulgate these regulations," *id.* at 915, and a related district court ruling vacating those rules, *Iowa v. Council on Env't Quality*, 765 F. Supp. 3d 859 (D.N.D. Feb. 3, 2025). Many questions remain unanswered about the impact of this repeal. *See e.g., Marin*, 121 F.4th at 914 ("Many agencies, including the parent departments of the agencies here (the Department of the Interior, for the Park Service, and the Department of Transportation, for the FAA), have issued their own NEPA regulations. If an agency adopts CEQ's rules or incorporates them by reference into its NEPA regulations, would that be a permissible exercise of its own rulemaking authority? The question is a good one, but it does not describe this case.").). The Court cites cases here that rely on the repealed regulations for general background only. Moreover, the repeal does not appear to materially impact the resolution of this case.

relevant caselaw and serves as an example of when NEPA does not apply because an agency entirely lacks control and/or responsibility of the environmental impacts of a proposed action. At issue in *Public Citizen* was a Congressionally imposed moratorium on new permits for Canadian and Mexican motor carriers to operate within the United States. *Id*. at 759. Congress authorized the President to extend, lift, or modify the moratorium. *Id*. At the same time, Federal law mandates that the Federal Motor Carrier Safety Administration (FMCSA), the agency responsible for motor carrier safety and registration, establish, among other things, federal safety standards for commercial motor vehicles, but FMCSA has only limited discretion over the registration process. *Id*. at 758. For example, it "must grant registration" to any domestic or foreign motor carrier willing to comply with applicable safety, fitness, and financial-responsibility requirements. *Id*. at 759.

The FMCSA prepared a preliminary environmental analysis (an "Environmental Assessment") as a preparatory step to aid in determining whether an EIS was required before it issued certain safety rules. *Id*. at 757, 761. That document concluded there would be no significant impacts resulting from FMCSA's rulemaking activities. *Id*. at 761–62. Public Citizen challenged the sufficiency of the EA shortly before the President lifted the moratorium. *Id*. at 762. The Ninth Circuit found the EA deficient, reasoning that the lifting of the moratorium was "reasonably foreseeable" at the time the EA issued and ordered FMSCA to prepare a full EIS. *Id*. at 761–63.

The Supreme Court reversed, finding that because FMCSA had no authority to impose or enforce emissions controls unrelated to motor carrier safety, it need not consider the environmental effects of cross-border operations of motor carriers in a NEPA review process, since it had no ability to prevent those operations. 541 U.S. at 770. The Court reasoned, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Id*. Therefore, the agency's decision not to prepare an EIS was lawful. *Id*. at 763, 770.[15] *See also*

---

[15] That FMCSA prepared an EA before deciding no EIS was required—a step that did not occur here—does not, in the Court's opinion, render the principles set forth in *Public Citizen* inapplicable. The issue presented in *Public Citizen*—whether the agency's EA correctly determined that no EIS was required—is at the very least closely

1   *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1516 (2025)

2   (reaffirming holding of Public Citizen that "where an agency has no ability to prevent a certain

3   effect due to its limited statutory authority over the relevant actions, the agency cannot be

4   considered a legally relevant 'cause' of the effect.").

5          *Stand Up for California!* falls on the other side of the spectrum, having distinguished

6   *Public Citizen* as a case that "involved a situation in which an agency unambiguously had no

7   discretion to change the decision made by the President." 959 F.3d at 1164. In contrast, *Stand Up*

8   *for California* concerned the Secretary of the Interior's issuance, under the Indian Gaming

9   Regulatory Act (IGRA) of "Secretarial Procedures" which authorized a tribal entity to operate

10  gaming activities. *Id*. at 1157. Among other things, the plaintiffs complained that the Secretary

11  had not performed environmental review under NEPA before promulgating those procedures. *Id*.

12  at 1162. The district court determined that the Secretary lacked the discretion and control required

13  to trigger NEPA, pointing to the language of IGRA, which provides that "the Secretary shall

14  prescribe . . . procedures . . . which are consistent with the proposed [gaming] compact selected

15  by the mediator . . . , the provisions of [IGRA], and the relevant provisions of the laws of the

16  State." *Id*. at 1163 (quoting 25 U.S.C. § 2710(d)(7)(B)(vii)).

17         Noting the statute's use of mandatory language ("shall"), the district
18         court read the provision "to contain an exhaustive list of authorities
           to be considered by the Secretary in prescribing Secretarial
           [P]rocedures"—the mediator-selected compact, IGRA, and state
19         law, but not other applicable federal law. The district court reasoned
           that because, elsewhere in IGRA, Congress specified that the
20         mediator should consider "other applicable Federal law," *id*.
           § 2710(d)(7)(B)(iv), the lack of such language with respect to
21         issuance of Secretarial Procedures is significant.

22  *Id*. The Ninth Circuit disagreed with this "overly restrictive reading." Its reasoning began with an

23  overview of general interpretive principles applicable to conflicts between NEPA and other

24  statutes:

25  _____

26  analogous to the one presented here: whether the agency was correct as a matter of law to determine that NEPA does
    not apply because the WIIN Act strips it of discretion to "prevent a certain effect" of its proposed action. The level of
    discretion afforded the agency's determination may be different, with a de novo review arguably applying here, while
27  some discretion was afforded the agency in *Public Citizen*. *See Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1511
    (explaining that after *Loper Bright* a court must review an agency's interpretation of a statute de novo but should
28  afford the agency "substantial deference" in reviewing whether an agency's NEPA document is sufficiently detailed).
    But that simply changes the way a court should apply *Public Citizen*, not its relevance to the inquiry.

"When confronted with two Acts of Congress allegedly touching on the same topic, [we are] not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018) (citations and quotation marks omitted). This is especially so in the case of NEPA, which "directs that, 'to the fullest extent possible . . . public laws of the United States shall be interpreted and administered in accordance with [it].'" *Jamul Action Comm. v. Chaudhuri*, 837 F.3d 958, 961 (9th Cir. 2016) (quoting *Westlands Water Dist. v. Nat. Res. Def. Council*, 43 F.3d 457, 460 (9th Cir. 1994)). We have recognized only "two circumstances where an agency need not complete an EIS even in the presence of major federal action and 'despite an absence of express statutory exemption' ": (1) "where doing so 'would create an irreconcilable and fundamental conflict' with the substantive statute at issue," and (2) where, "in limited instances, a substantive statute 'displaces' NEPA's procedural requirements." *Id.* at 963 (quoting *San Luis & Delta–Mendota Water Auth. v. Jewell*, 747 F.3d 581, 648 (9th Cir. 2014)).

*Id.* at 1163–64.

The Ninth Circuit concluded neither exception applied in *Stand Up for California!* because "[a]lthough the Secretary must prescribe Secretarial Procedures once the state has not timely consented to a mediator-selected compact, that does not mean the Secretary has no discretion whatsoever over the form of those Procedures." *Id.* at 1164. Critically, the Court of Appeals did not read the command that Secretarial Procedures be "*consistent* with the proposed compact selected by the mediator . . . , the provisions of [IGRA], and the relevant provisions of the laws of the State," to mean "that the Secretary must in every case adopt the mediator-selected compact wholesale, without modification." *Id.* (emphasis added).

The terms "consistent with" and "adopt" are plainly not synonymous. And earlier in the statute, Congress specified that the mediator must "select" one of the two proposed compacts offered by the state and the tribe. *Id.* § 2710(d)(7)(B)(iv). Congress could have used similarly restrictive language, such as "adopt," with respect to Secretarial Procedures, if it so intended.

*Id.* In addition, "while the statute enumerates some authorities that the Secretary must consider, it does not by its terms preclude the Secretary from considering other federal law." *Id.* Rather "[t]he statute can reasonably be read to allow for some discretion on the Secretary's part." *Id.* "Given that IGRA does not foreclose all consideration of applicable federal laws by the Secretary when issuing Secretarial Procedures, there is no 'irreconcilable and fundamental conflict' between

23

1    IGRA and NEPA." *Id.* "IGRA also does not 'displace' NEPA because it does not create any

2    comparable process for ensuring environmental protection." *Id.*

3          The Ninth Circuit also noted that its interpretation "comports with common sense,"

4    because "[a] construction in which the Secretary retains some discretion to consider and comply

5    with applicable federal laws avoids a [hypothetical] situation where the Secretary would

6    potentially be required to violate federal law, including perhaps the Constitution, by issuing

7    Secretarial Procedures—a situation which no doubt Congress did not intend." *Id.* at 1165. In other

8    words, because the plain language of the provision constrains the mediator to "choose either one

9    or the other proposed compact, as proposed by the state or the tribe, based on whichever is closer

10   to complying with relevant law, [i]f each proposes a compact that is contrary to federal law, then

11   the mediator must nevertheless select one without modification." *Id.* Under the district court's

12   reading, the Secretary would be required to adopt that unlawful proposed compact" without

13   modification, and the Ninth Circuit would not "presume that Congress would enact a statute that

14   requires a federal agency to violate federal law." *Id.*

15         The NEPA inquiry, like the ESA analysis, appears to boil down to this: NEPA applies

16   unless its application would create an "irreconcilable and fundamental conflict" with another

17   substantive statute, and such a conflict may inherently exist where an agency lacks discretion to

18   prevent the environmental impact. The inquiry is, again, highly context specific. *Compare*

19   *Westlands Water Dist. v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1157, 1180–81 (E.D. Cal. 2002),

20   *aff'd in part, rev'd in part and remanded*, 376 F.3d 853 (9th Cir. 2004) (lack of discretion

21   exception to NEPA did not apply where non-discretionary language was conditional and

22   condition was not triggered); *Murphy Co. v. Biden*, 65 F.4th 1122, 1134–35 (9th Cir. 2023), *cert.*

23   *denied*, 144 S. Ct. 1111 (2024) (where courts have repeatedly reinforced that a substantive act

24   grants an agency broad discretion to manage lands in a "flexible manner," agency could not use

25   "an excessively narrow construction of its existing statutory authorizations" to avoid compliance

26   with NEPA), *with Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) ("As was true in our

27   ESA analysis, we see no benefit from NEPA compliance where the [agency's] ability to modify

28   or halt [a] project is limited to the three conditions allowed by [a] right-of-way agreement.").

The Department of the Interior's regulations implementing NEPA are consistent with a rule that draws a distinction based upon agency control over the proposed action. 43 C.F.R. § 46.100(a) provides that:

> A bureau proposed action is subject to the procedural requirements of NEPA if it would cause effects on the human environment (40 CFR 1508.14), *and is subject to bureau control and responsibility* (40 CFR 1508.18). The determination of whether a proposed action is subject to the procedural requirements of NEPA depends on the extent to which bureaus exercise control and responsibility over the proposed action and whether Federal funding or approval are necessary to implement it. If Federal funding is provided with no Federal agency control as to the expenditure of such funds by the recipient, NEPA compliance is not necessary. The proposed action is not subject to the procedural requirements of NEPA if it is exempt from the requirements of section 102(2) of NEPA.

(Emphasis added.) As mentioned, the cross-referenced CEQ regulations contained within 40 C.F.R. are now defunct, but the provisions of 43 C.F.R. have not been withdrawn. No party has cited 43 C.F.R. § 46.100 or argued that it "harmonizes" NEPA with any potentially conflicting statutes akin to the harmonization discussed in *Karuk Tribe* in relation to Section 7 of the ESA, but the parallels between the ESA regulation discussed in *Karuk Tribe* and 43 C.F.R. § 46.100 are difficult to ignore.

Finally, the parties debate the level of deference, if any, that should be afforded Reclamation's determination that WIIN Act contract conversions are subject to NEPA review. Reclamation argues the Court should apply the deferential "arbitrary and capricious" standard, of review (Doc. 145 at 19), while Plaintiffs advocate for a less deferential "reasonableness" standard, or even a de novo standard. (*See* Doc. 150 at 10.) The relatively recent Ninth Circuit decision in *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475 (9th Cir. 2023), reaffirmed that where a NEPA coverage dispute "involve[d] primarily legal issues . . . based upon undisputed historical facts," the "reasonableness" standard applied. *Id*. at 491 (citing *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th Cir. 1995) ("We find that it makes sense to distinguish the strong level of deference we accord an agency in deciding factual or technical matters from that to be accorded in disputes involving predominantly legal questions.")).

**C.     Relationship of ESA and NEPA Standards**

As is apparent from the above descriptions, "[t]he standards for 'major federal action' under NEPA and 'agency action' under the ESA are much the same. If there is any difference, case law indicates 'major federal action' is the more exclusive standard." *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1996), impliedly overruled on other grounds, *Cascadia Wildlands v. Scott Timber Co*., 105 F.4th 1144, 1150 (9th Cir. 2024). Crucially, the Ninth Circuit has held that where there is no "agency action" under "what is probably the more liberal standard of the ESA, there is no 'major federal action' under the more exclusive standard of NEPA." *Id.*

**D.     WIIN Act**

Passed on December 16, 2016, the WIIN act is hundreds of pages long, addressing a wide array of water resource and related infrastructure issues across the United States. *See generally* Pub. L. 114-322, 130 Stat. 1628 (2016). This case focuses on provisions within Subtitle J, covering "California Water." WIIN Act §§ 4001–4014. Because there has thus far been scant judicial review of the WIIN Act generally or Subtitle J in specific, the Court provides a brief overview of what it views as the most salient provisions.

Section 4001(a) (Operations and Reviews) directs relevant federal agencies to:

> provide the maximum quantity of water supplies practicable to Central Valley Project agricultural, municipal and industrial contractors, water service or repayment contractors, water rights settlement contractors, exchange contractors, refuge contractors, and State Water Project contractors, by approving, in accordance with applicable Federal and State laws (including regulations), operations or temporary projects to provide additional water supplies as quickly as possible, based on available information.

In implementing this directive, the federal agencies are to coordinate closely with relevant state agencies to explore and implement a variety of operational modifications to increase water deliveries while monitoring and taking steps to control and minimize impacts to listed species. § 4001(b). Relatedly, Section 4002 (Scientifically Supported Implementation of OMR Flow Requirement), generally calls upon federal regulators to manage Project operations in the Delta so that "reverse flow in Old and Middle Rivers" is "at the most negative reverse flow rate allowed under the applicable biological opinion to maximize water supplies for the Central Valley Project

26

1    and the State Water Project," unless doing so would "cause additional adverse effects on the

2    listed fish species beyond the range of effects anticipated to occur to the listed fish species for the

3    duration of the applicable biological opinion, or would be inconsistent with applicable State law

4    requirements…." § 4002(a). And following this same pattern, Section 4003 (Temporary

5    Operational Flexibility for Storm Events) provides that regulators "shall evaluate and may

6    authorize" operations "that result in OMR flows more negative than the most negative reverse

7    flows allowed under the applicable biological opinion" in order "to capture peak flows during

8    storm-related events," so long as doing so does not cause "additional adverse effects on listed

9    species beyond the range of the effects anticipated to occur to the listed species for the duration of

10   the smelt biological opinion or salmonid biological opinion. . . ." § 4003(a).

11       Section 4007 (Storage) sets forth certain requirements and procedures applicable to

12   proposed projects for the design, study, and construction of federally owned or state-led water

13   storage projects. Among other things, language in this Section requires the Bureau to "comply

14   with all applicable environmental laws, including [NEPA]" when participating in federally owned

15   or state-led water storage projects. § 4007(b)(4), (c)(3). Section 4007(h) appropriates

16   $335,000,000 of funding from the provisions described below for projects covered by Section

17   4007.

18       Section 4010 delineates a variety of "actions to benefit threatened and endangered species

19   and other wildlife," including increased monitoring of environmental conditions and impacted

20   species populations, § 4010(a), specific actions to restore habitat and improve systems designed

21   to protect fish from direct harm at Project facilities, § 4010(b), provision of additional funding to

22   benefit wildlife refuges, § 4010(c), and the establishment of various programs aimed at

23   controlling nonnative, predatory fish species such as striped bass. §§ 4010(d), (e). Section

24   4010(d)(8) contains language designed to ensure that the CVPIA cannot be used to prohibit the

25   nonnative fish control programs, and Section 4010(g) amends the CVPIA in various ways to

26   repeal protections for striped bass contained therein.

27       The focal point of this case is Section 4011(a), entitled "Offsets and Water Storage

28   Account," which contains four parts. Section 4011(a)(1) commands Reclamation, upon request of

27

the contractor, to convert water service contracts into repayment contracts:

> (1) CONVERSION AND PREPAYMENT OF CONTRACTS.—Upon request of the contractor, the Secretary of the Interior shall convert any water service contract in effect on the date of enactment of this subtitle and between the United States and a water users' association to allow for prepayment of the repayment contract pursuant to paragraph (2) under mutually agreeable terms and conditions. The manner of conversion under this paragraph shall be as follows:

>> (A) Water service contracts that were entered into under section (e) of the Act of August 4, 1939 (53 Stat. 1196)[16], to be converted under this section shall be converted to repayment contracts under section 9(d) of that Act (53 Stat. 1195).

In addition, the WIIN Act specified that contracts from water service to repayment contracts must contain provisions requiring accelerated repayment of construction costs due.

> (2) PREPAYMENT.—Except for those repayment contracts under which the contractor has previously negotiated for prepayment, all repayment contracts under section 9(d) of that Act (53 Stat. 1195) in effect on the date of enactment of this subtitle at the request of the contractor, and all contracts converted pursuant to paragraph (1)(A) shall—

>> (A) provide for the repayment, either in lump sum or by accelerated prepayment, of the remaining construction costs identified in water project specific irrigation rate repayment schedules, as adjusted to reflect payment not reflected in such schedules, and properly assignable for ultimate return by the contractor, or if made in approximately equal installments, no later than 3 years after the effective date of the repayment contract, such amount to be discounted by ½ the Treasury rate. An estimate of the remaining construction costs, as adjusted, shall be provided by the Secretary to the contractor no later than 90 days following receipt of request of the contractor;

>> (B) require that construction costs or other capitalized costs incurred after the effective date of the contract or not reflected in the rate schedule referenced in subparagraph (A), and properly assignable to such contractor shall be repaid in not more than 5 years after notification of the allocation if such amount is a result of a collective annual allocation of capital costs to the contractors exercising contract conversion under this subsection of less than

---

[16] This is a reference to Section 9(e) of the Reclamation Act of August 4, 1939, 53 Stat. 1196, which allows the Secretary to enter into "either short- or long-term contracts to furnish water for irrigation purposes" for "such period, not to exceed forty years" at "such rates as in the Secretary's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper." These limited-term water service contracts are permitted "in lieu of entering into a repayment contract" pursuant to Section 9(d) "to cover that part of the cost of the construction of works connected with water supply and allocated to irrigation." 53 Stat. 1196. Section 4011(a)(1)(B) contains similar language that is applicable to municipal and industrial water service contracts not at issue in this case.

> $5,000,000. If such amount is $5,000,000 or greater, such cost
> shall be repaid as provided by applicable reclamation law;

WIIN Act § 4011(a)(2). In addition, the WIIN Act provides that the converted contracts shall "continue so long as the contractor pays applicable charges, consistent with section 9(d) of the Act of August 4, 1939 (53 Stat. 1195), and applicable law." WIIN Act § 4011(a)(2)(D).

Section 4011(a)(3) sets forth certain "Contract Requirements" applicable to municipal and industrial contracts converted under the WIIN Act, which are not directly relevant to this lawsuit. The requirements are similar, though not identical to the requirements set forth in § 4011(a)(2).

Section § 4011(a)(4) sets forth certain conditions applicable to all contracts converted under § 4011:

> (4)    CONDITIONS.—All contracts entered into pursuant to paragraphs (1), (2), and (3) shall—
>
> (A) not be adjusted on the basis of the type of prepayment financing used by the water users' association;
>
> (B) conform to any other agreements, such as applicable settlement agreements and new constructed appurtenant facilities; and
>
> (C) not modify other water service, repayment, exchange and transfer contractual rights between the water users' association, and the Bureau of Reclamation, or any rights, obligations, or relationships of the water users' association and their landowners as provided under State law.

It is the last of these conditions that has become the focal point of much of the dispute in this case.

The WIIN Act also contains several savings clauses. One potentially relevant savings clause is contained within § 4011 and provides that:

> Implementation of the provisions of this subtitle shall not alter … *except as expressly provided in this section, any obligations under the reclamation law*, including the continuation of Restoration Fund charges pursuant to section 3407(d) (Public Law 102–575), of the water service and repayment contractors making prepayments pursuant to this section.

WIIN Act § 4011(d)(3) (emphasis added).

Section 4012(a) contains an additional list of savings clauses as follows:

IN GENERAL.—This subtitle shall not be interpreted or implemented in a manner that—

(1) preempts or modifies any obligation of the United States to act in conformance with applicable State law, including applicable State water law;

(2) affects or modifies any obligation under the Central Valley Project Improvement Act (Public Law 102–575; 106 Stat. 4706), except for the savings provisions for the Stanislaus River predator management program expressly established by section 11(d) and provisions in section 11(g);

(3) overrides, modifies, or amends the applicability of the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.) or the application of the smelt and salmonid biological opinions to the operation of the Central Valley Project or the State Water Project;

(4) would cause additional adverse effects on listed fish species beyond the range of effects anticipated to occur to the listed fish species for the duration of the applicable biological opinion, using the best scientific and commercial data available; or

(5) overrides, modifies, or amends any obligation of the Pacific Fisheries Management Council, required by the Magnuson Stevens Act or the Endangered Species Act of 1973, to manage fisheries off the coast of California, Oregon, or Washington.

## E.    Deference to Agency Interpretation

The pending motions in these cases were briefed prior to the Supreme Court overturning *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Nonetheless, even after *Loper Bright*, a court "may look to agency interpretations for guidance," even if it does not defer to the agency. *Lopez v. Garland*, 116 F.4th 1032, 1036 (9th Cir. 2024) (internal citations and quotations omitted); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (explaining that, while an agency's interpretation is "not controlling," it may still have "power to persuade" based on "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements"). Post-*Loper Bright* cases have applied *Skidmore* deference to certain agency interpretations set forth in regulation. *Garcia v. Navy Fed. Credit Union*, No. 23-CV-2017-MMA-BLM, 2025 WL 1100898, at *18 (S.D. Cal. Apr. 14, 2025); *Barnett v. City of San Jose*, No. 18-CV-01383-JD, 2025 WL 354375, at *11 (N.D. Cal. Jan. 31, 2025) (same). And *Skidmore* has long-applied to other kinds of agency interpretations "such as those in opinion

1   letters—like interpretations contained in policy statements, agency manuals, and enforcement

2   guidelines, all of which lack the force of law." *Wilderness Watch, Inc. v. U.S. Fish & Wildlife*

3   *Serv.*, 629 F.3d 1024, 1034–35 (9th Cir. 2010). However, a court should not afford even *Skidmore*

4   deference to "litigation positions unmoored from any official agency interpretation" because any

5   delegation by Congress of the responsibility for elaborating and enforcing statutory commands is

6   a delegation "to the administrative official and not to appellate counsel the responsibility for

7   elaborating and enforcing statutory commands." *Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089,

8   1095 (9th Cir. 2008).

9          Here, the Court has not been made aware of any relevant *official* agency interpretation that

10   exists outside the confines of litigation, and certainly not any interpretation that presents any

11   reasoning or explanation. Therefore, Reclamation's interpretation of the WIIN Act appears to be

12   the kind of determination that is not entitled to *Skidmore* deference. Nonetheless, because the

13   Court ultimately agrees with Reclamation's interpretation, it is not necessary to definitively

14   determine whether *Skidmore* applies; *see Earth Island Inst. v. Nash*, No. 1:19-CV-01420-DAD-

15   SAB, 2020 WL 1936701, at *17 n. 22 (E.D. Cal. Apr. 21, 2020) (declining to decide the

16   applicable deference standard because "under any arguably applicable standard the outcome here

17   remains the same.").

18          **F.      APA & Summary Judgment Standard**

19          This Court's jurisdiction to adjudicate NEPA claims derives from the APA. This is

20   because NEPA does not itself create a private right of action, so the APA governs judicial review

21   of any claim premised upon NEPA's requirements. *See Ranchers Cattlemen Action Legal Fund*

22   *United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1102 (9th Cir. 2005), *as*

23   *amended* (Aug. 17, 2005); *Cent. Delta Water Agency v. U.S. Fish & Wildlife Serv.*, 653 F. Supp.

24   2d 1066, 1089 (E.D. Cal. 2009). Though the ESA does provide a private right of action, 16

25   U.S.C. § 1540(g)(1), that applies to the ESA claims in this case, *see Yurok Tribe v. United States*

26   *Bureau of Reclamation*, 231 F. Supp. 3d 450, 467 (N.D. Cal. 2017), *order clarified sub nom.*

27   *Yurok Tribe v. United States Bureau of Reclamation*, 319 F. Supp. 3d 1168 (N.D. Cal. 2018), the

28   APA's standard of review controls any judicial review. *See San Luis v. Jewell*, 747 F.3d at 601

1    ("Neither the ESA nor NEPA supply a separate standard for our review, so we review claims

2    under these Acts under the standards of the APA.").

3         Under section 702 of the APA, "[a] person suffering legal wrong because of agency

4    action, or adversely affected or aggrieved by agency action within the meaning of the relevant

5    statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under the APA, the Court shall

6    "hold unlawful and set aside agency action, findings, and conclusions found to be," among other

7    things "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*

8    § 706(A). In many APA cases, judicial review is limited to the administrative record. In such

9    situations, a slightly modified approach to summary judgment is applied, whereby the Court

10   determines "whether or not as a matter of law the evidence in the administrative record permitted

11   the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C.

12   2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).

13        A similar situation is presented here. Though the parties appear to dispute in theory

14   whether review of the claims in this case would be limited to the administrative record, (*see*

15   *generally* Doc. 142), they also agree that the administrative record has not been prepared and that

16   the Court may decide questions of law without the administrative record. (*Id*. at 3.) Relatedly, the

17   parties have stipulated to permit the Court to consider a small number of undisputed facts (*see*

18   Doc. 143) in part to avoid burdening the Court with additional briefing on factual submission.

19   (*See* Doc. 142.) Accordingly, given that the dispositive issue here is a question of statutory

20   interpretation—a question of law—the Court will proceed to determine whether Reclamation

21   acted "in accordance with law" under the APA, considering the stipulated facts.

22   **IV.    ANALYSIS**

23        As the Court has attempted to explain above, the standards applicable to the NEPA and

24   ESA claims presented in this case are roughly analogous. To reiterate, the ESA applies to any

25   "action authorized, funded, or carried out by [a federal] agency." 16 U.S.C. § 1536(a)(2). The

26   term "action" is defined by regulation to include "all activities or programs of any kind

27   authorized, funded, or carried out, in whole or in part, by Federal agencies" including "the

28   granting of . . . contracts." 50 C.F.R. § 402.02. The relevant ESA question is whether

32

1   Reclamation retains "some discretion" to influence or change the converted WIIN Act contracts

2   for the benefit of a protected species. *Karuk Tribe*, 681 F.3d at 1020–21, 1024–25. "The agency

3   lacks discretion only if another legal obligation makes it impossible for the agency to exercise

4   discretion for the protected species' benefit." *Jewell*, 749 F.3d at 784.

5       Relatedly, NEPA's applicability turns on whether Reclamation retains "control or

6   responsibility" over the contract conversions; "where an agency has no ability to prevent a certain

7   effect due to its limited statutory authority over the relevant actions, the agency cannot be

8   considered a legally relevant 'cause' of the effect," and NEPA does not apply. *Pub. Citizen*, 541

9   U.S. at 770; *see also Stand Up for California*, 959 F.3d at 1163–64 (reminding courts that

10  "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [we are] not

11  at liberty to pick and choose among congressional enactments and must instead strive to give

12  effect to both," especially in the case of NEPA, which "directs that, 'to the fullest extent possible

13  . . . public laws of the United States shall be interpreted and administered in accordance with

14  [it]'"; therefore NEPA should be applied unless doing so "would create an irreconcilable and

15  fundamental conflict" with the substantive statute at issue). Moreover, where there is no "agency

16  action" under "what is probably the more liberal standard of the ESA, there is no 'major federal

17  action' under the more exclusive standard of NEPA." *Marbled Murrelet*, 83 F.3d at 1075.

18      Ultimately, the parties appear to agree that whether Reclamation is required to comply

19  with the ESA and/or NEPA turns on the extent of the contracting discretion available to the

20  agency under the WIIN Act. (Doc. 150 at 14, 23; Doc. 145 at 20.) This raises novel questions of

21  statutory interpretation, which the Ninth Circuit instructs courts to generally approach as follows:

22          "As in any case of statutory construction, our analysis begins with
            the language of the statute." *United States v. Harrell*, 637 F.3d 1008,
23          1010 (9th Cir. 2011) (internal quotation marks omitted). "To aid our
            inquiry, we rely on our established rules of statutory construction . .
24          . ." *Id.* We also look to similar provisions within the statute as a whole
            and the language of related or similar statutes to aid in interpretation.
25          *See Jonah R. v. Carmona*, 446 F.3d 1000, 1006–07, 1011 (9th Cir.
            2006). "[S]tatutory interpretations which would produce absurd
26          results are to be avoided." *Arizona St. Bd. for Charter Schs. v. U.S.
            Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) (internal
27          quotation marks omitted). If a statute is ambiguous, we may "consult
            the legislative history, to the extent that it is of value, to aid in our
28          interpretation." *Merkel v. Comm'r*, 192 F.3d 844, 848 (9th Cir.1999).

1
2

Finally, in some cases, a statute's "purpose" may shed light on the interpretive question. *See Jonah R.,* 446 F.3d at 1005, 1010–11.

3      *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013).

4          **A.      "Mutually Agreeable Terms and Conditions"**

5      Plaintiffs' reading of the statute begins with a "plain language" argument (Doc. 150 at 8)

6  focused on WIIN Act § 4011(a)(1), which provides:

7
8
9
10

CONVERSION AND PREPAYMENT OF CONTRACTS.—Upon request of the contractor, the Secretary of the Interior shall convert any water service contract in effect on the date of enactment of this subtitle and between the United States and a water users' association to allow for prepayment of the repayment contract pursuant to paragraph (2) under mutually agreeable terms and conditions.

11  Plaintiffs argue that because conversion must take place "under mutually agreeable terms and

12  conditions," Reclamation retains sufficient discretion to determine and negotiate the terms and

13  conditions of the contracts to trigger the requirement for environmental review. (*See* Doc. 150 at

14  8.)[17]

15      Plaintiffs cite several cases bearing on their plain language argument. Most persuasively,

16  in *Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1125–26 (9th Cir. 1998), the

17  Ninth Circuit found "virtually identical" language to that used in the WIIN Act gave Reclamation

18  sufficient discretion to trigger application of the ESA. (Doc. 150 at 15.) *Houston* concerned

19  Reclamation contracts held by irrigators within the Friant Unit of the CVP that were originally

20  negotiated in the late 1940s with 40-year terms. *Id*. at 1123. In the late 1980s and early 1990s,

21  Reclamation negotiated and then executed 14 renewal contracts on terms substantially identical to

22  the original 40-year contracts. *Id*. at 1123–24. Plaintiffs filed suit, claiming that Reclamation

23  violated NEPA by renewing those 14 contracts without first engaging in Section 7 consultation

24  under the ESA and/or preparing an EIS under NEPA.[18] *Id*. at 1124.

25
26
27
28

---

[17] As further support for its reading, Plaintiffs point out that Reclamation uses the term "negotiated" in various ways in reference to the converted WIIN Act Contracts. For example, the contracts themselves indicate that they were "drafted, negotiated, and reviewed by the parties." (JSUF, Ex. 1 ¶ 46.) Reclamation also identifies the contracts as "Negotiated Draft conversion Contracts" on the departmental website. (JSUF #12.) The Court finds these passing references to be unhelpful, as they do not address the scope of any negotiations that took place.
[18] In 1992, Congress passed the CVPIA, which, as outlined above, required Reclamation to prepare an EIS before it could execute the additional 28 contracts that were up for renewal within the Friant Unit. *Houston*, 146 F.3d at 1123.

34

The central ESA issue in *Houston* was whether Reclamation retained sufficient discretion to trigger application of the ESA. *See id.* at 1126–27 ("Where there is no agency discretion to act, the ESA does not apply") (*quoting Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995)). The "right to renewal" applicable to these Friant Unit contracts comes from 43 U.S.C. § 485h-1(1).[19] *See id.* at 1126. As noted by the Ninth Circuit, other relevant provisions of Reclamation law provided "that water rights are based on the amount of available project water, 43 U.S.C. § 485h–1(4), and that the Secretary of the Interior (Secretary) has the discretion to set rates to cover an appropriate share of the operation and maintenance costs, 43 U.S.C. § 485h(e)." *Id.* Based on these provisions, the Ninth Circuit concluded "there was some discretion available to the Bureau during the negotiation process." *Id.* at 1125. Though the Solicitor of the Department of the Interior had issued an opinion indicating that Reclamation lacked discretion to change the quantity of water delivered under the contracts because the districts have "a first right . . . to a stated share or quantity of the project's available water supply. . . .," *id.* at 1126 (citing 43 U.S.C. § 485h–1(4)), the Solicitor assumed that the "project's available water supply" included <u>all</u> water impounded behind Friant dam, and did "not address the issue of whether the total amount of available project water could be reduced in order to comply with the ESA or state law." *Id.* (citing *O'Neill v. United States*, 50 F.3d 677, 686 (9th Cir.1995) (noting that an agency can deliver less than a contractually agreed upon amount of water to comply with subsequently enacted federal law)). Ultimately, *Houston* concluded that even if the original contracts guaranteed the contractor "a right to a similar share of available water in the renewal contracts, the Bureau had discretion to alter other key terms in the contract, and the Bureau may be able to reduce the amount of water available for sale if necessary to comply with ESA." *Id.*[20]

---

*Houston* only concerned the pre-CVPIA renewals and thus did not raise claims directly under the CVPIA. *See id.* at 1124.

[19] 43 U.S.C. § 485h-1(1) provides that Reclamation shall "include in any long-term contract hereafter entered into under subsection (e) of section 485h of this title provision [(i.e., water service contracts for irrigation)], if the other contracting party so requests, for renewal thereof under stated terms and conditions mutually agreeable to the parties. Such terms and conditions shall provide for an increase or decrease in the charges set forth in the contract to reflect, among other things, increases or decreases in construction, operation, and maintenance costs and improvement or deterioration in the party's repayment capacity."

[20] Plaintiffs also reference (Doc. 150 at 15) other cases that generally affirm agencies have broad discretion to negotiate contracts. *See Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 398 (1984)

Reclamation argues (Doc. 145 at 21) that *Houston* is distinguishable because here there is predicate language requiring that "upon request of the contractor" Reclamation "shall convert any water service contract . . . to allow for prepayment of the repayment contract pursuant to paragraph 2." WIIN Act § 4011(a)(1). In turn "paragraph 2," is a reference to WIIN Act § 4011(a)(2), which details the types of financial terms that "shall" be included in the converted contracts." Reclamation points out correctly that there are no such specific constraints imposed by the statutory language at issue in *Houston. See* 146 F.3d at 1123. Reclamation invokes the statutory canon of *ejusdem generis*, which provides that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *See also Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991)). Reclamation argues that the general reference to "mutually agreeable terms and conditions" is limited by the preceding, specific reference providing that Reclamation "shall convert any water service contract . . . to allow for prepayment of the repayment contract pursuant to paragraph (2)." (Doc. 145 at 22.) Put another way, applying *ejusdem generis* in the manner argued by Reclamation would mean that the only "mutually agreeable terms and conditions" that could be negotiated are those pertaining to conversion to a prepayment repayment contract.

Plaintiffs complain that Reclamation in effect is trying to amend the statute by adding the word "financial"—which does not appear in the statute—to turn the phrase "mutually agreeable terms" into "mutually agreeable *financial* terms." (Doc. 170 at 26.) Reclamation contends that it is doing no such thing but is instead "giving effect to a clause in the section that Plaintiffs wholly ignore." (Doc. 179 at 15.)

---

("Because the [Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. § 839 et seq.] does not comprehensively establish the terms on which power is to be supplied to [direct-service industrial customers] under the new contracts . . . the Administrator has broad discretion to negotiate them. Such discretion is especially appropriate in this situation, because [these] sales are merely one part of a complicated statutory allocation plan designed to achieve several goals."); *Forelaws on Bd. v. Johnson*, 743 F.2d 677, 681 (9th Cir. 1984) (even though Congress mandated that the agency offer contracts, "[t]he administrator possesses a great deal of discretion in contract matters," because Congress expressly authorized inclusion of provisions designed to achieve environmental purposes). Because these cases do not even arguably contain statutory commands that constrain contracting discretion, the Court does not find them particularly helpful here.

1    The Court does not find the language of § 4011(a), standing alone, to be conclusive in

2    either direction. But as the Supreme Court explained in *Circuit City*, "Canons of construction

3    need not be conclusive and are often countered, of course, by some maxim pointing in a different

4    direction." 532 U.S. at 115. As *Circuit City* counseled, a court must consider the rule of *ejusdem*

5    *generis* alongside "other sound considerations bearing upon the proper interpretation" of the

6    statutory language. *Id*. As explained below, other provisions of § 4011 constrain how the

7    "mutually agreeable terms and conditions" language can operate.

8            **B.**        **Shall "not modify other water service . . . contractual rights"**

9            Defendants' reading of the statute focuses on WIIN Act § 4011(a)(4)(C), which provides

10   that contracts converted thereunder shall "not modify other water service, repayment, exchange

11   and transfer contractual rights between the water users' association, and the Bureau of

12   Reclamation, or any rights, obligations, or relationships of the water users' association and their

13   landowners as provided under State law." (*See* Doc. 145 at 23.) Reclamation asserts this language

14   prohibited it from changing the contractors' terms of water service (i.e., the terms providing the

15   quantity of water delivered and manner of water delivery) and thus deprived Reclamation of the

16   discretion to impose additional environmental protections. (*Id*.) According to Reclamation, those

17   items "encompass effectively all substantive terms of the contract other than the payment terms

18   Congress expressly authorized to be changed, and certainly reach any contract terms relating to

19   water service." (*Id*.) Reclamation contends that because this "express" language deprives it of

20   discretion to act for the benefit of protected species or the environment, it precludes application of

21   ESA or NEPA. (*Id*. at 20, 23–24.) Reclamation also contends that this language is yet another

22   reason why this case is distinguishable from *Houston*, where no such limiting language was

23   present. (*Id*. at 23.)

24           Plaintiffs offer a different interpretation of WIIN Act § 4011(a)(4)(C), which is also

25   discussed in greater detail below. In addition, Plaintiffs contend that Reclamation's interpretation

26   conflicts with other commands and savings clauses within the WIIN Act; and argue that

27   Reclamation has acted in ways that are inconsistent with its own interpretation.

28                   1.       <u>Noscitur a sociis</u>

1    Plaintiffs' interpretation of § 4011(a)(4)(C) is based on the doctrine of "*noscitur a sociis,*"

2   which tells courts "that statutory words are often known by the company they keep." *Lagos v.*

3   *United States*, 584 U.S. 577, 582 (2018). In *Lagos*, for example, the Supreme Court considered

4   the meaning of a provision within the Mandatory Victims Restitution Act, 18 U.S.C.

5   § 3663(A)(b)(4), which required repayment of "the victim for lost income and necessary child

6   care, transportation, and other expenses incurred during participation in the investigation or

7   prosecution of the offense or attendance at proceedings related to the offense." 584 U.S. at 580–

8   81. At issue was whether the scope of the words "investigation" and "proceedings" was "limited

9   to government investigations and criminal proceedings, or whether it include[d] private

10  investigations and civil or bankruptcy litigation." *Id*. at 581. In reaching the conclusion that the

11  scope was limited to government investigations and criminal proceedings, the Court considered

12  that the "phrase lists three specific items that must be reimbursed, namely, lost income, child care,

13  and transportation; and it then adds the words, 'and other expenses.'" § 3663A(b)(4).

14   
15   
16   
17   
18  
> Lost income, child care expenses, and transportation expenses are precisely the kind of expenses that a victim would be likely to incur when he or she . . . misses work and travels to talk to government investigators, to participate in a government criminal investigation, or to testify before a grand jury or attend a criminal trial. At the same time, the statute says nothing about the kinds of expenses a victim would often incur when private investigations or, say, bankruptcy proceedings are at issue, namely, the costs of hiring private investigators, attorneys, or accountants.

19  584 U.S. at 582. Applying *noscitur a sociis* in that situation, the Court found "both the presence

20  of company that suggests limitation and the absence of company that suggests breadth,"

21  supporting a finding that the disputed language did not encompass private investigations and civil

22  or bankruptcy litigation. *Id*.

23    Section 4011(a) is entitled "Prepayment of Certain Repayment Contracts Between the

24  United States and Contractors of Federally Developed Water Supplies." Section 4011(a)(1)

25  contains the directive that Reclamation "shall convert" water service contracts on "mutually

26  agreeable terms and conditions," as discussed above. Subsection 4011(a)(2)(A) explains that

27  irrigation water contracts converted under § 4011(a)(1) must provide for prepayment[21] "either in

28  
---
[21] One of the recognized advantages of accelerated prepayment is that once a contractor has satisfied its repayment

lump sum" (i.e., entirely up front) or by "accelerated prepayment" in installments of "the remaining construction costs identified in water project specific irrigation rate repayment schedules," subject to some adjustments, and Subsection 4011(a)(2)(D) provides that any such converted contracts shall "continue so long as the contractor pays applicable charges."[22]

Subsection 4011(a)(4) places conditions on all types of contracts converted under § 4011(a), providing that they "shall":

> (A) not be adjusted on the basis of the type of prepayment financing used by the water users' association[23];
>
> (B) conform to any other agreements, such as applicable settlement agreements and new constructed appurtenant facilities; and
>
> (C) not modify other water service, repayment, exchange and transfer contractual rights between the water users' association, and the Bureau of Reclamation, or any rights, obligations, or relationships of the water users' association and their landowners as provided under State law.

According to Plaintiffs' *noscitur a sociis* argument, § 4011(a)(4)(A) refers to "an issue internal to the prepayment contracts—the prepayment financing," while subsection 4(B) overtly refers to "external obligations" by addressing "any other agreements." (Doc. 170 at 29 (emphasis added).) As to the key language in subsection 4(C), Plaintiffs contend that because "the latter half of subsection (4)(C) refers to obligations *external* to the Reclamation-association prepayment contractual relationship—obligations, rights and relationships between the association and other actors under State law," the doctrine of *noscitur a sociis* suggests that the first half of subsection (4)(C) must also concern obligations external to the prepayment contracts because those disputed

---

obligations, it is no longer subject to the acreage limitations and "full-cost pricing" of the Reclamation Reform Act of 1982. Congressional Research Service, Water Infrastructure Improvements for the Nation (WIIN) Act: Bureau of Reclamation and California Water Provisions (2018), *available at* https://www.congress.gov/crs-product/R44986 (last visited Apr. 30, 2025).

[22] Subsection 4011(a)(3), which concerns conversion of municipal and industrial water service contracts and is therefore not directly relevant here, sets forth mandatory financial terms that must be included in those converted contracts and also provides for a permanent contractual right so long as applicable charges are paid.

[23] WIIN Act § 4011(f)(5) defines a "water users' association" to mean "(A) an entity organized and recognized under State laws that is eligible to enter into contracts with Reclamation to receive contract water for delivery to end users of the water and to pay applicable charges; and (B) includes a variety of entities with different names and differing functions, such as associations, conservancy districts, irrigation districts, municipalities, and water project contract units."

1    terms must be understood by the company they keep. (*See id.*) Plaintiffs therefore criticize

2    Reclamation for claiming that the first half of subsection 4(C) constrains its ability to modify

3    substantive contractual rights contained <u>within</u> the water service contracts being converted. In

4    other words, Plaintiffs contend that the reference to "other water service . . . contractual rights" is

5    not a reference to internal substantive contractual rights contained within the pre-existing water

6    service contracts, but is instead "referring to substantive contractual rights external to the present

7    prepayment conversion contracts," revealing that the purpose of § 4011(a)(4)(A) is "to ensure that

8    the conversion of the contracts at hand does not interfere with other substantive rights and

9    obligations owed to Reclamation, the association or any other actor under other contracts." (*Id.*)

10       Plaintiffs' argument is not satisfying. Plaintiffs contend that while § 4011(a)(4)(A) refers

11   to matters <u>internal</u> to the converted contracts, both § 4011(a)(4)(B) <u>and</u> (C) refer to matters

12   <u>external</u> to the converted contracts. Why then is § 4011(a)(4) organized into three sub-parts

13   (internal, external, and external), instead of two (internal and external)? In addition, and perhaps

14   more importantly, it is unclear how a contract converted/entered into pursuant to the WIIN Act

15   could ever "modify" rights created by a <u>separate contract</u>, unless perhaps the parties to the

16   separate contract were identical to those party to the WIIN Act converted contract, in which case

17   why would Congress wish to prohibit such a modification? To be blunt, Plaintiffs' offered

18   interpretation does not make practical sense.

19       Reclamation asks the Court to apply *noscitur a sociis* in a different way. (Doc. 179 at 9.)

20   According to Reclamation's application of that doctrine, the two clauses of § 4011(a)(4)(C) work

21   together to preserve the existing rights of the contractors. (*Id.* ("The first clause preserves

22   'contractual rights between the water users' association and [] Reclamation and the second clause

23   preserves rights 'provided under State law.'").) Thus, they argue *noscitur a sociis* "counsels

24   against interpreting 'other' in a manner that would expose the contractors['] existing terms of

25   water service to possible change through the application of NEPA and the ESA to the contracts

26   Congress authorized to be converted." (*Id.*) Though this last assertion may be placing too much

27   weight on the *noscitur a sociis* doctrine, the general thrust of Reclamation's argument makes

28   more sense than Plaintiffs', particularly when § 4011(a)(4) is viewed holistically. Section

40

4011(a)(4)(A) is a command <u>not to adjust</u> terms in the converted contracts according to financing terms; (B) is a command <u>to conform</u> the converted contracts to other relevant agreements; (C) instructs Reclamation <u>not to modify</u> existing rights held by the contracting party, whether those rights are contractual or grounded in state law. Thus, as Reclamation suggests, what most obviously binds the two clauses of 4011(a)(4)(C) together is that they concern the protection of existing rights.

### 2.   Other

Plaintiffs also argue that Reclamation's interpretation of § 4011(a)(4)(C) reads the term "other" "nearly out of existence." (Doc. 170 at 29.) According to Plaintiffs:

> The word "other" modifies each substantive element of the subsection, including water service, exchange and transfer rights. By Reclamation's logic, though, no water service, exchange and transfer rights may change upon conversion of the contracts. The word "other" would therefore make no sense in its present place.

(*Id*.) Reclamation rejoins that its interpretation does give meaning to the term "other" because "the WIIN Act itself changes contractual rights" so the term "other" refers to "contractual rights *not* changed by the WIIN Act itself, which Reclamation is prohibited from modifying." (Doc. 179 at 9.)

On this point, the Court finds Reclamation's argument to be the more compelling one. There is no question that the WIIN Act <u>mandates</u> the alteration of <u>certain</u> terms previously included in the converted water service contracts. Reclamation's interpretation does not read the word "other" out of existence.

### 3.   Article 26 argument.

As mentioned, it is Plaintiffs' position that the "other" language in § 4011(a)(4)(C) restricts BOR from modifying *other contracts* and therefore does not limit Reclamation's ability to modify non-financial terms in the water service contracts being converted to repayment contracts. In support of this position, Plaintiffs point to Article 26 of the converted contracts, which provides:

///

> 26. Except as specifically provided in Article 16 of this Contract, the

41

> provisions of this Contract shall not be applicable to or affect non-Project water or water rights now owned or hereafter acquired by the Contractor or any user of such water within the Contractor's Service Area. Any such water shall not be considered Project Water under this Contract. *In addition, this Contract shall not be construed as limiting or curtailing any rights which the Contractor or any water user within the Contractor's Service Area acquires or has available under any other contract pursuant to Federal Reclamation law.*

(Doc. 170 at 28–29; Doc. 143 at 69 (Art. 26 of Westlands' Water District's converted contract); Doc. 143-1 at 44 (Art 26 of El Dorado Irrigation District's converted contract) (emphasis added).) Substantially similar language can be found in pre-conversion water service contracts. (*See* Doc. 143 at 153–54 (Art. 27 of Westlands' pre-existing water service contract); Doc. 143-1 at 94 (Art. 27 of El Dorado's pre-existing water service contract).) Plaintiffs contend that this provision is "consistent with WIIN Act section 4011(a)(4)(C) meaning that the converted contracts do not modify provisions in contracts other than the converted contracts." (Doc. 170 at 29.) In contrast, Reclamation contends that Article 26 does not disclose an intent to restrict modification of other contracts, but rather that it expresses a "general intent that the contract should stand on its own and not impact other contracts." (Doc. 179 at 8.)

The following chart presents a side-by-side comparison of the language in WIIN Act 4011(a)(4)(C) and Article 26:

| WIIN ACT § 4011(a)(4)(C) | Article 26 of Converted Contracts |
|---|---|
| All contracts entered into pursuant to paragraphs (1), (2), and (3) [of WIIN Act § 4011(a)] shall . . . not modify other water service, repayment, exchange and transfer contractual rights between the water users' association, and the Bureau of Reclamation, or any rights, obligations, or relationships of the water users' association and their landowners as provided under State law. | . . . , this Contract shall not be construed as limiting or curtailing any rights which the Contractor or any water user within the Contractor's Service Area acquires or has available under any other contract pursuant to Federal Reclamation law. |

Though covering related subjects, the language in these two contexts is distinct. The WIIN Act uses the phrase "shall . . . not modify" while Article 26 uses the phrase "shall not be construed as limiting or curtailing." Modify means "[t]o make somewhat different; to make small changes to (something) by way of improvement, suitability, or effectiveness," while construe means "to

42

1    analyze and explain the meaning of (a sentence or passage)." *Modify* and *Construe*, Black's Law

2    Dictionary (12th ed. 2024). In addition, the WIIN Act refers to "other water service . . .

3    contractual rights" as opposed to "other contracts." These distinctions render Plaintiffs'

4    arguments about Article 26 unconvincing. To the contrary, they highlight the fact that the

5    wording in the WIIN Act does not refer to "other contracts" but instead to "other contractual

6    rights," language that could easily have been replaced with the more straightforward term "other

7    contracts" but was not.

8                                   4.      Purpose

9          As mentioned, a statute's purpose may "shed light on the interpretive question." *LKAV*,

10   712 F.3d at 440. It is undisputed that a principal purpose of the WIIN Act is to fund the

11   construction of water storage projects. (*See* Docs. 170 at 13; Doc. 179 at 9.) WIIN Act § 4011(e),

12   for example, indicates that $335 million dollars from "receipts generated from prepayment of

13   contracts under [§ 4011] beyond amounts necessary to cover the amount of receipts forgone from

14   scheduled payments under current law for the 10-year period following the date of enactment of

15   this Act shall be directed to the Reclamation Water Storage Account," § 4011(e)(1), which is, in

16   turn, to be used to fund "the construction of water storage." § 4011(e)(2); *see also* § 4007(h)

17   ("$335,000,000 of funding in section 4011(e) is authorized to remain available until expended").

18         To further this purpose, Congress provided incentives to encourage Contractors to elect to

19   convert their water service contracts to accelerated prepayment contracts. Some of those

20   incentives include relief from acreage limitations, § 4011(c)(1); and creation of a no-term

21   contract, which would continue so long as applicable charges are paid, *id.* at § 4011(a)(2)(D).

22   Reclamation argues that preservation of the contractors' existing terms of water service was

23   another incentive designed to encourage conversion, (Doc. 179 at 10 (citing § 4011(a)(4)(C))

24   because "it avoids the prospect of review under NEPA and the ESA being used as a means to

25   reduce the quantity of water available under the contracts." (*Id.*) Reclamation argues Plaintiffs'

26   interpretation of Section 4011(a)(4)(C) would "undermine the purpose of the WIIN Act by

27   creating a disincentive for contractors to convert their contracts because converting a contract

28   could result in a loss of water following NEPA and ESA review." (*Id.* (citing *Johnson v. Transp.*

1    *Agency, Santa Clara Cty., Cal.*, 480 U.S. 616, 633 (1987) (declining to adopt a construction of a

2    statute which would create disincentive to achieving statute's purpose).)

3        While conceding that accelerating prepayment to fund water storage projects was a

4    purpose of the WIIN Act, Plaintiffs do not agree that furthering this purpose requires elimination

5    of NEPA and ESA review. (*See* Doc. 170 at 7–8, 13.) In support of argument, Plaintiffs point to

6    § 4011(d)(4) and the WIIN Act's various savings clauses contained in § 4012, which the Court

7    discusses in turn.

8            5.    4011(d)(4)

9        WIIN Act § 4011(d)(4) provides that "[i]mplementation of the provisions of [Subtitle J]

10   shall not alter . . . except as expressly provided in [§ 4011], any obligations under the reclamation

11   law, including the continuation of Restoration Fund charges pursuant to section 3407(d) (Public

12   Law 102–575), of the water service and repayment contractors making prepayments pursuant to

13   this section." Plaintiffs assert that the relevant "obligations under the reclamation law" include

14   compliance with the CVPIA including the CVPIA's NEPA review and ESA compliance

15   requirements. (Doc. 170 at 15.) Reclamation contends instead that the provision was not intended

16   to preserve environmental review, but rather "makes clear that prepayment of construction-related

17   debts does not alleviate a contractor's obligations to make continuing payments to the Restoration

18   Fund." (Doc. 179 at 313.)[24]

19       At first glance, the grammatically awkward language of § 4011(d)(4) seems facially

20   amenable to either interpretation. But even assuming Plaintiffs are correct that the "obligations"

21   referenced in § 4011(d)(4) include all obligations under the CVPIA, the obliged parties

22   referenced in § 4011(d)(4) are "the water service and repayment contractors making

23   prepayments" pursuant to converted WIIN Act contracts. Section 4011(d)(4) makes absolutely no

24   reference to Reclamation's obligations under the CVPIA. If any entity has the obligation to

25   perform environmental review of the contract conversions it is Reclamation, not the water service

26   contractors. Plaintiffs do not suggest otherwise.

27

28   [24] Reclamation also correctly points out that Plaintiffs raise this argument for the first time in their reply brief. (Doc. 179 at 13.) In the interest of thoroughness, the Court will exercise its discretion to address this argument even though it was not raised in Plaintiffs' opening brief.

1          6.      WIIN Act Savings Clauses

2          Plaintiffs also contend that Reclamation's interpretation of WIIN Act § 4011(a)(4)(C)

3    cannot stand because it conflicts with the WIIN Act's own savings clauses and/or that

4    environmental review is independently required by those savings clauses. (Doc. 150 at 8–9, 16–

5    18, 24; Doc. 170 at 27–28.) The savings clauses are set forth in WIIN Act § 4012, which

6    provides:

7          (a) IN GENERAL.—This subtitle shall not be interpreted or
           implemented in a manner that—
8
           (1) preempts or modifies any obligation of the United States to act in
9          conformance with applicable State law, including applicable State
           water law;
10
           (2) affects or modifies any obligation under the Central Valley
11         Project Improvement Act (Public Law 102–575; 106 Stat. 4706),
           except for the savings provisions for the Stanislaus River predator
12         management program expressly established by section 11(d) and
           provisions in section 11(g);
13
           (3) overrides, modifies, or amends the applicability of the
14         Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.) or the
           application of the smelt and salmonid biological opinions to the
15         operation of the Central Valley Project or the State Water Project;

16         (4) would cause additional adverse effects on listed fish species
           beyond the range of effects anticipated to occur to the listed fish
17         species for the duration of the applicable biological opinion, using
           the best scientific and commercial data available; or
18
           (5) overrides, modifies, or amends any obligation of the Pacific
19         Fisheries Management Council, required by the Magnuson Stevens
           Act or the Endangered Species Act of 1973, to manage fisheries off
20         the coast of California, Oregon, or Washington.

21              a.    *General Considerations*

22         In evaluating the savings clauses, the Court has taken the entire context of the WIIN Act

23   into consideration. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir.

24   2018) ("Savings clauses are read in their context, and they cannot be given effect when the Court

25   . . . would override clear and specific language. This principle is neither controversial nor

26   surprising: 'It is a commonplace of statutory construction that the specific governs the general.'").

27   As discussed above, significant parts of the WIIN Act are aimed at water project operations,

28   rather than contracting. For example, Section 4001(a) directs relevant federal agencies to

45

1    "provide the maximum quantity of water supplies practicable to Central Valley Project

2    [contractors] and State Water Project contractors, by approving, in accordance with applicable

3    Federal and State laws (including regulations), operations or temporary projects to provide

4    additional water supplies as quickly as possible, based on available information." Relatedly,

5    Section 4002 calls upon federal regulators to manage Project operations in the Delta so that flow

6    in Old and Middle Rivers is maintained "at the most negative reverse flow rate allowed under the

7    applicable biological opinion to maximize water supplies for the Central Valley Project and the

8    State Water Project," unless doing so would "cause additional adverse effects on the listed fish

9    species beyond the range of effects anticipated to occur to the listed fish species for the duration

10    of the applicable biological opinion, or would be inconsistent with applicable State law

11    requirements. . . ." § 4002(a); *see also* § 4003(a) (regulators "shall evaluate and may authorize"

12    operations "that result in OMR flows more negative than the most negative reverse flows allowed

13    under the applicable biological opinion" in order "to capture peak flows during storm-related

14    events," so long as doing so does not cause "additional adverse effects on listed species beyond

15    the range of the effects anticipated to occur to the listed species for the duration of the smelt

16    biological opinion or salmonid biological opinion. . . .").

17        Still other sections mandate "actions to benefit threatened and endangered species and

18    other wildlife," including the establishment of various programs aimed at controlling nonnative,

19    predatory fish species such as striped bass. §§ 4010(d), (e). Section 4010(d)(8) contains language

20    designed to ensure that the CVPIA cannot be used to prohibit the nonnative fish control

21    programs, and Section 4010(g) amends the CVPIA in various ways to repeal protections for

22    striped bass contained therein. With this context in mind, the Court turns to Plaintiffs' various

23    arguments about the savings clauses.

24                b.    *CVPIA Savings Clause*

25        WIIN Act § 4012(a)(2) prohibits "interpret[ation] or implement[ation]" of the WIIN act

26    "in a manner that . . . affects or modifies any obligation under the [CVPIA], except for the

27    savings provisions for the Stanislaus River predator management program expressly established

28    by [WIIN Act] section 11(d) and provisions in section 11(g)." Plaintiffs' arguments about this

1   savings clause focus on CVPIA § 3404(c)(1), but Plaintiffs also discuss CVPIA § 3404(a)(1) and

2   3404(c)(2).

3                          i.          CVPIA § 3404(c)(1

4        Plaintiffs argue that considering the CVPIA savings clause, interpreting WIIN Act

5   § 4011(a)(4)(C) to allow the converted contracts to evade environmental review would

6   impermissibly "affect[] or modif[y]" Reclamation's obligation under the CVPIA's to complete

7   "appropriate environmental review" as required by CVPIA § 3404(c)(1). (Doc. 150 at 16.) This of

8   course presumes that CVPIA § 3404(c)(1) applies to the conversion of water service contracts

9   under the WIIN Act. For the reasons explained below, the Court does not read CVPIA

10  § 3404(c)(1) that way.

11       CVPIA § 3404(c)(1) indicates that Reclamation "shall, upon request, renew any existing

12  long-term repayment or water service contract for the delivery of water from the Central Valley

13  Project for a period of twenty-five years and may renew such contracts for successive periods of

14  up to 25 years each," but must not authorize any "such renewals . . . until appropriate

15  environmental review, including the preparation of the environmental impact statement required

16  in section 3409 of this title, has been completed." Plaintiffs contend that this language requires

17  "appropriate environmental review" for the converted WIIN Act contracts at issue in this case.

18  (Doc. 150 at 16.)

19       Reclamation argues that § 3404(c)(1) is entirely inapplicable to the converted WIIN Act

20  contracts because the "mandatory contract conversions under the WIIN Act are not 'renewals' of

21  existing contracts under the CVPIA" at all. (Doc. 145 at 28 ("Here, rather than renewing existing

22  contracts, Reclamation, acting at the request of the contractors, converted them to create a

23  prepayment contract under the authority of the WIIN Act.").)

24       Plaintiffs respond that Reclamation should not be permitted to evade NEPA and/or the

25  ESA through such "word games." (Doc. 170 at 22.) First, Plaintiffs point to dictionary definitions

26  of "renew" and "renewal." (*Id.*) The definition of "renewal" in Black's Law Dictionary includes:

27  "The re-creation of a legal relationship or the replacement of an old contract with a new contract,

28  as opposed to the mere extension of a previous relationship or contract." *Renewal*, Black's Law

Dictionary (12th ed. 2024). The Oxford Dictionary of English defines "renewal" as "the replacement or repair of something." *Renewal*, Oxford Dictionary of English (3rd ed. 2015).[25] One of the definitions of "renew" is "replace." *Renew*, Oxford Dictionary of English (3rd ed. 2015). With these definitions in mind, Plaintiffs suggest that because "[t]he entire purpose of § 4011(a) is to allow for prior contracts to be *replaced* by new prepayment contracts," the "conversion" called for in § 4011(a) is the equivalent of "renewal." (*See* Doc. 170 at 22–23.)

The dispute, therefore, is whether there is a distinction between "conversion" and "renewal," as Reclamation suggests, or whether these terms are synonymous for purposes of interpreting CVPIA § 3404(c)(1). Relevant law does not appear to treat the terms as identical. For example, 43 U.S.C. § 485h-1, which dates to 1956, is entitled "Administration of repayment contracts and long-term contracts to furnish water; *renewal* and *conversion*; credit for payments; right to available water supply; rates; construction component." (Emphasis added.) The relevant text of § 485h-1 provides:

> In administering subsections (d) and (e) of section 485h of this title, the Secretary of the Interior shall--
>
> (1) *include in any long-term contract* hereafter entered into under subsection (e) of section 485h[26] of this title provision, if the other contracting party so requests, *for renewal thereof under stated terms and conditions mutually agreeable to the parties*. Such terms and conditions shall provide for an increase or decrease in the charges set forth in the contract to reflect, among other things, increases or decreases in construction, operation, and maintenance costs and improvement or deterioration in the party's repayment capacity. Any right of renewal shall be exercised within such reasonable time prior to the expiration of the contract as the parties shall have agreed upon and set forth therein;
>
> (2) *include in any long-term contract* hereafter entered into under subsection (e) of section 485h of this title with a contracting organization provision, if the organization so requests, *for conversion of said contract*, under stated terms and conditions mutually agreeable to the parties, *to a contract under subsection* (d)

---

[25] The citations to the Third Edition of the Oxford Dictionary of English are taken from Plaintiffs' briefs. They are substantially identical to the respective definitions offered by the Oxford Online English Dictionary (British English Version), available at: https://premium.oxforddictionaries.com/definition/english/renewal; https://premium.oxforddictionaries.com/definition/english/renew (last visited May 21, 2025). The American English definitions offered by Oxford Online are slightly different but not in any way that is material to this discussion.

[26] To reiterate, 43 U.S.C. § 485h(e) allows Reclamation to enter into the kinds of "water service" contracts held by the Contractor Defendants prior to their conversion under the WIIN Act.

1
2
3
4

> of section 485h of this title at such time as, account being taken of the amount credited to return by the organization as hereinafter provided, the remaining amount of construction cost which is properly assignable for ultimate return by it can probably be repaid to the United States within the term of a contract under subsection (d) of section 485h of this title;

5   (Emphasis added.)

6       Notwithstanding this apparent distinction in § 485h-1, there is an argument to be made

7   that CVPIA § 3404(c)(1) meant to sweep broadly to include a wide range of contractual

8   arrangements, given that it indicates that Reclamation "shall, upon request, renew any existing

9   long-term *repayment* or *water service* contract for the delivery of water from the Central Valley

10  Project for a period of twenty-five years and may renew such contracts for successive periods of

11  up to 25 years each." (Emphasis added.) But even accepting that conversion and renewal may at

12  least overlap, that does not mean CVPIA 3404(c) applies to WIIN Act converted contracts. This

13  is because the conversions at issue in this case are from 25-year water service contracts to

14  contracts with no term whatsoever. CVPIA § 3404(c) permits renewal "for successive periods of

15  up to 25 years each," so by its own terms does not permit any kind of renewal or conversion to a

16  permanent contract. As Reclamation argues, "the CVPIA and WIIN Act are different statutes

17  through which Congress imposed different obligations on Reclamation. Therefore, the

18  requirements imposed by the CVPIA do not apply to Reclamation's conversion of contracts under

19  the WIIN Act." (Doc. 145 at 28.)

20      Plaintiffs attempt to work their way around the fact that CVPIA § 3404(c)(1) only

21  authorizes renewals for 25-year terms by pointing out that the first sentence of CVPIA § 3404(c)

22  generally references renewals of "long-term" contracts. Plaintiffs are correct that Reclamation's

23  own internal policy manual defines a long-term contract as "a contract with a term of more than

24  10 years." (Doc. 170 at 12.[27]) This definition is also consistent with the Dictionary definitions of

25  "long-term" cited by Plaintiffs. (Doc. 170 at 23 ("'Long-term' is an adjective describing something

26

---

27  [27] Though Plaintiffs request that the Court take judicial notice of this "fact" within Reclamation's Policy Manual, (*see* Doc. 172-2 at 2), the Court construes the request as one seeking judicial notice of the content of a public record, not a request for the Court to assume the truth of that content. The former is an appropriate use of judicial notice, *see* Fed. R. Evid. 201; *Nat. Res. Def. Council v. Zinke*, 347 F. Supp. 3d 465, 479 n.10 (E.D. Cal. 2018) (taking judicial notice of public records for their content, not for the truth of that content), and so construed the request is **GRANTED**.

28

1  occurring over or relating to a long period of time. *Long-term*, Oxford Dictionary of English (3rd

2  ed. 2015).) Though it is true that a permanent contract is "as long as long-term can be," (Doc. 170

3  at 7), the Court cannot ignore the fact that CVPIA § 3404(c) plainly is meant to <u>constrain</u>

4  renewals to 25-year terms, while the WIIN Act <u>indisputably lifted that constraint</u> for contracts

5  converted under WIIN Act § 4011. From there, it is no monumental leap to conclude that

6  Congress intentionally placed WIIN Act conversion contracts into a category that is not subject to

7  CVPIA § 3404(c)(1)'s other restrictions, including any requirements for environmental review

8  that might motivate or require Reclamation to consider reducing contract quantities. Despite the

9  enormously complex web of relevant law, Congress is generally presumed to be aware of

10  previous legislation on a topic. *See Hall v. United States*, 566 U.S. 506, 516 (2012) (a court

11  "assumes that Congress is aware of existing law when it passes legislation"). This seems

12  particularly applicable here, where the WIIN act specifically references the CVPIA in numerous

13  places, including the savings clauses discussed herein. Thus, while "appropriate environmental

14  review" is required for renewals of <u>water service</u> contracts for successive <u>25-year terms</u> under

15  CVPIA 3404(c)(1), the WIIN Act sets up a separate track for conversion of water service

16  contracts into permanent repayment contracts, a process that does not fall within the scope of

17  § 3404(c)(1)'s explicit terms. As a result, the CVPIA savings clause does not constrain

18  interpretation of the WIIN Act § 4011(a)(4)(c) in the manner Plaintiffs suggest.

19      Plaintiffs argue relatedly that the "fact that Reclamation's *permanent* contract conversions

20  would be even more impactful than the 25-year contract renewals contemplated by the CVPIA

21  further emphasizes the necessity of environmental review for the conversions at issue." (Doc. 150

22  at 16–17 (emphasis in original).) However, this is a public policy argument of unclear import to

23  the statutory interpretation question before the Court. Congress could have, but did not, include

24  language in the WIIN Act amending or addressing the gap in coverage caused by the fact that

25  CVPIA § 3404(c)(1) is limited by its terms to water service contracts being renewed for 25-year

26  terms.

27                    ii.      CVPIA § 3404(a)(1)

28      Having concluded that CVPIA § 3404(c)(1) does not apply to the contracts converted

1   under the WIIN Act, the Court next turns to CVPIA § 3404(a)(1), which Plaintiffs briefly

2   mention. (*See* Doc. 170 at 22.) As noted, CVPIA § 3404(a)(1) provides that Reclamation "shall

3   not enter into any new short-term, temporary, or long-term contracts or agreements for water

4   supply from the Central Valley Project for any purpose other than fish and wildlife before: (1) the

5   provisions of subsections 3406(b)-(d) of this title are met." The Court assumes for purposes of

6   evaluating the applicability of this provision that the WIIN Act conversion contracts qualify

7   generically as "long-term contracts . . . for water supply from the [CVP]" for the reasons

8   articulated by Plaintiffs above.

9          However, nothing in CVPIA § 3406(b)-(d) seems to get Plaintiffs where they are trying to

10  go. Section 3406(b) mandates certain fish and wildlife restoration activities, including that

11  Reclamation "shall operate the Central Valley Project to meet all obligations under State and

12  Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. 1531, et

13  seq., and all decisions of the California State Water Resources Control Board establishing

14  conditions on applicable licenses and permits for the project." Plaintiffs point to this language in

15  § 3406(b) to argue generally that "ESA and NEPA compliance are . . . required." (Doc. 170 at

16  22.) But they do not tie this requirement back to the contract conversions because they cannot.

17  CVPIA § 3406(b) facially requires Reclamation to "operate" the CVP to meet all obligations

18  under State and Federal law, including under the ESA, NEPA, and the decisions of the State

19  Water Board. Reclamation does not dispute that water project <u>operations</u> are subject to these legal

20  regimes and, as the Court has explained above, project operations undergo ESA and NEPA

21  review.

22         In sum, neither 3404(a)(1) nor 3406(b) move the ball regarding any requirement for

23  environmental review during the contracting process.

24                          iii.          CVPIA 3404(c)(2)

25         Plaintiffs also point to CVPIA § 3404(c)(2), which requires Reclamation to "incorporate

26  all requirements imposed by existing law, including provisions of the [CVPIA]" within any

27  renewed "long-term repayment or water service contract." (*See* Doc. 170 at 38.) Plaintiffs

28  contend that the "requirements imposed by existing law" include "compliance with NEPA and the

1  ESA." (*Id.*) But this argument is circular because it depends upon a finding that Reclamation

2  retains sufficient discretion to trigger the application of those statutes. If, for example,

3  § 4011(a)(4)(C) strips Reclamation of all "discretion to influence or change the activity for the

4  benefit of a protected species," then Section 7 of the ESA does not apply because there is no

5  discretionary federal involvement or control under *Home Builders. See Karuk Tribe*, 681 F.3d at

6  1024. Therefore, ESA consultation is not a "requirement imposed by existing law." By analogy,

7  the result is the same as to NEPA.

8                              iv.        Stanislaus River Predator Management Program Exception

9          As mentioned, CVPIA § 4012(a)(2) prohibits "interpret[ation] or implement[ation]" of the

10  WIIN act "in a manner that . . . affects or modifies any obligation under the [CVPIA], except for

11  the savings provisions for the Stanislaus River predator management program expressly

12  established by [WIIN Act] section 11(d) and provisions in section 11(g)." In their reply, Plaintiffs

13  raise an argument about the exception in the CVPIA savings clause concerning the Stanislaus

14  River predator management program. As to this exception, Plaintiffs invoke the *expressio unius*

15  *est exclusio alterius* canon, (Doc. 170 at 23–24), which holds that "expressing one item of [an]

16  associated group or series excludes another left unmentioned." *N.L.R.B. v. SW General, Inc.,* 580

17  U.S. 288, 302 (2017). In applying that canon, the force of the negative implication depends on the

18  context. *Id.* at 940 ("The *expressio unius* canon applies only when circumstances support a

19  sensible inference that the term left out must have been meant to be excluded.").

20          Plaintiffs argue that the express inclusion of an exemption for the Stanislaus River

21  predator management program suggests, by negative implication, that Congress meant for that to

22  be the only exemption from continued application of the CVPIA.[28] The problem with this

23  argument is that the context does not "support a sensible inference that the term left out must have

24

25  [28] Plaintiffs attempt to tie into their *expressio unis* analysis of § 4012 (a)(2) a related argument about § 4011(d)(4),
    which, as discussed above, provides that implementation of the WIIN Act Subtitle J, "shall not alter . . . any

26  obligations under the reclamation law" except "as expressly provided" in § 4011. Plaintiffs point out, correctly, that
    Congress expressly exempted converted contracts from the acreage limitations referred to as the "excess land

27  provisions" to give incentive to the contractors to prepay the contracts. (*See* Doc. 170 at 23–24 (citing WIIN Act
    § 4011(c)(1)).) But, as discussed above, § 4011(d)(4) applies on its face to obligations of "water service and

28  repayment contractors making prepayments pursuant to this section" and thus appears to have little direct bearing on
    Reclamation's obligations under the CVPIA regarding environmental review.

1   been meant to be excluded" because there is an obvious reason why the Stanislaus River predator

2   management program needed to be singled out for specific mention.

3        WIIN Act § 4010 contains several provisions facially designed to benefit threatened and

4   endangered species and other wildlife, including a provision requiring the establishment and

5   implementation of a "nonnative predator research and pilot fish removal program to study the

6   effects of removing from the Stanislaus River—(A) nonnative striped bass, smallmouth bass,

7   largemouth bass, black bass; and (B) other nonnative predator fish species." This program at least

8   arguably <u>directly conflicts</u> with requirements in the CVPIA to increase populations of these

9   species. *See* CVPIA § 3406(b)(1) (requiring Reclamation to "develop within three years of

10   enactment and implement a program which makes all reasonable efforts to ensure that, by the

11   year 2002, natural production of anadromous fish in Central Valley rivers and streams will be

12   sustainable, on a long-term basis, at levels not less than twice the average levels attained during

13   the period of 1967-1991); § 3403(a) (defining "anadromous" to include populations of striped

14   bass). It is no wonder, therefore, that in the section that immediately follows the creation of the

15   Stanislaus River predator management program, Congress thought the program worthy of explicit

16   mention as an exception to the CVPIA. In this context, the Plaintiffs' *expressio unius* argument

17   does not inform the analysis.

18                     c.    *ESA Savings Clause*

19        The Court next turns to the savings clause that prohibits Subtitle J of the WIIN Act from

20   being "interpreted or implemented in a manner that—overrides, modifies, or amends the

21   applicability of the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.) or the application of

22   the smelt and salmonid biological opinions *to the operation* of the Central Valley Project or the

23   State Water Project." WIIN Act § 4012(a)(3) (emphasis added). Plaintiffs argue in their opening

24   brief that this language "cannot be any clearer; the contract conversions must comply with the

25   ESA." (Doc. 150 at 24.) But this argument entirely ignores the plain language of § 4012(a)(3),

26   which relates only to "the operation" of the CVP.

27        Plaintiffs relatedly cite this Court's ruling in *California Natural Resources Agency v.*

28   *Ross*, No. 1:20-CV-00426 and 00431, 2020 WL 2404853 at *20 (E.D. Cal., May 11, 2020),

1    which reasoned that "nothing in the WIIN Act modifies (or even bends) any of Federal

2    Defendants' obligations under the ESA." But that decision also relates to *operations* of the CVP,

3    not to contracting. As *Ross* explained:

4
> San Luis argues that the 2016 Water Infrastructure Improvements for
> the Nation Act (WIIN Act), Title III, Subtitle J, § 4002(a), Pub. L.
5
> No. 114-322, 130 Stat. 1628, 1855 (2016), should be taken into
> consideration by the court in conducting the public interest balance.
6
> (*CNRA*, Doc. No. 74 at 6.) In assessing the impact of the WIIN Act
> in this regard, one must be mindful of both the 2008 FWS BiOp,
7
> which imposed an outer limit on reverse OMR flows of -5,000 with
> more stringent limitations coming into play depending on conditions,
8
> fish monitoring, and the time of year (*see* 2008 FWS BiOp at 280–
> 82), and the 2009 FWS BiOp which, as discussed above, imposed
9
> various provisions that constrained export pumping, including the
> I:E Ratio. Some viewed the approaches taken in these BiOps as more
10
> cautionary (and therefore more restrictive to water supply) than
> justified by the then-available science, but ultimately the Ninth
11
> Circuit found the restrictions to be lawful and supported by the
> record. *See San Luis v. Jewell*, 747 F.3d at 607–15; *San Luis v. Locke*,
12
> 776 F.3d at 1004

13
> In the WIIN Act, Congress instructed Reclamation to maximize
> export pumping, but to do so within the sideboards of the applicable
14
> biological opinions and state law requirements. Thus, WIIN Act
> § 4002(a) requires Reclamation to
15

16
>> manage reverse flow in Old and Middle Rivers at the most
>> negative reverse flow rate allowed under the applicable
17
>> biological opinion to maximize water supplies for the Central
>> Valley Project and the State Water Project, unless that
18
>> management of reverse flow in Old and Middle Rivers to
>> maximize water supplies would cause additional adverse
19
>> effects on the listed fish species beyond the range of effects
>> anticipated to occur to the listed fish species for the duration
20
>> of the applicable biological opinion, or would be inconsistent
>> with applicable State law requirements, including water
21
>> quality, salinity control, and compliance with State Water
>> Resources Control Board Order D–1641 or a successor order.

22
> (*Id*.) (emphasis added); *see also* WIIN Act § 4001(a) ("The Secretary
> of the Interior and Secretary of Commerce shall provide the
23
> maximum quantity of water supplies practicable to Central Valley
> Project [contractors], by approving, in accordance with applicable
24
> Federal and State laws (including regulations), operations or
> temporary projects to provide additional water supplies as quickly as
25
> possible, based on available information."). Reclamation is required
> under the WIIN Act to document in writing the reasons why it
26
> constrains reverse flows to a level not as negative as the most
> negative flow permitted. *Id*. at § 4002(b). The WIIN Act directs
27
> Reclamation to move toward an approach that "increase[s]
> monitoring to inform real-time operations," *id*. § 4010(a), and then
28
> "use[s] all available scientific tools to identify any changes to the

54

1

2

3

> real-time operations...that could result in the availability of additional water supplies." *Id*. at § 4001(b)(1)(B). However, nothing in the WIIN Act modifies (or even bends) any of Federal Defendants' obligations under the ESA.

4

5

6

7

> While the WIIN Act perhaps expresses a Congressional preference for a balanced approach to managing OMR flows, its plain language does not modify the scope or application of the ESA in any way. Here, plaintiffs have raised serious questions as to the validity of the applicable NMFS BiOp. The WIIN Act does nothing to alter the well-established jurisprudence regarding the balance of the harms in an ESA case such as this one.

8    *Id*. at *20. To the extent this reasoning has any bearing on the dispute presented in these lawsuits

9    it does not support Plaintiffs' position. Rather, it demonstrates that the WIIN Act contained

10   numerous provisions pertaining to operations and that none of those provisions were meant to

11   override application of any existing or future biological opinions "*to the operation*" of the CVP

12   and or SWP pursuant to WIIN Act § 4012(a)(3).

13                          d.      *State Law Savings Clause*

14          Plaintiffs next turn to WIIN Act § 4012(1), which provides that the WIIN Act "shall not

15   be interpreted or implemented in a manner that—preempts or modifies any obligation of the

16   United States to act in conformance with applicable State law, including applicable State water

17   law. Plaintiffs argue that preparation of environmental review documents, such as an EIS under

18   NEPA, would "afford[d] the analytical and interactive process to determine whether contract

19   terms and conditions confirm with State law, including State water law." (Doc. 150 at 17.) They

20   offer as an example Article X of the California Constitution, which requires, among other things,

21   that "water resources of the State be put to beneficial use to the fullest extent of which they are

22   capable." Cal. Const. art. X, § 2; *see also* Cal. Water Code § 100. Plaintiffs argue that an EIS

23   "provides the necessary analysis of whether those state-mandated, constitutional requirements are

24   met by contract terms and conditions" and would require Reclamation to consider "such

25   foundational alternatives as conditioning the contracts to provide for reducing deliveries as

26   current methods of use become unreasonable due to innovations and/or worsening of adverse

27   impacts of water diversions due to climate change. . . ." (Doc. 150 at 17.)[29]

28   _____

[29] The Court notes that throughout its argument about how an EIS would facilitate analysis of whether converting the

55

1    However one views this argument from a public policy perspective, it does not directly

2    line up with the statutory text. As Reclamation correctly points out (Doc. 145 at 29), Plaintiffs are

3    not arguing that Reclamation's interpretation of the WIIN Act "preempts or modifies any

4    obligation of the United States to act in conformance with applicable State law." Rather, Plaintiffs

5    make the more indirect assertion that preparation of an EIS would help ensure that the converted

6    contracts conform with state law both in the present and into the future. (*See* Doc. 150 at 18–19

7    (explaining the ways an EIS might have included discussion of possible conflicts between the

8    action of converting the contracts and state law, including the goals of the Delta Reform Act, Cal.

9    Water Code § 85021).) This latter assertion reads too much into the state law savings clause, the

10    plain language of which merely reiterates a common thread running through all of Reclamation

11    law—that federal water projects generally must conform to state law. (*See* Doc. 145 at 29); 43

12    U.S.C § 383 (requiring Reclamation to "proceed in conformity with" state law "relating to the

13    control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired

14    thereunder").

15    Plaintiffs make a related argument regarding California's public trust doctrine, the origins

16    of which were explained by the California Supreme Court in *National Audubon Society v.*

17    *Superior Court*, 33 Cal. 3d 419 (1983):

18        "By the law of nature these things are common to mankind—the air,
     running water, the sea and consequently the shores of the sea."
19        (Institutes of Justinian 2.1.1.) From this origin in Roman law, the
     English common law evolved the concept of the public trust, under
20        which the sovereign owns "all of its navigable waterways and the
     lands lying beneath them 'as trustee of a public trust for the benefit
21        of the people.' " The State of California acquired title as trustee to
     such lands and waterways upon its admission to the union; from the
22        earliest days its judicial decisions have recognized and enforced the
     trust obligation.

23

24    *Id*. at 433–34 (internal citations and quotations omitted). All entities holding appropriative state

25    water rights, including the Bureau, "hold those rights subject to the trust, and can assert no vested

26    right to use those rights in a manner harmful to the trust." *Id*. at 437. California "has an

27    _____

28    contracts would run afoul of any state law, Plaintiffs cite (*see* Doc. 150 at 18–19) NEPA implementing regulations
     contained within 40 C.F.R. that have since been removed from the Code of Federal Regulations. (*See supra* note 14.)

1     affirmative duty to take the public trust into account in the planning and allocation of water

2     resources, and to protect public trust uses whenever feasible." *Id.* at 446. Plaintiffs argue that

3     "locking in water quantities forever would destroy the application of the public trust doctrine to

4     the allocation of the public trust water resources" which would be "contrary to section

5     4012(a)(1)." (Doc. 170 at 23.) But Plaintiffs' argument about the public trust doctrine comes from

6     an awkward procedural position. They do not contend that the converted contracts as currently

7     framed presently run afoul of the public trust doctrine.[30] Rather, they make the more roundabout

8     argument that any interpretation of the WIIN Act that would preclude environmental review prior

9     to contract conversion "preempts or modifies" Reclamation's obligation to act in conformity with

10    the public trust doctrine.

11         This Court's ruling in *AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969,

12    1061 (E.D. Cal. 2018), explains that completing a formal environmental review that discusses the

13    public trust doctrine <u>can</u> "suffice to show that an agency has considered public trust issues." Yet

14    such formal environmental review is not the only way an agency can demonstrate that its actions

15    are consistent with the public trust. *Id.* By analogy, failing to perform a formal environmental

16    review does not necessarily mean an action is inconsistent with the public trust doctrine. This is

17    all to say that Plaintiffs cannot use the existence of the public trust and the possibility that formal

18    environmental review would reveal public trust violations to demonstrate that the formal

19    environmental reviews are required here.

20                              e.     *Additional Adverse Effects Prohibition*

21         WIIN Act § 4012(a)(4) prohibits interpreting or implementing the WIIN Act in a manner

22    that:

23                   would cause additional adverse effects on listed fish species beyond
                     the range of effects anticipated to occur to the listed fish species for
24                   the duration of the applicable biological opinion, using the best
                     scientific and commercial data available.

25         Plaintiffs again argue that it is the preparation of an EIS and/or BiOp that "provides the

26    informed analysis enabling determination of whether contract terms and conditions would cause

27    _____

28    [30] As this Court has explained previously, "it is possible to maintain a direct cause of action against an agency for
      violating the public trust doctrine." *AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1060 (E.D. Cal.
      2018) (citing *San Francisco Baykeeper, Inc. v. California State Lands Comm'n*, 242 Cal. App. 4th 202 (2015)).

additional adverse effects and whether alternatives could avoid those effects." (Doc. 150 at 18.)
This argument misses what is the more obvious purpose of this provision—to prevent any of the
many operations-related provisions of the WIIN Act from undermining the protections set forth in
the "applicable biological opinion," which plainly is a reference to whatever biological opinion is
currently in force regarding project operations. This usage is repeated elsewhere in the WIIN Act,
such as in § 4002(a):

> In implementing the provisions of the smelt biological opinion and
> the salmonid biological opinion, the Secretary of the Interior and the
> Secretary of Commerce shall manage reverse flow in Old and Middle
> Rivers at the most negative reverse flow rate allowed under the
> applicable biological opinion to maximize water supplies for the
> Central Valley Project and the State Water Project, unless that
> management of reverse flow in Old and Middle Rivers to maximize
> water supplies would cause additional adverse effects on the listed
> fish species beyond the range of effects anticipated to occur to the
> listed fish species for the duration of the applicable biological
> opinion, or would be inconsistent with applicable State law
> requirements, including water quality, salinity control, and
> compliance with State Water Resources Control Board Order D–
> 1641 or a successor order.

Both Plaintiffs and Reclamation point to President Obama's signing statement related to
the WIIN Act. (Doc. 170 at 36–37; Doc. 179 at 18); Statement on Signing the [WIIN] Act, 2016
Daily Comp. Pres. Doc. 12 (Dec. 16, 2016). In relation to Subtitle J, that Statement makes no
mention of contracting, but rather focuses on operational instructions in the WIIN Act.

> Title III, Subtitle J, of the law has both short-term and long-term
> provisions related to addressing the continuing drought in California.
> In the long-term, it invests in a number of water projects to promote
> water storage and supply, flood control, desalination, and water
> recycling. These projects will help assure that California is more
> resilient in the face of growing water demands and drought-based
> uncertainty.

> Title III, Subtitle J, also includes short term provisions governing
> operations of the federal and state water projects under the
> Endangered Species Act for up to five years, regardless of drought
> condition. Building on the work of previous Administrations, my
> Administration has worked closely with the State of California and
> other affected parties to address the critical elements of California's
> complex water challenges by accommodating the needs and concerns
> of California water users and the important species that depend on
> that same water. This important partnership has helped us achieve a
> careful balance based on existing state and federal law. It is essential
> that it not be undermined by anyone who seeks to override that
> balance by misstating or incorrectly reading the provisions of

> Subtitle J. Consistent with the legislative history supporting these provisions, I interpret and understand Subtitle J to require continued application and implementation of the Endangered Species Act, consistent with the close and cooperative work of federal agencies with the State of California to assure that state water quality standards are met. This reading of the short-term operational provisions carries out the letter and spirit of the law and is essential for continuing the cooperation and commitment to accommodating the full range of complex and important interests in matters related to California water.

The signing statement is consistent with an interpretation of this and the ESA savings clause as being focused on the "short term operational provisions" of the WIIN Act. These savings clauses therefore have little bearing on the interpretive question presented in this case.

### 7.    Actions Inconsistent with Interpretation?

Plaintiffs urge the Court to disfavor Reclamation's interpretation of the WIIN Act § 4011 by arguing that Reclamation has acted contrary to its own interpretation of the statute by "materially" changing the terms of water service during the contract conversion process. (Doc. 170 at 8.) As examples of this, Plaintiffs focus on Articles 2(a), 2(b), 3(e), 26, and 28.

#### a.    *Articles 2(a), 2(b)*

Westlands' pre-conversion water service contract contained the following language at Article 2(a):

> Except as provided in subdivision (b) of this Article, *until completion of all appropriate environmental review*, and provided that the Contractor has complied with all the terms and conditions of the interim renewal contract in effect for the period immediately preceding the requested successive interim renewal contract, this Contract will be renewed, upon request of the Contractor, for successive interim periods each of which shall be no more than two (2) Years in length.

(JSUF Ex. 2, (Doc. 143 at 115 (emphasis added)); *see also* Article 2(b) from the same document (Doc. 143 at 116) (discussing process for completing environmental review prior to long-term water service contract renewal)[31].) This language was eliminated from the converted Westlands

---

[31] Article 2(b) provides in full:

> The parties have engaged and if necessary will continue to engage in good faith negotiations intended to permit the execution of a twenty-five (25) Year long-term renewal contract contemplated by Section 3404 (c) of the CVPIA, herein after referred to as a long-term renew al contract. The parties recognize the possibility that this schedule may not be met without further negotiations In the event (i) the Contractor and Contracting Officer have reached agreement on the

1    WIIN Act contract.

2         These changes, according to Plaintiffs, are contrary to Reclamation's claim that it did not

3    and could not modify the provisions of the pre-existing contracts when it converted the contracts.

4    (Doc. 170 at 10.) Plaintiffs also point out that these provisions sit within a section of the water

5    service contract titled "TERM OF CONTRACT—RIGHT TO USE OF WATER." (Doc. 183-1 at

6    4; Doc. 143 at 115.) Plaintiffs thereby suggest that Article 2(a)'s language about completion of all

7    appropriate environmental review is a substantive term of the contractor's water right. Given the

8    content of Article 2(a), it seems far more logical to interpret this provision as a term related to the

9    "term of [the] contract," which the WIIN Act specifically requires Reclamation to omit because

10   WIIN Act repayment contracts are statutorily required to have no term. *See* WIIN Act

11   § 4011(a)(2)(D). The Court therefore agrees with Reclamation (*see* Doc. 179 at 16) that the

12   omitted language in Articles 2(a) and 2(b) did not proscribe the terms of water service. Instead,

13   those Articles addressed the term of the contracts and related procedures pursuant to NEPA and

14   the ESA which, according to Reclamation's interpretation of the WIIN Act, are no longer

15   applicable. Thus, the omission of this language is consistent with—not contrary to—

16   Reclamation's interpretation of the WIIN Act.

17                   b.    *Article 3(e)*

18        Relatedly, Article 3(e) in both the Westlands' and El Dorado's pre-existing water service

19   contracts stated:

20        The Contractor shall comply with requirements applicable to the
         Contractor in biological opinion(s) *prepared as result of a*
21

22   ───────────────────────────

     terms of the Contractor's long-term renewal contract or (ii) the Contractor and Contracting Officer
23   have not completed the negotiations on the Contractor's long-term renewal contract, believe that
     further negotiations on that contract would be beneficial, and mutually commit to continue to
24   negotiate to seek to reach agreement, but (iii) all environmental documentation required to allow
     execution of the Contractor's long-term renewal contract by both parties has not been completed
25   in time to allow execution of the Contractor's long-term renewal contract by February 28, 2010,
     then (iv), the parties will expeditiously complete the environmental documentation required of
26   each of them in order to execute the Contractor's long-term renewal contract at the earliest
     practicable date. In addition, the Contractor's then current interim renewal contract will be
27   renewed without change upon the request of either party through the agreed-upon effective date of
     the Contractor's long-term renewal contract or, in the absence of agreement on the terms of the
28   Contractor's long-term renewal contract, through the succeeding February 28.

     (Doc. 143 at 116–17.)

                                            60

> *consultation regarding the execution of this Contract* undertaken pursuant to Section 7 of the Endangered Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to implement.

(Doc. 143 at 120. (emphasis added); Doc. 143-1 at 71.) This language appears again in the El Dorado converted WIIN Act repayment contract, (Doc. 143-1 at 16), but was modified in the Westlands converted WIIN Act repayment contract to:

> The Contractor shall comply with requirements applicable to the Contractor in biological opinion(s) prepared as a result of a consultation regarding the execution of any water service contract between the Contracting Officer and the Contractor in effect immediately prior to the Effective Date of this Contract undertaken pursuant to Section 7 of the Endangered Species Act of 1973 (ESA), as amended, that are within the Contractor's legal authority to implement."

(Doc. 143 at 34.)

Plaintiffs contend that, at least for Westlands' contracts, the shift in the language used in Article 3(e) represented a material change in the contract by eliminating the requirement for pre-execution ESA review. (Doc. 170 at 31.) Reclamation provides a much more nuanced explanation for these contractual provisions:

> Article 3(e) of the prior contracts did not require Reclamation to *perform* ESA Section 7 consultation prior to contract execution, but rather bound the contractors to any requirements applicable to them as a result of any applicable ESA consultation. Westlands' converted contract, like those of other contractors who converted interim renewal contracts rather than long term contracts, includes language in Article 3(e) which has the same effect as that in Article 3(e) of El Dorado's contract: it continues to bind the contractor to BOs applicable to their respective prior contract. Further, all relevant CVP contracts continue to be subject to the present Biological Opinion addressing long term operations of the Project through the Constraints on the Availability of Water (shortage) provisions generally found in Article 11 of the contracts and will continue to be subject to any future Biological Opinions done on long term project operations.

(*See* Doc. 180 at 3–4; Doc. 179 at 6 n.1 (emphasis added).) In other words, Article 3(e) is not a contractual requirement to perform ESA consultation; rather, it requires the contractor to abide by any ESA consultation that resulted from a consultation required by law. The Court concludes this is the most sensible reading of Article 3(e). In the pre-existing water service contracts,

1  recognizing that some form of ESA consultation was then required, Article 3(e) requires the

2  contractor to "comply with requirements applicable to the Contractor in biological opinion(s)

3  *prepared as result of a consultation regarding the execution of this Contract*." (Doc. 143 at 120.

4  (emphasis added); Doc. 143-1 at 71.) In Westlands' converted WIIN Act contract, given

5  Reclamation's assumption that ESA consultation would not be required, the language was

6  changed to ensure that the terms of any pre-conversion consultation would continue to apply.

7  (Doc. 143 at 34.)

8          Plaintiffs make an argument in their sur-reply related to this reading of Article 3(e). They

9  suggest Reclamation is drawing an artificial distinction between "substantive terms of the

10  contract other than payment terms," which Reclamation asserts cannot be modified per WIIN Act

11  § 4011(a)(4)(C), and those that "address procedures pursuant to NEPA and the ESA." (Doc. 183-

12  1 at 3 (citing Doc. 179 at 16 & 15 n. 5).) Plaintiffs are correct that WIIN Act § 4011(a)(4)(C) does

13  not draw a distinction between "substantive" and "procedural" "contractual rights," but this only

14  makes a material difference if <u>Plaintiffs</u>' interpretation of Article 3(e) is correct. In other words, if

15  Article 3(e) is read as a contractual requirement to perform ESA review, then modifying any such

16  <u>contractual</u> requirement for ESA consultation arguably modifies a "water service contractual

17  right" because ESA consultation would be a pre-existing contractual condition on the delivery of

18  water. (*See* Doc. 186 at 4.) For the reasons set forth above, the Court does not adopt Plaintiffs'

19  interpretation, so this related argument is also unpersuasive.[32]

20                  8.    <u>Article 26</u>

21          Article 26(a) of the pre-existing water service contracts required that "[p]rior to the

22  delivery of water provided . . .  pursuant to *this Contract*, the Contractor *shall be implementing* an

23  effective water conservation and efficiency program." (Doc. 143 at 152; Doc. 143-1 at 93.) This

24  requirement was moved to Article 25 in the Converted WIIN Act Repayment Contracts and

25  modified to provide that "Prior to the delivery of water provided … pursuant to *this Contract*, the

26

27  ─────────────────
[32] The Court's conclusion on this point is not disturbed by the fact that Article 3(e) sits within a section of the
28  contracts entitled "WATER TO BE MADE AVAILABLE AND DELIVERED TO THE CONTRACTOR." (See
Doc. 143 at 117, 120–21.) Reclamation's offered interpretation of the contractual provision makes the most sense
under the circumstances, regardless of the title of that section of the contracts.

1    Contractor *shall develop* a water conservation plan … ." (Doc. 143 at 68; Doc. 143-1 at 43.)

2    Plaintiffs again argue this was a material change the making of which runs contrary to

3    Reclamation's interpretation of WIIN Act § 4011(a)(4)(C). (Doc. 170 at 9.)

4         Reclamation responds by first acknowledging that this term "is arguably related to water

5    service," but maintaining that "the converted contracts did not materially change the application

6    of water conservation plans to the delivery of project water" because "under both the prior and

7    the converted contracts '[c]ontinued Project Water delivery pursuant to th[e] Contract shall be

8    contingent upon the Contractor's continued implementation of such water conservation program."

9    (Doc. 179 at 16; *compare* Doc. 143 at 152 (Westlands' pre-existing water service contract) *with*

10    Doc. 143 at 68 (Westlands' converted WIIN Act contract); and Doc. 143-1 at 93 (El Dorado's

11    pre-existing water service contract) *with* Doc. 143-1 at 43 (Westlands' converted WIIN Act

12    contract).) In addition, Reclamation points out that the change to language requiring

13    "development" of a conservation plan rather than "implementing" a conservation plan merely

14    conforms the contracts to the statutory language. *See* 43 U.S.C. § 390jj(b) (each contracting

15    district "shall develop a water conservation plan").

16              9.    Article 28

17         Finally, Plaintiffs complain that Reclamation eliminated detailed requirements and

18    procedures pertaining to pumping facilities that had been in Article 28 of Westlands' previous

19    contracts. (Doc. 170 at 9.) Plaintiffs make this argument in passing without developing it or

20    specifically identifying the key omitted language. The Court has reviewed these provisions and

21    agrees with Reclamation (Doc. 179 at 16) that any language omitted from Article 28 addresses

22    obligations of various parties to operate and maintain pumping facilities. These do not relate to

23    terms of water service such as the timing and quantity of water delivery through those facilities.

24    (*Compare* Art. 28.3 Westlands' pre-existing water service contract at Art. 28.3 (Doc. 143 at 160–

25    64) (discussing contractor's and Reclamation's respective responsibilities and rights regarding

26    installation and maintenance of pumping equipment and related issues) *with* Westlands' WIIN

27    Act Repayment Contract Art. 28.3 (Doc. 143 at 77–78).)

28    ///

1

**C.    Synthesis**

2          Given the layered complexity of the multiple statutory schemes at issue it is easy to lose

3    track of the central issues in this case. In the context of the ESA Section 7 claim, the question is

4    whether Reclamation's obligations under the WIIN Act regarding contract conversion make it

5    "impossible for the agency to exercise discretion for the protected species' benefit."

6          As the Court explained above, Plaintiffs initially focus on the "mutually agreeable terms

7    and conditions" language in WIIN Act § 4011(a)(1) as proof that Congress intended for

8    Reclamation to retain negotiating discretion, but Reclamation has persuasively argued that this

9    language is constrained by the other parts of that sentence, which require Reclamation to convert,

10   upon request, "any water service contract . . . to allow for prepayment of the repayment contract

11   pursuant to paragraph (2) under mutually agreeable terms and conditions." Paragraph 2, WIIN

12   Act § 4011(a)(2), in turn requires converted repayment contracts "to provide for" accelerated

13   repayment. Crucially, WIIN Act § 4011(a)(4) further constrains the way Reclamation may

14   structure these converted contracts, by, among other things, precluding Reclamation from

15   modifying "other water service, repayment, exchange and transfer contractual rights between the

16   water users' association, and the Bureau of Reclamation, or any rights, obligations, or

17   relationships of the water users' association and their landowners as provided under State law."

18         The more crucial debate is over how § 4011(a)(4) operates. At first glance, the immediate

19   statutory language is facially amenable to both interpretations offered by the parties, but

20   Plaintiffs' interpretation–that "other water service, repayment, exchange and transfer contractual

21   rights" refers to contracts other than the ones being converted (or rights set forth in those other

22   contracts) does not make practical sense, as it assumes without any support that the conversion

23   taking place under § 4011 <u>could</u> somehow modify other, already executed contracts. In contrast,

24   Reclamation's interpretation is consistent with the other commands of § 4011, which detail the

25   terms Reclamation must include in the converted contracts, making it logical to conclude that

26   § 4011(a)(4) precludes modification of other pre-existing contractual terms. This conclusion is

27   also consistent with the statute's overall purpose to encourage conversion so that funds will be

28   available to complete other water storage projects.

1        Plaintiffs' various arguments about why Reclamation's interpretation is inconsistent with

2    other provisions of the WIIN Act, including its savings clauses, are not compelling. The savings

3    clauses do not undermine Reclamation's interpretation. The CVPIA savings clause, WIIN Act

4    § 4012(a)(2) prohibits "interpret[ation] or implement[ation]" of the WIIN act "in a manner that

5    . . . affects or modifies any obligation under the [CVPIA], except for the savings provisions for

6    the Stanislaus River predator management program expressly established by [WIIN Act] section

7    11(d) and provisions in section 11(g)." As discussed, the CVPIA does not contain any obligations

8    that conflict with Reclamation's interpretation, most notably because the most likely source of

9    such an obligation, CVPIA § 3404(c)(1) is limited by its terms to water service contracts being

10    renewed for 25-year terms. As mentioned, while "appropriate environmental review" is required

11    for renewals of <u>water service</u> contracts for successive <u>25-year terms</u> under CVPIA 3404(c)(1), the

12    WIIN Act sets up a separate track for conversion of water service contracts into permanent

13    repayment contracts, a process that does not fall within the scope of § 3404(c)(1)'s explicit terms.

14    The other savings clauses do not move the needle for the reasons explained above.

15        Relatedly, WIIN Act § 4011(d)(4), appears to be largely inapposite to the claims in this

16    case, which challenge Reclamation's failure to comply with NEPA and the ESA. Rather, WIIN

17    Act § 4011(d)(4), provides that "[i]mplementation of the provisions of [Subtitle J] shall not alter .

18    . . except as expressly provided in [§ 4011], any obligations under the reclamation law . . . *of the*

19    *water service and repayment contractors* making prepayments pursuant to this section."

20    (Emphasis added.) Even assuming § 4011(d)(4) applies to the present claims, it again

21    incorporates by reference "obligations under the reclamation law." Plaintiffs' contention that the

22    CVPIA imposes obligations to perform environmental review on the contract conversions is not

23    supported by the text of the CVPIA for the reasons explained in the Court's analysis of the

24    CVPIA savings clause.

25        Finally, Plaintiffs have pointed to numerous changes Reclamation did make to the terms

26    of the converted contracts as examples of Reclamation acting inconsistent with its own

27    interpretation of § 4011(a)(4)(c). However, these do not amount to material changes to "water

28    service . . . .contractual rights."

1    In sum, Reclamation's interpretation of § 4011(a)(4)(c) is the only sensible one that has

2    been offered to the Court. It is consistent with the policy underpinning the WIIN Act and is not

3    inconsistent with the WIIN Act's other provisions, notwithstanding the WIIN Act's various

4    savings clauses. The Court therefore agrees with and adopts Reclamation interpretation that (1)

5    the WIIN Act requires contract conversion upon request, and (2) WIIN Act § 4011(a)(4)(c) strips

6    reclamation of discretion to modify any "water service . . . .contractual rights" other than those

7    related to the financial terms specifically addressed by the WIIN Act. Unlike in *Jewell*, where the

8    Ninth Circuit suggested Reclamation retained some discretion to re-negotiate the Sacramento

9    River Settlement Contracts' terms regarding "their pricing scheme," no party suggests that the

10   WIIN Act offers such flexibility. *See* WIIN Act § 4011(a)(2)(setting forth the "contract

11   requirements" including a limited number of options for the timing of repayment). This makes it

12   "impossible for the agency to exercise discretion for the protected species' benefit," meaning that

13   Section 7 of the ESA does not apply to the contract conversion process.

14       Plaintiffs repeatedly suggest that the language of § 4011(a)(4)(c) is not clear enough to

15   "repeal by implication" the various statutes that otherwise would impose environmental review

16   upon the contract conversion process. (*See* Doc. 170 at 1–19 (arguing that Defendants must

17   "prove to this Court a clear and manifest intention by Congress to repeal by the WIIN Act, the

18   CVPIA, NEPA, and ESA requirements for NEPA and ESA review of proposed water

19   contracts").) But, as discussed above, the ESA implementing regulations limit Section 7's

20   application to "'actions in which there is discretionary Federal involvement or control.'" *Home

21   Builders*, 551 U.S. at 666 (quoting 50 C.F.R. § 402.03). A long line of Ninth Circuit cases has

22   interpreted the scope of that regulation without adding on a layer of additional analysis from the

23   "repeal by implication" caselaw, and this Court declines to do so. Applying *Home Builders* and

24   50 C.F.R. § 402.03, as interpreted by *Karuk Tribe*, 681 F.3d at 1019–20, and *NRDC v. Jewell*,

25   749 F.3d at 784, the Court must focus on the language of § 4011(a)(4)(c) and determine whether

26   that obligation "makes it *impossible* for the agency to exercise discretion for the protected

27   species' benefit." *Jewell*, 749 F.3d at 784 (internal citation omitted) (emphasis added). This is

28   dispositive of the NEPA analysis as well because where there is no "agency action" under "what

is probably the more liberal standard of the ESA, there is no 'major federal action' under the more exclusive standard of NEPA." *Cascadia Wildlands*, 105 F.4th at 1150 (9th Cir. 2024).

The Court understands why Plaintiffs appear to be flabbergasted by the result here. Ultimately, the Court must conclude that this monumental policy shift is one that Congress deliberately created by wording the WIIN Act as it did.

**D.    Remedies Arguments**

Because the Court concludes that Plaintiffs are not entitled to summary judgment, the Court does not address the remedies arguments raised in the papers.

**V.    CONCLUSION**

For the reasons set forth above:

(1) In *Center for Biological Diversity, et al., v. U.S. Bureau of Reclamation*, Case. No. 1:20-cv-00706 JLT EPG:

    (a)    Federal Defendants' and Contractor Defendants' motions for summary judgment are GRANTED.

    (b)    Plaintiffs' motion for summary judgment is DENIED.

    (c)    Within fourteen days of the date of this order, Federal Defendants and Contractor Defendants are directed to cooperate on the preparation of and then submit a proposed form of order entering judgment in accordance with this order.

(2) In *North Coast Rivers Alliance, et al., v. United States Department of the Interior*, et al., Case. No. 1:16-cv-00307 JLT EPG:

    (a)    Pursuant to the parties' adoption of the briefing in *CBD* for overlapping claims, the above order disposes of the first and second causes of action.

    (b)    The Court will address the remaining claims by separate order.

    (c)    The case shall remain **OPEN**.

IT IS SO ORDERED.

Dated:   **June 29, 2025**

UNITED STATES DISTRICT JUDGE